No. 24-1707

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

NETLIST, INC.,

*Appellant,*

v.

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY INC., MICRON
SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY TEXAS, LLC,

*Appellees.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, Nos. IPR2022-00639, IPR2023-00204

### OPENING BRIEF FOR APPELLANT NETLIST, INC.

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Elizabeth Kathleen Clarke
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700

Blair A. Silver
 *Counsel of Record*
IRELL & MANELLA LLP
750 17th Street, N.W., Suite 850
Washington, D.C.  20006
(202) 777-6500
bsilver@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

*Counsel for Appellant Netlist, Inc.*
*(Additional Counsel Listed on Inside Cover)*

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

*Counsel for Appellant Netlist, Inc.*

## REPRESENTATIVE PATENT CLAIM

U.S. Patent No. 10,949,339, Claim 1

[pre]  A N-bit-wide memory module mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide, the memory module comprising:

[a]  a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and configured to be releasably coupled to corresponding contacts of the memory socket;

[b]  double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks;

[c]  a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, wherein the module controller is configurable to receive from the memory controller via the address and control signal lines input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals, wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals; and

[d]  a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals, wherein each respective byte-wise buffer of the plurality of byte-wise buffers has a first side configured to be operatively coupled to a respective set of data signal lines, a second side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side, wherein the each respective byte-wise buffer is disposed on the PCB at a respective

position corresponding to the respective set of the plurality of sets of data signal lines;

[e]  wherein the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals, wherein the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period; and

[f]  wherein the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period.

**FORM 9. Certificate of Interest**                                    Form 9 (p. 1)
                                                                      March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1707 |
| **Short Case Caption** | Netlist, Inc. v. Samsung Electronics Co., Ltd. |
| **Filing Party/Entity** | Netlist, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/15/2024          Signature:  /s/ Jeffrey A. Lamken

                         Name:      Jeffrey A. Lamken

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Netlist, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest                                          Form 9 (p. 3)
                                                                          March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| Philip Warrick<br>Irell & Manella LLP | | |
| Jonathan M. Lindsay<br>Irell & Manella LLP | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF THE ISSUES.................................................................4

STATEMENT OF THE CASE.....................................................................4

I.      Technological Background.................................................................4

        A.      Conventional Server Memory Modules ................................5

        B.      Netlist Expands Server Memory Capacity but Confronts Load
                and Noise Problems That Reduce Performance....................9

II.     Netlist's '339 Patent Overcomes Load and Noise Problems ......................12

III.    Procedural History .........................................................................17

        A.      The Asserted Prior Art .......................................................18

                1.      Ellsberry .................................................................18

                2.      Halbert....................................................................21

        B.      The PTO Allows the Claims over Ellsberry and Halbert...................22

        C.      This IPR Proceeding...........................................................24

                1.      Enabling Data Paths (Limitations 1[e.1] & 1[f]).....................24

                2.      Enabling Data Paths for a First Time Period According to
                        a Latency Parameter (Limitation 1[e.2])..................................28

                3.      Claims 7, 16, and 21 ................................................31

SUMMARY OF ARGUMENT .................................................................31

STANDARD OF REVIEW ......................................................................34

ARGUMENT ............................................................................................. 35

I.    The Board's Determination That Ellsberry Teaches Enabling Data
      Paths Using a Latency Parameter (Limitation 1[e.2]) Cannot Be
      Sustained ....................................................................................... 37

      A.    The Board Erred in Determining That Ellsberry Controls Data
            Paths Based on a Latency Parameter ................................... 38

      B.    The Board Erred by Invoking the '537 Patent To Teach
            Enabling the Data Path at the Required Time ..................... 44

            1.    The Board's Reliance on the '537 Patent Was
                  Impermissible ............................................................ 45

            2.    The Board Failed To Show That Skilled Artisans Would
                  Combine the '537 Patent with Ellsberry ................... 49

II.   The Board's Conclusion That the Prior Art Discloses Enabling a Data
      Path (Limitations 1[e.1] & 1[f]) Cannot Be Sustained .................. 51

      A.    The Board Erred in Determining That Ellsberry's Disclosure of
            Enabling Ports Teaches Enabling the Claimed Data Paths ........ 52

            1.    The Board's Determination That Enabling and Disabling
                  Ports Involves Enabling and Disabling Data Paths Is
                  Unsupported by Substantial Evidence or Reasoned
                  Decisionmaking ......................................................... 54

            2.    The Board Misapprehended Ellsberry ....................... 59

      B.    The Board Failed To Explain Its Departure from the Patent
            Office's Prior Determination ................................................ 62

      C.    Ellsberry Teaches Away from the Asserted Combination ........ 63

III.  The Board's Decision on Other Limitations and Claims Was
      Unexplained ....................................................................................... 66

      A.    The Board's Unreasoned Analysis of "Undisputed" Claims
            and Limitations Requires Remand ....................................... 66

B.    The Board Failed To Address Netlist's Arguments on Claims 7, 16, and 21 ........................................................................................... 67

CONCLUSION ................................................................................................. 69

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott Labs. v. Novopharm Ltd.*,
   323 F.3d 1324 (Fed. Cir. 2003) ........................................................... 61

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012) .......................................................... 50

*Alacritech, Inc. v. Intel Corp.*,
   966 F.3d 1367 (Fed. Cir. 2020) ..................................................... 67, 69

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
   522 U.S. 359 (1998) ............................................................................ 41

*Anacor Pharms., Inc. v. Iancu*,
   889 F.3d 1372 (Fed. Cir. 2018) .......................................................... 47

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017) ............................................... 63, 64, 66

*Arendi S.A.R.L. v. Apple Inc.*,
   832 F.3d 1355 (Fed. Cir. 2016) .......................................................... 49

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ..................................................... 56, 58

*Chemours Co. v. Daikin Indus., Ltd.*,
   4 F.4th 1370 (Fed. Cir. 2021) ....................................................... 64, 66

*Corephotonics, Ltd. v. Apple Inc.*,
   84 F.4th 990 (Fed. Cir. 2023) ............................................................ 46

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) .......................................................... 61

*FanDuel, Inc., v. Interactive Games, LLC*,
   966 F.3d 1334 (Fed. Cir. 2020) .......................................................... 42

*In re Fritch*,
   972 F.2d 1260 (Fed. Cir. 1992) .......................................................... 48

iv

*Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*,
    825 F.3d 1360 (Fed. Cir. 2016) ............................................................47

*Google Inc. v. Intell. Ventures II, LLC*,
    701 F. App'x 946 (Fed. Cir. 2017) .......................................................57

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966) ..................................................................................35

*In re Hedges*,
    783 F.2d 1038 (Fed. Cir. 1986) ............................................................59

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017) ..............................................36, 66, 67

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ............................................................47

*Johnson v. Merit Sys. Prot. Bd.*,
    No. 2023-1996, 2024 WL 2290014 (Fed. Cir. May 21, 2024)...........67

*K/S Himpp v. Hear-Wear Techs., LLC*,
    751 F.3d 1362 (Fed. Cir. 2014) ............................................................48

*Koninklijke Philips N.V. v. Google LLC*,
    948 F.3d 1330 (Fed. Cir. 2020) .....................................................45, 49

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ............................................................48

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) .............................................41, 49, 55

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) ............................................................42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto Ins. Co.*, 463 U.S. 29 (1983) ...............................................39, 41

*In re Nuvasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) ............................................................34

*OSI Pharms., LLC v. Apotex, Inc.*,
    939 F.3d 1375 (Fed. Cir. 2019) .......................................................41

*Pers. Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017) ...................................................35, 49

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2015) .......................................................61

*Provisur Techs., Inc. v. Weber, Inc.*,
    50 F.4th 117 (Fed. Cir. 2022) .....................................51, 66, 67, 69

*Rembrandt Diagnostics, L.P. v. Alere, Inc.*,
    76 F.4th 1376 (Fed. Cir. 2023) ........................................................46

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 (2018)...........................................................................45

*Sirona Dental Sys. GmbH v. Institut Straumann AG*,
    892 F.3d 1349 (Fed. Cir. 2018) .......................................................45

*TQ Delta, LLC v. CISCO Sys., Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) .................................................50, 51

*In re Van Os*,
    844 F.3d 1359 (Fed. Cir. 2017) .......................................................50

*Vicor Corp. v. SynQor, Inc.*,
    869 F.3d 1309 (Fed. Cir. 2017) .......................................................63

*VirnetX Inc. v. Cisco Sys., Inc.*,
    776 F. App'x 698 (Fed. Cir. 2019) ............................................67, 69

*Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*,
    97 F.4th 882 (Fed. Cir. 2024) ..........................................................34

## STATUTES

28 U.S.C. § 1295(a)(4)(A).....................................................................4

35 U.S.C. § 6 ...........................................................................................4

35 U.S.C. § 318(a) ..................................................................................4

35 U.S.C. § 103 .................................................................................2, 35

35 U.S.C. § 141(c) .................................................................................4

35 U.S.C. § 319 .....................................................................................4

## OTHER AUTHORITIES

*About Netlist*, https://netlist.com/about/ (last accessed Oct. 15, 2024) .....................9

## STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court.  The following cases may directly affect or be directly affected by this Court's decision in the pending case: *Netlist, Inc. v. Samsung Electronics Co., Ltd., et al.*, No. 2:21-cv-00463 (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc., et al.*, No. 2:22-cv-00203 (E.D. Tex.); and *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 24-2203 (Fed. Cir.) (appeal from No. 2:21-cv-00463 (E.D. Tex.)).  In addition, on September 12, 2024, this Court ordered that this appeal and the following related appeals be treated as companion cases and assigned to the same merits panel: Nos. 2024-1859, 2024-1863, 2024-2203, 2024-2240, and 2024-2241.  ECF No. 23.

## INTRODUCTION

Modern servers require large amounts of memory and processing power to accommodate vast numbers of users and new demanding application features, such as those involving artificial intelligence.  A leader in memory technology, Appellant Netlist, Inc. developed revolutionary memory modules to increase server memory capacity and speed.

This appeal concerns Netlist's patented technology for "Load-Reduced Dual Inline Memory Modules" ("LRDIMMs"), which Netlist developed at the behest of server makers such as HP and Dell.  Computer makers had increased server memory capacity by adding more dynamic random access memory ("DRAM") devices to each memory module and adding more memory modules to each server. But connecting so many memory devices to the memory bus—the data lines that transmit signals between the server's CPU and the memory—created problems with electrical "load" and noise, distorting the data signals and reducing the speed at which the memory could reliably operate.

Netlist overcame load and noise problems by adding a plurality of "buffers" to each memory module that electrically isolate DRAM devices from the memory bus until the DRAM devices are accessed.  At that moment, the buffer connects the DRAM device to the memory bus to "drive" data from the memory bus to the DRAM device, or vice versa.  Netlist obtained a patent on its technology, U.S.

1

Patent No. 10,949,339 (the '339 patent).  Netlist's technology was widely adopted by manufacturers of the industry's "DDR4 LRDIMM" memory modules.  As relevant here, the challenged claims require: (1) that a buffer ***data path*** "is enabled" to connect DRAM devices to the memory controller during a write operation (limitations 1[e.1] & 1[f]); and (2) that the buffer data path "is enabled . . . in accordance with a ***latency parameter***" such that the data path is enabled at the correct time to drive data from the memory bus to the DRAM device (limitation 1[e.2]).

The Board found the challenged claims of the '339 patent obvious under 35 U.S.C. § 103 based on two references, Ellsberry and Halbert.  The Board's determination that Ellsberry teaches the "enabling" requirement, limitation 1[e.1], is unsupported by reasoned decisionmaking or the record.  The Board found that Ellsberry's disclosure of enabling "ports," which concededly are not the claimed data paths, taught that limitation.  The Board failed to explain why enabling ports teaches enabling data paths; it pointed to nothing in Ellsberry to support its assumption.  The Board also dismissed undisputed expert testimony:  Samsung's expert in this IPR admitted that Ellsberry is silent on how ports are enabled, while its expert in another IPR (also involving Ellsberry) testified that enabling ports does not involve enabling data paths.  The Board also overlooked Ellsberry's consistent disclosure equating "ports" with groups of DRAM devices ("memory

banks"). Enabling memory banks undisputedly does not teach the claims. Finally, the Board failed to address Netlist's argument that Ellsberry teaches away from the claimed invention.

The Board's determination that Ellsberry teaches the "timing" requirement, limitation 1[e.2], is equally unsound. The Board conceded Ellsberry did not mention using timing information to control its "switch ASICs" (the putative buffers containing the putative data paths). But the Board assumed Ellsberry *must* work that way because it mentions a timing-related data value in discussing how the memory controller initializes DRAM devices. Taking such illogical leaps is not reasoned decisionmaking. The Board pressed on anyway: It conceded Ellsberry does not teach the particular timing requirements of limitation 1[e.2], so it invoked an unasserted reference, Netlist's '537 patent, to fill the gap. The Board's reliance on that unasserted reference was procedurally improper and substantively incorrect.

Finally, the Board made no effort to reconcile its decision with the Patent Office's findings in granting the '339 patent. During prosecution, Netlist successfully distinguished Ellsberry and Halbert. The Board, however, reached the opposite conclusion about what those references disclose, without explaining its change in position. It is the height of arbitrary and capricious agency action for the Patent Office to grant patent rights based on findings about the prior art, then take

3

away those rights based on diametrically opposed findings about the same prior art, without any attempt to reconcile those two views.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 6, 318(a). It issued a final written decision on October 18, 2023. Appx1-66. It denied rehearing on February 9, 2024. Appx67-86. Netlist appealed on April 11, 2024. Appx11595. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## STATEMENT OF THE ISSUES

1.    Whether the Board's determination that Ellsberry discloses enabling a data path "for a first time period according to a latency parameter," as the claims require, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

2.    Whether the Board's determination that Ellsberry discloses "enabling" a "data path," as the claims require, was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

3.    Whether the Board's unreasoned decision on other limitations requires vacatur.

## STATEMENT OF THE CASE

### I.    TECHNOLOGICAL BACKGROUND

Cloud computing has fundamentally changed how people use computers. People use personal devices, such as laptops and phones, for a vast array of tasks

4

that require enormous quantities of data and computational power—data and power those devices cannot themselves provide. Cloud computing overcomes that deficiency by allowing personal devices to access centralized servers in data centers that can store vast quantities of data and perform demanding computations, such as those required for artificial intelligence.

Servers used for cloud computing and AI require significant processing power to execute complex tasks, such as performing calculations. They also require vast quantities of memory to hold data used in those calculations or to "cache" data so it need not be placed in and retrieved from slower storage, such as hard drives. Appx4812-13; Appx9357.

***Processing*** power has doubled every eighteen months since the 1980s. Appx9357-58. But ***memory*** technology has struggled to keep up, in terms of capacity and speed. Appx9357-58. This appeal concerns Netlist's patented technology for increasing the speed of the high-capacity memory modules used throughout the server industry.

## A.    Conventional Server Memory Modules

Server memory is contained in "modules" that can be installed to expand the server's memory capacity. Appx109(1:27-36). A common type of memory module is the dual inline memory module ("DIMM").



Appx2051 (annotated).  A DIMM consists of a circuit board with dynamic random access memory ("DRAM") chips (green) mounted on it and a connector (yellow), with hundreds of electrical contacts, that plugs into the server's motherboard. Appx4820.  Wires (not shown) connect electrical contacts on the DRAM chips to electrical contacts on the connector, establishing continuous electrical pathways between the DRAM chips and the motherboard.  Appx4108.  Each DRAM chip has millions of data cells, each of which is identified by a unique "address." Appx4867-68.  Servers can store data in the DRAM chips (writing), or retrieve stored data (reading).  *See* Appx4868.

The image below shows how a memory module and DRAM chips on the module connect to the motherboard.  (The image shows one memory module, but a server will typically have several.)



Appx6237.  The memory controller (220, brown) communicates with the memory

modules.  Appx111(5:48-55); Appx109(1:27-31).  Here, the memory module has

18 DRAM chips, organized into two "ranks" or "banks" of 9 (green and cyan).

Appx4964-66; Appx111(5:48-51).  When reading and writing data, the memory

controller will read a fixed number of bits from (or write a fixed number of bits to)

an entire rank of DRAM devices at the same time.  Appx4964-65; Appx109(2:39-

44).

The memory controller is connected to the DRAM chips by "data lines"

(250, red).  Appx111(5:55-58).  The memory controller is also connected via

"control lines" (240, black) to a "register" chip (230, yellow).  Appx111(5:51-54);

Appx4108.  In the simplified image above, each line represents multiple data or

control lines. Together, the data and control lines are called a "memory bus." *See, e.g.*, Appx4870.

To read or write data, the memory controller sends a command over the control lines to the register (230, yellow) including the memory address of the data to be accessed. Appx4026-27; Appx4954-55; Appx111(5:51-55). The register then forwards the command and memory address to the DRAM chips. Appx111(5:51-55); Appx4954-55. The DRAM chips then send (or receive) the requested data to (or from) the memory controller over the data lines (250, red). Appx111(5:55-61); Appx4871-73.

The operation of the memory controller and DRAM chips is synchronized according to a "clock." *See, e.g.*, Appx115(14:15-18). Operations such as reading and writing data take place over several cycles of the clock. *See* Appx108; Appx2135. For example, the memory controller begins a read or write operation by sending a command to the memory module, which sends it to the DRAM chips. After receiving the command, the DRAM chip requires a certain number of clock cycles (the "CAS latency") before it expects to receive data on its data lines (for a write command) or begins sending data on its data lines (for a read command). Appx116(15:61-66). After that delay, the data is transmitted in a "burst" over several clock cycles. Appx2134-35. The memory module and memory controller

8

must strictly comply with timing requirements to avoid data loss.  Appx112(7:36-39).

Virtually all servers conform to standards promulgated by the industry organization "JEDEC."  Appx5143; Appx109(1:65-2:1).  JEDEC standards specify how memory controllers communicate with memory modules and DRAM chips, including wiring details and timing requirements.  Appx4883.  The standards ensure compatibility between servers, memory modules, and DRAM devices made by different manufacturers.  Appx4971.

## B.    Netlist Expands Server Memory Capacity but Confronts Load and Noise Problems That Reduce Performance

Netlist has been at the forefront of innovation in expanding memory capacity in server-based computing for almost 25 years.  Appx9937.  Netlist develops high-performance memory systems that are used by leading computer makers such as HP, IBM, and Samsung.  Appx8576; Appx9711; Appx9938-39.  Netlist's technology has been widely adopted by manufacturers of memory modules that comply with JEDEC standards.  *About Netlist*, https://netlist.com/about/ (last accessed Oct. 15, 2024); Appx9447; Appx9938-39.

Server memory capacity was long constrained by the amount of data that can be stored in a DRAM chip, which is limited by manufacturing technology.  Appx4960.  The industry has sought to increase total capacity by increasing the number of DRAM chips in each memory module.  Appx9357-58.  Netlist

9

developed technology to increase memory capacity by adding additional ranks of memory devices while maintaining compliance with existing standards. Appx1326.

While Netlist's technology increased memory capacity, adding more DRAM devices created new challenges. In a conventional memory system, each DRAM device is electrically connected to the memory controller's data lines. Appx110-11(4:61-5:3). Conventionally, each data line is connected to one DRAM chip from every rank on every memory module. Appx110-11(4:61-5:3). The image below, for example, shows a memory module with four ranks of memory chips (the rows): two ranks stacked underneath another two, with each rank having nine memory chips. All the memory chips in a column (*e.g.*, blue box below) are connected to one group of data lines (*e.g.*, red line below). In this example, the red data line is connected to four DRAM chips (green boxes), one DRAM chip from each of the four ranks. Each of the other data lines 250' are connected to four DRAM chips in their respective column. If the server had four such memory modules, each data line would be connected to four DRAM chips in each module, for a total of 16 DRAM chips. Appx111(5:12-16).



Appx99 (prior art, annotated).

Connecting numerous DRAM chips to a single data line creates problems. The first problem is "load." Memory controllers communicate with DRAM chips by sending electrical signals along data lines. Appx109-10(2:64-3:19). Connecting more DRAM devices to each data line results in increased "load" on that line, which degrades the data signals. Appx110-11(4:48-5:3); Appx116-17(16:65-17:6); Appx4086; Appx9365. That signal distortion, in turn, limits the maximum rate at which data can be communicated on that data line without errors or data loss. Appx111(5:23-43).

Connecting more memory devices to data lines creates other problems. For example, it creates more electrical "noise" and "crosstalk" as more devices are attempting to communicate on the same data line. Appx116-17(16:67-17:6). That

11

also degrades "signal quality," which again slows down the rate at which data can be reliably transferred on the memory bus.  Appx116-17(16:67-17:6).

Around 2010, those issues limited the highest-speed memory systems to just two memory modules per memory bus—severely limiting memory capacity.  Thus, leading computer makers, including IBM and HP, asked Netlist to develop a memory system that could support ***three*** memory modules on a standard memory bus without sacrificing speed.  Appx9711; Appx9360.

## II.   NETLIST'S '339 PATENT OVERCOMES LOAD AND NOISE PROBLEMS

After years of development, Netlist created its "load-reduced DIMM" ("LRDIMM") technology, which it commercialized as "HyperCloud."  Appx9357-61.  That technology allows servers to have more high-speed memory modules without changing the memory controller or JEDEC-standardized memory bus wiring.  Netlist's technology has been adopted by makers of memory modules that comply with JEDEC's "DDR4" standard.  Appx9713-14; Appx8576.  Netlist obtained the '339 patent for its load- and noise-reducing invention.  Appx87-122.

Netlist's '339 patent overcomes load and noise problems using a plurality of "'load-reducing circuits,'" or buffers (416', orange), incorporated on each memory module between the memory controller and DRAM devices.  Appx113(10:55-66).  Note that buffers are present only on the ***data lines***, 450' below; they do not affect commands sent on the ***control lines***, 440' below.  Each buffer is connected on one

side to a subset of the data lines (black) from the memory controller (brown) and on the other side to a subset of the DRAM devices on the memory module (green and cyan). Appx113(10:58-67).



Appx6238 (annotating Figure 3C).

The buffers "reduce the . . . load[]" experienced by the "system memory controller" by "isolat[ing] . . . memory devices" from the memory bus. Appx115-16(14:46-15:42). They also "regenerate the signals" while driving them through the buffer. Appx117(17:5-12). That is, instead of merely passing along received signals, the buffers "restor[e] the desired signal waveform" to improve signal quality. Appx117(17:5-12). And the buffers reduce "crosstalk" and "noise" on the memory bus. Appx117(17:5-12). All that improves the "quality of the data signals" on the memory bus. Appx116-17(16:65-17:13).

The buffers contain data paths that ordinarily are disabled, effectively disconnecting the attached memory devices from the memory bus and memory

13

controller.  *See* Appx115-16(14:65-15:3) (buffers "isolate" memory devices from data lines); Appx1157 (buffer "isolate[s] the memory devices from the bus interface . . . when the memory module is not communicating data with the memory controller").  "[W]hen the memory controller . . . executes read or write operations," however, those data paths are enabled to "connect[]" the DRAM devices and "drive[] the data signal" through the buffer between the "memory controller" and the "memory devices."  Appx117(17:14-27).

To read or write data, the memory controller (420', brown) sends a command to the control circuit (430', yellow) over the control lines (440', dashed line).  Appx113(10:33-41).  The control circuit sends the command to the DRAM devices.  Appx117(17:14-44).  The buffers associated with the DRAM devices being accessed "connect[]" the "memory devices" to the memory bus.  Appx117(17:20-22).  The buffers then "drive[] the data" through data paths in the buffer—either from the DRAM device to the memory bus for a read command or from the DRAM device to the memory bus for a write command.  Appx117(17:14-18:65).

The image below shows an embodiment of a buffer.

14



Appx107 (Fig. 5) (annotated).  The buffer connects on one side to data lines coupled to the memory controller (red arrow 450) and on the other to data lines coupled to memory chips (green and blue arrows $452_1$ and $452_2$).  Appx115 (14:34-43).  The buffer has "data paths" (two in this example) from the first side to the second side of the buffer.  Appx116 (15:40-48).  The data paths include "tristate buffers" (504 and 506, blue box), which normally are "disabled" (*e.g.*, in a "high impedance" state) to isolate the memory device from the rest of the buffer and the memory bus.  Appx116 (16:7-25).  During a memory operation, one of the data paths is enabled, and the corresponding tristate buffer is enabled to "driv[e]" the data from one side of the buffer to the other.  Appx116 (15:45-16:44).  During write operations, tristate buffers 504 and 506 function to "regenerate the signals"

received from the "memory controller" to eliminate distortion.  Appx117(17:10-12).

As explained above, memory-module operations are synchronized according to a clock.  *See* pp. 8-9, *supra*.  Adding buffers to isolate the memory devices from the memory bus complicates synchronization.  *See* Appx8639-41.  Buffer data paths ordinarily function to disconnect the memory devices from the memory bus; the memory devices must be connected to the memory bus at precisely the correct time to send or receive data when the memory devices are accessed.  *See* Appx116(15:61-16:25).  Enabling the buffer data paths at the correct time requires accounting for various delays (latencies) in the circuits of the memory modules.  Appx116(15:61-16:25).  During a write operation, for example, there is a period of time between when the DRAM device receives the write command and when the DRAM expects the data at issue on its data lines.  Appx116(15:61-66).  Other circuits on the memory module, including the buffer, also create delays because it takes time for signals to pass through them.  Appx117(18:9); *see* Appx10152-53.  Thus, the data paths must be enabled according to a "latency" parameter that reflects the total delay between when the "memory module" receives a command from the memory controller, and when the data must arrive at the "pins" of the DRAM device.  Appx116(15:61-16:25); *see* Appx117(17:45-18:65).

Representative claim 1 of the '339 patent is directed to the operation of the buffer during memory **write** operations. As relevant here, the claim recites:

- A memory module comprising a plurality of "buffers" between the memory controller's "data signal lines" and DRAM devices. Appx118(19:40-52) (limitation 1[d]).

- Each buffer having a "data path" between the "first side and the second side" of the buffer. Appx118(19:48-50) (limitation 1[d]).

- The "data path [1] *is enabled* [2] *for a first time period in accordance with a latency parameter* to actively drive . . . write data . . . from the first side to the second side [of the buffer]." Appx118(19:53-61) (emphasis added) (limitations 1[e.1] & 1[e.2]).

- The "data path" includes "*first tristate buffers*" that are "enable[d] . . . to drive . . . write data to the respective module data lines during the first time period." Appx118(19:62-67) (emphasis added) (limitation 1[f]).

## III.  PROCEDURAL HISTORY

Netlist sued Petitioner Samsung in the Eastern District of Texas for infringement of various patents, including the '339 patent. Appx9615. A jury found claims 1, 8, and 9 of the '339 patent infringed and not invalid. *See Netlist, Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:21-cv-463, Dkt. No. 479 at 2, 4-5 (E.D. Tex. Apr. 21, 2023). While that case was pending, Samsung filed an IPR petition, relying on two references, Ellsberry and Halbert.[1] Appx128; Appx159. Although the Patent Office had considered both references during prosecution of the '339 patent,

---

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC also filed a petition and were joined as petitioners in the proceeding below. Appx1 n.1. Micron's petition was "substantively identical" to Samsung's. Appx10950.

Appx1004-1057, the Board instituted trial and found claims 1-35 of the '339 patent

unpatentable as obvious over those references.  Appx9, Appx64.

### A.    The Asserted Prior Art

#### 1.    *Ellsberry*

Ellsberry is an abandoned patent application (Pub. No. 2006/0277355).

Appx1831.  It addresses a system that "expands the addressable memory capacity

on a module by making two smaller-capacity memory devices emulate a single

higher-capacity memory device."  Appx1850(¶10).



Appx1832 (annotated).

The "Control ASIC" (204, red) receives commands and memory addresses

from the memory controller over the memory bus.  Appx1851(¶12).  The switch

ASICs (orange, 206 and 208) receive data from the memory bus and cause data to be stored in the DRAM chips (dark blue and dark green). Appx1850(¶10). In the image above, each switch ASIC is connected to two "banks" of memory chips through two buses. For example, switch ASIC 206 is connected to one bank of memory chips (dark blue) through bus 234 (light blue), and another bank of memory chips (dark green) through bus 236 (light green). Appx1852(¶30). Ellsberry refers to the memory chips attached to the switch through bus 234 (light blue) as the "first memory bank (i.e., *Port A* . . .)" and those attached to the switch through bus 236 (light green) as the "second memory bank (i.e., *Port B* . . .)." Appx1853(¶41) (emphasis added).

To make those two memory banks simulate a larger memory device, Ellsberry divides up the memory addresses—identifying locations where data can be stored—associated with the larger memory device, assigning some to one smaller memory bank and the others to the other smaller memory bank. Appx1853(¶40). During a write operation, Ellsberry uses the "memory address" to select the memory bank where the data will be stored. Appx1853(¶40). To ensure that only the selected memory bank (Port A or Port B) stores the data, Ellsberry "selectively activat[es] or deactivat[es] the *memory devices*." Appx1850(¶10) (emphasis added); *see* Appx1852(¶31) ("switch [ASIC] . . . activate[s] the correct *memory bank*," either "Port A" or "Port B" (emphasis

added)); Appx1853(¶40) ("selectively enabling or activating one of the two physical ***memory banks*** (e.g., either Port A or Port B)" (emphasis added)).

During a write operation, Ellsberry sends the "write-data . . . to ***both*** ports A and B," but functionally disables one of the memory banks using commands or control signals to ensure only one memory bank stores the data. Appx1852(¶33) (emphasis added); *see* Appx1853(¶41) (commands sent to "two or more memory banks (e.g., Ports A & B) ***concurrently***" (emphasis added)). In one mode, the control unit "uses [a] data mask (DM) signal to select the target memory device," Appx1852(¶33)—that is, both memory banks receive the data, but one is directed to "mask" (*i.e.*, ignore) that data, Appx7841. In another mode, Ellsberry sends a "write command[] . . . only to the targeted memory device," and sends a "NOP (no-operation) command . . . to the non-targeted memory device." Appx1852-53(¶33). Again, both memory banks receive the data, but one receives a command to write the data, and the other receives a command to ignore it. Appx8619; *see also* Appx1853-54(¶¶41-42). Ellsberry only describes embodiments in which "write-data is sent to ***both*** ports A and B of the switch [ASIC]." Appx1852(¶33) (emphasis added); *see* Appx1853(¶41). It does not mention any embodiments in which write data is sent only along one data path in the switch ASIC, much less explain how that function would be performed.

Ellsberry emphasizes minimizing "delays." Appx1850(¶10). It explains that its "novel scheme"—sending data to both memory banks but directing one of those banks to ignore the data—avoids "delays" and enables "selection between memory devices at speeds not achievable in the prior art." Appx1853-54(¶41); Appx1855(¶57). Ellsberry disparages other approaches, such as using "FET switches," as "too slow and imprecise to reliably comply with industry standards." Appx1850(¶9); Appx1855(¶57).

### 2. *Halbert*

Halbert is a patent (No. 7,024,518) directed to a technique that enables memory devices that operate at a lower speed to be connected to a memory controller that operates at a higher speed. Appx1857. As relevant here, Halbert's Figure 4 depicts a circuit including a "bi-directional buffer 122" and two "bi-directional registers 126 and 128" (orange boxes below). Appx1870-71(4:60-5:14); *see* Appx173.



Appx1862 (annotated).

## B. The PTO Allows the Claims over Ellsberry and Halbert

During prosecution, Netlist overcame an initial rejection based on Ellsberry and Halbert. Appx1004-57. The Examiner initially found that ¶31 of Ellsberry, which refers to the "switch . . . caus[ing] Port B to be activated and Port A to be disabled," teaches enabling data paths, as the claims require. Appx1012-13. Netlist distinguished Ellsberry, however, explaining that the '339 patent claims are directed to "controlling of the *data paths* between the memory devices and the bus interface" to "*isolate* the memory devices from the bus interface" except during data transfer. Appx1157 (emphasis added). Ellsberry does not disclose selectively isolating the memory devices by disconnecting data paths in the switch. Appx1156-57. Instead, Ellsberry selects the memory bank to receive the data by

22

"activating/deactivating the **memory banks**." Appx1154 (emphasis added); *see* Appx1127 (Ellsberry "enable[s]/disable[s] ... one of the memory banks"). Ellsberry says that can be accomplished by directing one of the two banks to ignore the data using a "no operation" command or data mask signal. Appx1155.[2]

Indeed, Netlist argued, Ellsberry "teaches away" from the claims. Appx1154. As explained above, adding a buffer adds latency. *See* p. 16, *supra*. Ellsberry disparages techniques that would introduce delay, such as those using "FET switches ... to select a data line," as "too slow and imprecise to reliably comply with industry standards." Appx1154 (emphasis omitted) (quoting Appx1850(¶9)). Ellsberry thus "avoid[s] using any switches in the data paths" because that would "introduce memory timing issues, which Ellsberry is not equipped to address and attempts to avoid." Appx1155.

The Examiner acknowledged Netlist's "argument that Ellsberry does not teach or suggest activating/deactivating data [paths]," noting that he "was most convinced by the idea that Ellsberry doesn't describe any mechanisms to accomplish [such] selection." Appx1172; *see* Appx1174. He then allowed the claims, stating that he found the "amendments submitted 7/24/2020 in light of the remarks submitted therewith to overcome the prior art of record." Appx1207.

---

[2] Netlist also amended the claims to "incorporate the limitation of previously presented claim 5," which recited tristate buffers, into claim 1, and to make non-substantive changes "for clarity." Appx1152; Appx1138-39.

### C.    This IPR Proceeding

Samsung petitioned for inter partes review, challenging claims 1-35 of the '339 patent as obvious in view of Ellsberry and Halbert.  Appx162.  The Board focused on limitations 1[e] and 1[f].  Appx37-53.  As relevant here, those limitations require: (1) **enabling** a buffer data path when data is driven to DRAM devices attached to the buffer; and (2) enabling the buffer data path **at a particular time** according to a "latency parameter."  *See* p. 17, *supra*.  The Board found that Ellsberry and Halbert taught those limitations.  Appx37-53.

### 1.    *Enabling Data Paths (Limitations 1[e.1] & 1[f])*

The invention improves signal quality by isolating DRAM devices from the memory bus using buffers.  *See* pp. 12-17, *supra*.  But during memory access, the buffer must connect the memory devices to the memory bus and drive data from the memory controller and memory devices (or vice-versa).  Limitation 1[e.1] thus requires that, during a write operation, a buffer "data path **is enabled**" to "drive . . . data" through the buffer to the memory devices.  Appx118(19:56-61) (emphasis added).  Limitation 1[f] requires "enabl[ing] the first tristate buffers to drive . . . data" to the DRAM device.  Appx118(19:64-67).

Samsung urged a construction of limitation 1[e.1] under which the buffer "connect[s]" memory devices to the memory bus during memory operations, and "disconnect[s]" memory devices from the memory bus otherwise.  Appx1382-84

(Samsung's expert); *see* Appx171 (Petition). Netlist disputed whether the claims require "more than one possible [data] path," but did not otherwise dispute Samsung's proposed construction. Appx8511. The Board found it unnecessary to construe the claims. Appx13.

The Board found that Ellsberry alone taught enabling a data path, as required by limitation 1[e.1]. Appx40-41; Appx72-73. The Board pointed to Ellsberry's "switch ASICs," (206 and 208 below) as the "buffers." Appx35. Claim 1 requires the "data path" to be "between the first side and the second side" of the buffer. Appx118(19:42-49). The Board found that the "data path" in Ellsberry is "between data bus 230 and . . . data bus 234 . . . or data bus 236"—between the orange lines in the image below. Appx36.



Appx1832 (annotated).

The Board asserted that Ellsberry uses its "switch ASICs" (the putative buffers) to "enable or disable data paths to respective banks of memory devices." Appx39-40. The Board pointed to Ellsberry's statement that "'memory bank switch 206 . . . causes Port B to be activated and Port A to be disabled so that the data is written to the correct memory bank.'" Appx40 (quoting Appx1852(¶31)). The Board did not explain what those ports are, what Ellsberry means when it says they are "disabled," or how enabling ports constitutes enabling the putative *data paths*. Samsung's expert conceded Ellsberry does not disclose what it "mean[s] when [it] says Port B [or A] is disabled." Appx9106.

The Board also found Ellsberry taught enabling and disabling data paths using "bidirectional drivers 402/404" (yellow below). Appx40-42. The Board identified no disclosure in Ellsberry of using those bidirectional drivers to enable or disable data paths. Samsung's expert conceded that the bidirectional drivers depicted in Ellsberry are *incapable* of disabling the data paths used for writing data (as relevant here). Appx9116-17. But the Board noted that the "only" elements within the switch ASIC "that the data paths pass through are the bidirectional drivers 402, 404." Appx40. The Board thus insisted the "bidirectional drivers 402, 404 are what enables or disables data paths." Appx40-41.

26



Appx1834 (Fig. 4) (cropped, annotated).

The Board rejected Netlist's argument that Ellsberry's disclosure of enabling and disabling "ports" refers to enabling or disabling the **memory banks** connected to the ports—not **data paths**. Appx39-40; Appx69-72; *see* Appx8492-94. Netlist pointed out that Ellsberry consistently "us[es] activating/disabling port A/B" as a "shorthand" for enabling and disabling "the memory banks coupled to the port[s]." Appx7760-61. For example, Ellsberry refers to "enabling one of . . . two physical memory banks (e.g., either Port A or Port B) while disabling . . . the other." Appx1853 (¶40); Appx7761; *see* Appx11579 ("'[enabling] a first memory bank (i.e., Port A in FIG. 2) without disabling or deactivating a second memory bank (i.e., Port B in FIG. 2)'" (quoting Appx1853 (¶41)). The Board did not address those disclosures.

Netlist pointed out the Examiner had found that Ellsberry ***does not*** disclose enabling and disabling data paths, *see* Appx10989-90, but the Board did not address the Examiner's determination. Nor did it address Netlist's argument that Ellsberry disparages techniques that would add delay. *See* Appx8523.

In the alternative, the Board asserted that "[t]o the extent there is any doubt as to what in Ellsberry's memory bank switch performs these functions," Halbert disclosed "tristate buffers" that "would provide ***the capability*** to enable or disable data paths." Appx42 (emphasis added). The Board did not contend, however, that Halbert ***taught*** the enabling limitation. *See* Appx39-42. It acknowledged Halbert did not expressly disclose using tristate buffers to enable and disable data paths. Appx42; *see* Appx49.

The Board denied Netlist's rehearing petition. Appx69. The Board asserted that "enabling a port means that the data path through the port is enabled, and disabling a port means that the data path through that port is disabled." Appx70. It pointed to nothing in Ellsberry or the record to support that assertion.

2.   *Enabling Data Paths for a First Time Period According to a Latency Parameter (Limitation 1[e.2])*

The Board acknowledged that limitation 1[e.2] requires using "latency" information "to control ***timing*** of the enablement of the data path." Appx47 (emphasis added). There was no dispute that the claims require using the latency information to enable the data path at the right time, so DRAM devices receive

28

data when they expect it. *See* Appx39; Appx42. The Board determined Ellsberry taught those limitations. Appx38-39; Appx43-47.

a. The Board found that Ellsberry alone teaches using a latency parameter "to control timing of the enablement of the data path." Appx47. The Board identified Ellsberry's "Posted CAS_n" value as the claimed "latency parameter." Appx47; *see* Appx1845. The Board conceded, however, that Ellsberry does not teach using "Posted CAS_n" for ***anything***, much less using it to control the timing of enabling a data path. Appx44. "Posted CAS_n" is one of several values in an "EMRS" command, a JEDEC-standardized ***initialization*** command sent by the memory controller to the DRAM devices. Appx8497-99. Ellsberry shows the data format of the EMRS command, and states that the switch (*i.e.*, the putative buffer) may intercept the command and modify certain values before sending them to the DRAM chips. Appx7827; *see* Appx236; Appx1845 (Fig. 9); Appx1854 (¶44). But the only disclosure regarding Posted CAS_n itself is that it is "'passed thru as received from the Host'"—*i.e.*, sent to the DRAM chips unmodified. *See* Appx1845; Appx8633.

Despite acknowledging that Ellsberry does not disclose using a timing value to control the switch ASIC, the Board found that Ellsberry taught the claims' timing requirement. Appx44; Appx47. The Board posited that the "memory bank switch would [not] store the Posted CAS_n latency parameter if it did not use it,"

29

and reasoned the switch must "us[e] the Posted CAS_n parameter" for "***some*** purpose." Appx44 (emphasis added). Based on that, it concluded that "Ellsberry's switch ASICs use[s] Posted CAS . . . to control timing of the enablement of the data path." Appx47. The Board blamed Netlist for "not explain[ing]" what else Ellsberry might do with "Posted CAS_n." Appx47.

b.    There was no dispute the claimed "latency parameter" must reflect timing information for the ***whole memory module*** so the buffer data paths can be enabled for data to arrive at the DRAM devices at the correct time. Appx8529-30; Appx45; *see* Appx118(19:56-57). Nor was there any dispute that Ellsberry's "Posted CAS_n" was not a timing value for a memory module, and had nothing to do with a buffer. Appx45-46. It is a configuration value that allows the memory controller to direct the DRAM device to add an additional delay between receiving a command and responding to that command. Appx2406.

The Board, however, turned to Netlist's Patent No. 7,532,537. Appx45-47; *see* Appx9854-55. According to the Board, the '537 patent taught controlling the timing of a data buffer, including "account[ing] for the time needed for data to traverse the data buffer" itself. Appx45. Over Netlist's objection that the Petition did not even mention the '537 patent, the Board found that a skilled artisan would have used that patent to modify Ellsberry to "account for propagation delay through data buffers." Appx46-47. The Board justified reliance on the '537 patent

30

by asserting it was within the "general knowledge" of skilled artisans.  Appx44-47; Appx64.

In denying rehearing, the Board rejected Netlist's argument that reliance on the '537 patent was improper.  Appx76.  The Board insisted that the '537 patent had a "nexus" to Netlist's "argument that Ellsberry never disclosed enabling or disabling the data path in accordance with a latency parameter."  Appx76.

### 3.  *Claims 7, 16, and 21*

Claim 7 depends from claim 1, but requires a "module controller" to "use the ***module control signals*** to control timing of the first time period in accordance with the latency parameter."  Appx118(20:40-43) (emphasis added).  Claims 16 and 21 similarly require using "***module control signals***" to control timing. Appx119-20(22:55-58, 24:41-46) (emphasis added).  Netlist argued that the prior art did not disclose the "module control signal" limitation.  Appx8554-55.  The signals Samsung identified as "module control signals," it urged, are different from the signals Samsung identified as transmitting the "latency parameter." Appx8554-55.  The Board did not address that argument.  *See* Appx58-59.

## SUMMARY OF ARGUMENT

I.     The Board erred in determining that the prior art teaches the timing requirements of the challenged claims.  Limitation 1[e.2] requires enabling data paths "for a first time period in accordance with a latency parameter."

Appx118(19:56-57).  That requires using a "latency parameter"—timing informa-
tion—to control the buffer data paths so the data paths are enabled and disabled at
the correct times.

A.    The Board erred in finding that Ellsberry teaches using a latency
parameter to control the timing of enabling the data path.  The Board found that
Ellsberry's switch ASICs contain the claimed data paths, but Ellsberry concededly
provides no disclosure of using timing information to control the switch ASICs.
The Board speculated that, because Ellsberry makes a passing reference to timing
information in the context of the memory controller configuring DRAM devices,
the switch ASIC must use that information to control data paths.  Such speculation
is not reasoned decisionmaking.

B.    The Board erred in relying on an unasserted reference.  The Board
conceded that the claimed latency parameter must reflect the timing information
necessary to control *buffer* data paths, and that Ellsberry's "Posted CAS_n," the
Petition's putative latency parameter, had nothing to do with a buffer.  The Board,
however, turned to Netlist's '537 patent—which the Petition never mentioned—
and asserted skilled artisans would have used that patent to modify Ellsberry to
account for timing information relevant to a buffer.  The Board could not properly
rely on the '537 patent, which was not asserted.  And the Board's finding that a

32

skilled artisan would combine Ellsberry and the '537 patent was erroneous regardless.

II.    The Board's conclusion that Ellsberry teaches enabling and disabling buffer data paths (limitation 1[e.1]) is erroneous.

A.    The Board pointed to Ellsberry's disclosure of enabling "ports" as teaching that limitation, but nowhere explained how that involved enabling data paths.  To the contrary, the experts agreed Ellsberry was silent as to how it enables and disables ports, and that there were ways to disable ports that did not involve disabling data paths.  Samsung's expert also conceded that the circuits in Ellsberry's data path are **incapable** of enabling and disabling the relevant data paths.  In fact, Ellsberry does not disable data paths—in the only described embodiments, Ellsberry's switch sends data to **both** memory banks, and it uses "no-operation" commands and data-mask signals to direct one memory bank to ignore the data.

Ellsberry's reference to enabling or disabling "ports," moreover, is a shorthand for functionally enabling or disabling the **memory banks** attached to ports.  Enabling memory banks concededly does not involve enabling data paths, as the claims require.  Nor does it achieve the patent's advantage of reducing noise and signal interference.

33

Finally, the Board failed to explain why it reached a different conclusion than the Examiner, who considered Ellsberry during prosecution and determined it does not teach enabling data paths.

B.     Ellsberry concededly does not teach tristate buffers as required by limitation 1[f].  The Board therefore had to combine Ellsberry with Halbert.  But Ellsberry teaches away from the invention.  Ellsberry seeks to avoid added delays.  The invention's buffers undisputedly add delay.  At minimum, the Board's failure to consider that issue requires vacatur.

III.     Remand is required because the Board failed to explain its reasoning. For most limitations of claim 1 and most other claims, the Board simply accepted Samsung's arguments without analysis.  As to claims 7, 16, and 21, the Board failed to address Netlist's argument that the prior art does not disclose those claims' "module control signal" limitation.

## STANDARD OF REVIEW

Obviousness is a question of law, which this Court reviews de novo.  *See Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 886 (Fed. Cir. 2024).  The Court reviews underlying fact findings for substantial evidence. *Id.*  While motivation to combine is a question of fact, this Court applies a "'thorough and searching'" review to that issue, demanding "'specificity'" in the Board's findings.  *In re Nuvasive, Inc.*, 842 F.3d 1376, 1381-82 (Fed. Cir. 2016).

34

Board decisions must be vacated if they are "arbitrary, capricious, an abuse of discretion," "not in accordance with law," or "unsupported by substantial evidence." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017).

## **ARGUMENT**

For a claim to be invalid under 35 U.S.C. § 103, "the prior art" must be "such that the subject matter as a whole would have been obvious" to skilled artisans "at the time the invention was made." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 3 (1966). The patented invention reduces load and noise using "buffers" interposed between the memory controller and the DRAM devices. Claim 1, which is representative, imposes two key requirements. First, limitations 1[e.1] & 1[f] require that, when the memory controller writes data to a DRAM attached to a buffer, a "data path" through the buffer is "enabled" to drive the data through the buffer to the DRAM device. Appx118(19:56-67). That requires electrically connecting DRAM devices, which are otherwise isolated, to the memory bus. Second, limitation 1[e.2] governs **when** (and **for how long**) that data path is enabled: "for a first time period in accordance with a latency parameter" so the DRAM device is connected to the memory bus at the time data is transmitted. Appx118(19:55-57).

The Board found those limitations obvious primarily based on Ellsberry. But Ellsberry does not disclose *any* of the key limitations. It does not disclose enabling data paths to connect memory controllers to DRAM devices. And it does not disclose connecting DRAM devices to the memory controller at precisely the right time, much less doing so with a latency parameter.

The most the Board could say about Samsung's secondary reference, meanwhile, is that Halbert did "not *preclude*" adapting Ellsberry so as to satisfy the limitations of the '339 patent's claims. Appx72-73 (emphasis added). The Board thus relied on Halbert only for a general disclosure of tristate buffers. The Board identified nothing in Halbert providing any instruction as to *how* to use those tristate buffers to achieve the invention of claim 1. Appx72-73; Appx49.

Finding no help in Ellsberry or Halbert, the Board was forced to resort to filling in each limitation with conjecture, *ipse dixit*, unasserted prior art, and supposed "general knowledge." The Board's analysis is unsupported by substantial evidence. It is arbitrary and capricious. And it defies the Administrative Procedure Act's reasoned-decisionmaking requirements. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1047 (Fed. Cir. 2017). This Court should reverse.

I.   **THE BOARD'S DETERMINATION THAT ELLSBERRY TEACHES ENABLING DATA PATHS USING A LATENCY PARAMETER (LIMITATION 1[E.2]) CANNOT BE SUSTAINED**

The invention uses a plurality of buffers to isolate memory devices from the memory bus.  DRAM devices are electrically connected to the data lines of the memory bus as needed to transfer data during memory access.  Limitation 1[e.2] thus requires that a buffer "data path is enabled *for a first time period* in accordance with a *latency parameter*."  Appx118(19:56-57) (emphasis added).  The Board acknowledged that limitation 1[e.2] requires using "latency" information—information about the timing of operations on the memory module—"to control *timing* of the enablement of the data path."  Appx47 (emphasis added).  It was undisputed, moreover, that the claims require using latency information to enable the data path at the correct time, so memory devices receive the data when they expect it.  *See* Appx39; Appx42.

Even assuming the asserted references teach enabling data paths—which they do not, *see* pp. 51-66, *infra*—they certainly do not teach enabling data paths using timing information.  Ellsberry concededly contains no disclosure of using a latency parameter to control the putative data paths.  Nor does Ellsberry disclose using timing information to enable the data paths in the way required by the claims.  And Halbert does not disclose enabling and disabling data paths at all, much less doing so according to timing information.  Appx77-78.

37

Given the absence of disclosure of the timing limitations in the asserted prior art, the Board should have ended the inquiry there. Instead, it proceeded to conjure the limitation out of thin air using speculation and unasserted references. The Board pointed to a parameter ("Posted CAS_n") in an initialization message sent from the memory controller to the DRAM devices as the claimed "latency parameter." Appx44. Notwithstanding that Ellsberry nowhere discusses using Posted CAS_n to control the putative data path, the Board asserted that the switch ASIC (the putative buffer) "would [not] store the Posted CAS_n latency parameter if it did not use it." Appx44. The Board thus ruled that the "switch ASICs use Posted CAS . . . to control timing of the enablement of the data path." Appx47.

But that still was not enough to invalidate the claim. Ellsberry undisputedly did not teach the specific timing requirements at issue here: enabling a data path at the correct time for the memory device to receive the data, accounting for the delay of circuits on the memory module. The Board thus turned to an unasserted reference and concluded that skilled artisans could have reconstituted that timing limitation based on that reference. The Board's determination—reconstructing the invention out of whole cloth—defies patent-law principles and the APA alike.

## A. The Board Erred in Determining That Ellsberry Controls Data Paths Based on a Latency Parameter

The linchpin of the Board's determination regarding the recited timing limitation, 1[e.2], was its finding that "Ellsberry's switch ASICs use" a latency

parameter "to control timing of the enablement of the data path." Appx47. While the Board turned to other references for the particulars—exactly when to enable the data path—the Board did not contend that any other reference taught that prerequisite concept of controlling a buffer data path based on a timing parameter. The Board's determination, however, was based on unsubstantiated speculation about Ellsberry's operation. It does not comport with the APA's requirements of "'substantial evidence'" and "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 44, 52 (1983).

1.     The Board failed to identify a "rational connection between the facts" and its conclusion that Ellsberry discloses using a latency parameter to control when the data path is enabled. *State Farm*, 463 U.S. at 43. The Petition pointed to "Posted CAS_n" in Ellsberry's Figure 9, highlighted in orange in the figure below, as the claimed "latency parameter." Appx43.



Fig. 9

Appx1845 (annotated).   But Figure 9 just reproduces the data format of an
***initialization command***, set forth in the JEDEC standard, that is sent from the
memory controller to the DRAM devices.  Appx8497-99.  Ellsberry mentions
Posted Cas_n nowhere else.  The ***experts agreed*** that Ellsberry contains no
disclosure of using "Posted CAS_n" to control data paths in the switch ASICs (the
putative buffers), much less to control when those data paths are enabled.
Appx8632-33 (Netlist's expert); *see* Appx9129-32; Appx9237-38 (Samsung's
expert).

40

The Board conceded that Ellsberry does not disclose using "Posted CAS_n" to control the switch ASIC data paths or control when they are enabled.  Appx44. Instead, the Board questioned "why the memory bank switch would store the Posted CAS_n latency parameter if it did not use it."  Appx44.  Assuming that Ellsberry must "us[e] the Posted CAS_n parameter for *some purpose*," Appx44 (emphasis added), the Board simply asserted that "Ellsberry's switch ASICs use Posted CAS . . . to control timing of the enablement of the data path across its switch," Appx46-47.

That does not come close to "reasoned decisionmaking."  *State Farm*, 463 U.S. at 52.  The Board must identify a "rational connection between the facts" and its conclusions, *id.* at 43, and provide a "full and reasoned explanation of its decision," *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).  "[S]peculation" does not suffice.  *OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019).  Yet that is all the Board offered here—it speculated that Ellsberry's switch must use "Posted CAS_n" to control the timing of enabling a data path, because, in the Board's view, the switch "would [not] store the Posted CAS_n latency parameter if it did not use it."  Appx44.

The Board's conclusion, moreover, does not follow "logical[ly]" from the facts.  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374-75 (1998). Even if Ellsberry "us[es] the Posted CAS_n parameter for *some purpose*," it does

41

not follow that Ellsberry uses it for the ***claimed purpose*** of controlling when the data path is enabled. Appx44 (emphasis added). Indeed, Ellsberry explains that "Posted CAS_n" is used for a ***different purpose***. The initialization command that includes "Posted CAS_n" is used by the memory controller to "configure[]" the DRAM devices. Appx1854(¶44). Because Ellsberry's switch sits between the memory controller and the DRAM devices, it passes the command values along to the DRAM devices. In the case of "Posted CAS_n," Figure 9 makes clear that it is simply "passed thru" to the memory devices unmodified. Appx1845. Contrary to the Board's finding that Ellsberry's "switch . . . ***store[s]*** the Posted CAS_n" value, Appx44 (emphasis added), Ellsberry only discloses passing it along. The Board offered no justification for speculating that Ellsberry ***uses*** "Posted CAS_n" for some ***additional purpose***—controlling ***when*** the data path is enabled—beyond the disclosed purpose of configuring the DRAM devices during initialization.

The Board, moreover, improperly shifted the burden to Netlist to explain Ellsberry's lack of disclosure. The Board demanded that "[Netlist] . . . ***explain why***" Ellsberry mentions "Posted CAS_n . . . if it [does] not use it." Appx44. In an IPR, however, the "burden" to prove each limitation always lies with the "patent challenger." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016); *FanDuel, Inc., v. Interactive Games, LLC*, 966 F.3d 1334, 1341-42 (Fed. Cir. 2020). The Board's approach defies the AIA.

42

2. Skilled artisans would not understand Ellsberry to teach using a latency parameter to control the data paths, as the claims require. To the contrary, the switch ASIC operates completely differently than the claims. Instead of enabling and disabling data paths based on *timing* information, Ellsberry's switch controls the *destination* of the data.

As explained above, Ellsberry emulates a larger memory device by combining smaller ones. It achieves that by mapping some memory addresses of the larger device to one smaller physical memory bank, and other memory addresses to the other smaller physical memory bank. *See* pp. 18-21, *supra*. During write operations, Ellsberry's system relies on the "memory address" of the write operation—the location to which data is to be written—to control the switch. It "decodes a memory address," "determines to which memory bank the received address corresponds, and causes the ... switch ... to activate the correct memory bank." Appx1852(¶31). The other memory banks, by contrast, may be told to ignore the data. Appx1853-54(¶42). A *memory address* is not a *latency parameter*. A memory address is information about a *destination*, while a latency parameter is information about *timing* of operations.

Controlling a data path using a memory address is fundamentally different from controlling it using a latency parameter. The Board conceived of Ellsberry as operating like a railway switch, directing trains on one route or another. Even if

43

that were how Ellsberry worked—and it is not, *see* pp. 52-62, *infra*—that would make Ellsberry very different than the invention.  A railway switch is controlled based on the ***direction*** of the train.  It can remain pointed in the same direction until a train needs to go in a different direction.  The invention, by contrast, relies on timing information to open and close paths for specific intervals.  In short, Ellsberry does not disclose using a latency parameter to control the timing of enabling data paths.  The Board's effort to invent reasons why it might cannot be reconciled with the APA's substantial-evidence and reasoned-decisionmaking requirements.

## B.    The Board Erred by Invoking the '537 Patent To Teach Enabling the Data Path at the Required Time

Even if the Board had properly supported its view that Ellsberry uses timing information—latency information in particular—to control data paths, the Board acknowledged that Ellsberry does not teach enabling the data path at the required time.  As explained above, the claims require using a "latency parameter" to enable a buffer data path at a certain time for the data ***to arrive*** at the memory device at the correct time.  *See* pp. 16-17, *supra*.  Because various circuits on the memory module can add delays, including the buffer, the latency parameter must reflect timing information for the "memory module" as a whole.  Appx116 (15:61-16:6).  The Board did not deny that "Posted CAS_n," the Petition's putative latency parameter, did not reflect timing information for the module and had nothing to do

with a ***data buffer***.  Appx45.  "Posted CAS_n" is used to configure DRAM devices with an "additive latency"—to add a delay between when the DRAM device receives a command and responds to it.  Appx2406.  Halbert, moreover, did not teach the required timing information either.  Appx44-45.

That should have ended the case.  The asserted art did not disclose or teach the invention's limitations.  So the Board invoked unasserted art—Netlist's '537 patent—to fill the gap.  Appx45.  According to the Board, the '537 patent taught controlling the timing of data paths, including "account[ing]" for delays created by the buffer.  Appx45-47.  The Board's reliance on the '537 patent was both procedurally improper and legally insufficient.

           1.     *The Board's Reliance on the '537 Patent Was Impermissible*

The Board could not permissibly rely on the '537 patent because it was not in Samsung's Petition.  The Supreme Court has made clear that the Board may not "depart from the petition" and find claims invalid on grounds "of [its] own design."  *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 365 (2018).  Among other things, the Board cannot rely on "a combination of prior art references not advanced in . . . [the] petition."  *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1335 (Fed. Cir. 2020); *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1358 (Fed. Cir. 2018).

Here, Samsung's Petition made no mention of the '537 patent. It asserted that Ellsberry's "Posted CAS_n" value, as described in "JEDEC standards," was the "latency parameter." Appx237-39. Indeed, the Petition did not merely omit all mention of the '537 patent; it did not even address the need to account for circuits on the memory module, such as the buffer, in determining when to enable data paths. Only on reply did Samsung argue the '537 patent constituted "prior art" that taught "how to control data buffers 'in accordance with a CAS latency parameter' (as required by [1.e])." Appx9854 (emphasis omitted). But reply is too late to raise new prior art. *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1009 (Fed. Cir. 2023) (vacating Board decision that relied on "reference that was not disclosed in a petition").

On rehearing, the Board invoked *Rembrandt Diagnostics, L.P. v. Alere, Inc.*, 76 F.4th 1376 (Fed. Cir. 2023), to defend its reliance on the '537 patent. There was a "nexus," the Board urged, between that patent and "Patent Owner's argument that Ellsberry never disclosed enabling or disabling the data path in accordance with a latency parameter." Appx76. But the "nexus" *Rembrandt* addressed relates only to whether reply arguments are proper under the Board's rules, not whether a party can raise prior art absent from ***the petition***. 76 F.4th at 1383, 1385.

46

Regardless, *Rembrandt* does not permit a petitioner to raise new prior art whenever it is responsive to the argument that the asserted art fails to disclose a claim limitation.   In *Rembrandt*, this Court approved reliance, in reply, on "previously unidentified disclosures" found in the same embodiments asserted in the petition.   76 F.4th at 1385 (emphasis added); *see Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380 (Fed. Cir. 2018) (similar); *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016).   But a petitioner may not invoke new "references which were not relied upon to support unpatentability in the Petition."   *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369-70 (Fed. Cir. 2016).

Nor was there any connection between the '537 patent and the arguments that Samsung made in the Petition.   Contrary to the Board's characterization, the Petition never addressed the "contention that it would have been obvious . . . to account for the data buffer" delay in the modified version of Ellsberry's switch.   Appx76.  Samsung made a different argument.  The Petition asserts that "a Skilled Artisan would have" used the "***JEDEC*** **standard** "to control the timing of actions on the data path."   Appx239 (emphasis added); *see* Appx8516; Appx8529-31; Appx9852-55.  The JEDEC standard does not address data buffers, and does not explain how to account for data-buffer latency.  Indeed, the Petition does not even mention accounting for data-buffer latency.

47

Nor could the Board rely on the '537 patent as "general knowledge . . . [of] a person of ordinary skill in the art." Appx64. First, "general knowledge" cannot be used to supply "important structural limitation[s]" that are absent from the asserted art. *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1365 (Fed. Cir. 2014). Here, the claimed latency parameter is essential to the invention. Adding a data buffer between the memory controller and DRAM devices creates additional delays and complex timing issues that must be addressed in determining precisely when to enable and disable the claimed data paths. *See* p. 16, *supra*. The claims at issue address that; the asserted art did not.

Second, to constitute "general knowledge," information must be "evidently and indisputably within the common knowledge of those skilled in the art." *K/S Himpp*, 751 F.3d at 1365-66. Samsung never argued that the '537 patent met that requirement here—Samsung belatedly urged it was "prior art." Appx9855. Indeed, Samsung raised the '537 patent because it was cited in the "'339 Patent" specification. Appx9854-55. But using the challenged patent's specification as an "instruction manual" to identify relevant prior art is textbook impermissible hindsight. *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992). In determining obviousness, the Board must determine why a "skilled artisan, with ***no knowledge of the claimed invention***, would have selected these components for combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000)

(emphasis added). Relying on the challenged patent as a guide to combining the prior art it discusses is manifestly improper.

On rehearing, the Board relied on *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355 (Fed. Cir. 2016), and *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020). Appx74. But *Arendi* vacated the Board's decision for impermissibly relying on "common knowledge." 832 F.3d at 1365-67. And in *Koninklijke Philips*, the petitioner had argued in the petition itself that a prior art reference reflected "general knowledge." 948 F.3d at 1337. Samsung did not do so here.

> ### 2. *The Board Failed To Show That Skilled Artisans Would Combine the '537 Patent with Ellsberry*

Even if the Board could permissibly rely on the '537 patent, the Board failed to provide a "reasoned explanation" for why a skilled artisan would have relied on the "teachings of the '537 patent" to modify Ellsberry, as the Board determined. Appx45-46; *Lee*, 277 F.3d at 1342. To justify combining references, the Board must articulate ***why*** skilled artisans would be motivated to combine the references and have "a reasonable expectation of success" in doing so. *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993 (Fed. Cir. 2017). This Court has explained that the APA's requirement to provide a reasoned analysis is "especially" important in the context of motivation to combine because of the risk of falling into

impermissible "*ex post* reasoning." *In re Van Os*, 844 F.3d 1359, 1361-62 (Fed. Cir. 2017).

Here, the Board failed to articulate ***why*** skilled artisans would have looked to the '537 patent's teachings to modify Ellsberry. The Board asserted that skilled artisans would have found it "***useful***" to look to the '537 patent "to account for propagation delay through [the] data buffer[]." Appx46-47 (emphasis added). Even on its own terms, such a generic, "conclusory assertion" is "inadequate to support a finding that there would have been a motivation to combine." *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012) (testimony that skilled artisans would "want[] to build something better" is legally insufficient).

The Board's assertion is also nonsensical. The Board found that Ellsberry's switch ASIC, by itself, met the requirements of the '339 patent's "buffer." *See* p. 25, *supra*. But if Ellsberry's switch ASIC ***was*** a buffer, as the Board assumed, Ellsberry would already have to account for buffer delay, somehow. *See* Appx9179-80. The Board nowhere explained why skilled artisans would have looked to the '537 patent to modify Ellsberry to do something, that, under the Board's logic, Ellsberry already does. Skilled artisans would not have done such a thing. The Board did so—turning to the '537 patent—only to fill a conceded gap

50

in the prior art. Such "impermissible *ex post* reasoning" cannot support an obviousness determination. *TQ Delta*, 942 F.3d at 1361.[3]

The Board's finding that skilled artisans would reasonably expect success in creating the proposed combination was also deficient. The Board asserted that "Patent Owner does not dispute that adding an additional clock cycle, as taught by the '537 patent . . . would be sufficient to address latency through a data buffer." Appx30. But Netlist *did* dispute that premise. Appx8483; Appx8529-31 & n.9; Appx8639-41; Appx9360; Appx9388. Netlist explained that the delay added by buffers is unpredictable, and skilled artisans would not have expected that importing the '537 patent's timing information into Ellsberry's entirely different circuit would work. Appx9852-55. The Board failed to address that argument. That failure to address an argument is arbitrary, capricious, and a failure of reasoned decisionmaking. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123-24 (Fed. Cir. 2022).

## II.    THE BOARD'S CONCLUSION THAT THE PRIOR ART DISCLOSES ENABLING A DATA PATH (LIMITATIONS 1[E.1] & 1[F]) CANNOT BE SUSTAINED

The Board erred again in concluding that the prior art disclosed "enabling" a data path as required by claim 1. During a write operation that accesses a DRAM chip, limitation 1[e.1] requires that the associated buffer's "data path *is enabled* . . .

---

[3] Ellsberry's conceded lack of disclosure of how to account for buffer delay proves that Ellsberry's switch *does not* operate like the claimed buffer, as the Board incorrectly determined. *See* p. 25, *supra*.

to drive" data from the memory bus to the DRAM chip; the data path is otherwise disabled, isolating the DRAM device from the memory bus. Appx118(19:60-67) (emphasis added). In this context, enabling and disabling data paths means *connecting* and *disconnecting* data paths to isolate DRAM devices. Appx1382-84; *see* pp. 13-14, *supra*.

The Board found that Ellsberry teaches that limitation. Appx39-40. But Ellsberry's switch ASIC, the putative buffer, merely *selects* a memory bank to receive data. It does so by enabling and disabling *memory banks*—located outside the buffer—using commands and signals directed to the memory banks themselves. No method described in Ellsberry involves connecting and disconnecting *data paths* in the buffer to isolate DRAM devices. To the contrary, in Ellsberry, "write-data is sent to *both ports*," which requires *both putative data paths* to be enabled. Appx1852(¶33) (emphasis added).

### A.   The Board Erred in Determining That Ellsberry's Disclosure of Enabling Ports Teaches Enabling the Claimed Data Paths

As explained above, the Board found that Ellsberry's switch ASICs were the claimed buffers. *See* p. 25, *supra*. The Board found that Ellsberry teaches enabling data paths because a single paragraph—paragraph 31—refers to the switch ASIC "caus[ing] Port B to be activated and Port A to be disabled," which the Board assumed meant disabling the *data paths* leading to Ports A and B. Appx40 (quoting Appx1852(¶31)). In the image below, the ports are shown in

green, *see* Appx36 ("data bus 234 (Port A)" and "data bus 236 (Port B)"), while

the putative data paths are within the switch ASIC between the yellow lines.



Appx1832 (annotated).

The Board's determination cannot be sustained for two reasons.  First, even

assuming Ellsberry's disclosure is referring to enabling ***the ports themselves***, that

still would not involve enabling data paths as the claims require.  The ports (green

boxes above) concededly are not the same thing as the claimed data paths (within

the yellow lines above).  Second, Ellsberry does not enable "ports" at all.  Reading

Ellsberry as a whole makes clear that disclosure refers to enabling and disabling

***memory banks*** associated with the ports (blue boxes above)—commanding them

to execute or ignore commands—which concededly does not teach the claims.

1.  *The Board's Determination That Enabling and Disabling Ports Involves Enabling and Disabling Data Paths Is Unsupported by Substantial Evidence or Reasoned Decisionmaking*

The Board asserted that Ellsberry's reference to activating and disabling "Port A" and "Port B" taught enabling data paths. Appx40. But the Board nowhere explained why enabling and disabling ports functions to enable and disable *data paths*, as the claims require. The connection is not apparent. The ports undisputedly are not the putative data paths. The Board did not explain what it thought "Port A" and "Port B" *were*, but seems to have equated them with "data bus 234 (Port A)" and "data bus 236 (Port B)." Appx36. Those data buses, however, are *outside* the switch ASIC, while the putative data paths to be "enabled" or "disabled" are *inside* the switch ASIC.

The Board nowhere explained why disabling those external data buses results in disabling internal data paths. The Board insisted that "enabling a port *means* that the data path through the port is enabled, and disabling a port *means* that the data path through the port is disabled." Appx70 (emphasis added). But the Board cited nothing in the record to support that assertion. Appx40; Appx70. Nor is it necessarily true: Data paths and ports could be controlled independently. Imagine a castle with a drawbridge and a gate—opening the gate does not necessarily lower the drawbridge, and vice versa. The Board's failure to "explain

54

[its] reasoning" alone violates the APA and requires vacatur. *Lee*, 277 F.3d at 1338.

Nor would the record support the Board's (unexplained) assumption. Samsung's expert, Dr. Subramanian, conceded Ellsberry was silent as to ***how*** ports are enabled or disabled. Appx9106. When asked what Ellsberry "mean[s] when [it] says Port B is disabled," he answered: "***it depends*** on the specifics of how it's done." Appx9106 (emphasis added). Dr. Subramanian insisted that enabling ports "***could be*** implemented" by enabling data paths, but he conceded it could be done in other ways as well, and never contended that those other ways teach the claims. Appx9106-07 (emphasis added).

Meanwhile, Samsung's expert in another IPR (also involving Ellsberry), Dr. Wolfe, testified that enabling and disabling ports ***does not*** involve enabling and disabling internal data paths. The "normal way" to "disable a port," Dr. Wolfe explained, would be to "turn[ ] off" circuits at the edge of the switch ASIC, called "pin drivers," that transmit signals from the internal data path to the external wires leading to the memory devices. Appx8927-28. Dr. Wolfe conceded that disabling the pin driver ***would not disable*** any data path "internal to the chip." Appx8931-32. Netlist's expert in this IPR, Dr. Brogioli, "agree[d]." Appx8644. A skilled artisan "would not regard enabling/disabling a port" to involve enabling and disabling "a data path internal to the switch ASIC." Appx8644-45.

55

In asserting that enabling ports taught enabling data paths, the Board purported to "credit Dr. Subramanian's testimony" over that of Dr. Wolfe and Dr. Brogioli.  Appx41-42.  But the **experts agreed** that Ellsberry did not disclose **how** ports were enabled and disabled, and agreed that function could be performed in ways that did not involve connecting and disconnecting data paths.  *See* p. 26, *supra*.  While Dr. Subramanian insisted ports "could be" enabled by enabling data paths, Appx9106, a reference does not teach a limitation merely because a skilled artisan "***could have***" implemented a function as in the claims, where the reference does not actually disclose the claimed approach.  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).  The Board could not find that Ellsberry teaches enabling data paths by pointing to how Ellsberry ***could*** perform a particular function that is disclosed nowhere in Ellsberry itself.

The Board's treatment of the expert testimony, moreover, was unreasoned. The Board discounted Dr. Wolfe's testimony because "Dr. Subramanian is testifying in this case, and Dr. Wolfe is not."  Appx42.  But that is not a rational reason to credit one expert's testimony over another's when they are discussing the same feature of the same prior-art reference—especially when both are experts for the same party.  And the Board did not address Dr. Brogioli's testimony at all.  The

Board cannot arbitrarily disregard expert testimony without adequate reasoning. *Google Inc. v. Intell. Ventures II, LLC*, 701 F. App'x 946, 953 (Fed. Cir. 2017).[4]

The Board's assumption that Ellsberry discloses connecting and disconnecting data paths seems to rest on the presence in the switch ASIC of "bidirectional drivers 402, 404," shown below in yellow.



Appx1834 (cropped, annotated). The Board asserted that the "bidirectional drivers 402, 404 are what enables or disables data paths," because they are depicted as the "only elements within the . . . switch ASIC . . . that the data paths pass through." Appx40-41. But Ellsberry does not mention using bidirectional drivers to enable *either data paths or ports*. And the Board could not logically assume that the

---

[4] The Board suggested Dr. Wolfe's testimony was equivocal, Appx41 (quoting Appx8927; Appx8883), but Dr. Wolfe's testimony explaining how Ellsberry disables ports using pin drivers was detailed, extensive—spanning a dozen transcript pages—and unequivocal. *See* Appx8921-33.

*presence* of bidirectional drivers in the data path means that Ellsberry *uses them* to enable and disable the data path. Bidirectional drivers undisputedly perform other functions. Appx1585.

Indeed, the experts agreed that Ellsberry's bidirectional drivers lack even the *capability* to disable the putative data paths. Appx9112-17 (Samsung's expert); Appx8653 (Netlist's expert). Here, the putative data paths are those used for *writing* memory. As shown above, bidirectional drivers 402 and 404 (yellow box) have a "flip-flop" (black square) in the "WRITE" data path, not a "tri-state buffer" (black triangle). Appx9116-17; *see* Appx8653. A "flip-flop" is not a "tri-state buffer" and cannot disable a data path. Appx8653. That is consistent with Ells-berry's disclosure that "write-data is sent to *both* ports A and B of the switch" during write operations. Appx1852(¶33).

Halbert does not fill the gap in Ellsberry's disclosure. The Board relied on *Ellsberry* to teach enabling and disabling data paths. Appx39. The most the Board said about Halbert was that, insofar as Ellsberry discloses enabling data paths, Halbert discloses tristate buffers that a skilled artisan could use to implement that function. For example, the Board observed that the "tristate buffers" in Halbert "have the *capability* to enable and disable data paths." Appx42 (emphasis added). That is not a finding that Halbert *teaches* disabling a data path, only that a skilled artisan could use Halbert to implement the teaching (supposedly) in Ellsberry. *See*

*Belden*, 805 F.3d at 1073.  The Board also asserted that Halbert "does not *preclude* disabling data paths before enabling them in a write operation *according to Ellsberry*," Appx72-73 (emphasis added), and "does not preclude disabling the port and its associated data path according to *Ellsberry's teaching*," Appx78 (emphasis added).  Those statements just mean that Halbert is not *incompatible* with Ellsberry.

### 2.    *The Board Misapprehended Ellsberry*

In any event, the Board misread Ellsberry.  Read as a whole, *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986), Ellsberry teaches only enabling and disabling the *memory banks* associated with ports.  In describing its "*invention*," Ellsberry states its system sends "data . . . to a plurality of physical memory banks."  Appx1850-51 (¶11) (emphasis added).  To ensure only one memory bank writes the data, Ellsberry uses "commands" to enable one "memory bank" and disable the other.  Appx1850-51 (¶11); Appx1850 (¶10) ("switch" ensures data is written to the correct "memory bank" by "activat[ing] or deactiv[ing] the *memory devices*" (emphasis added)).  During a write operation, the switch determines "which memory bank should be activated."  Appx1853 (¶39).  The data is "sent to both ports A and B"—*i.e.*, both memory banks.  Appx1852 (¶33).

To ensure only one memory bank stores the data, Ellsberry sends different commands or control signals to the two banks.  It "sends commands . . . to two or

more memory banks (e.g., Ports A & B) *concurrently*," but directs one to ignore the data using a "no operation" command or "data mask" signal. Appx1853-54(¶¶41-42) (emphasis added); *see* Appx1853(¶41) (switch "perform[s] operations in a first *memory bank* (i.e., Port A in Fig. 2) without disabling or deactivating a second *memory bank* (i.e., Port B in Fig. 2)" (emphasis added)). Samsung never contended that this embodiment involves enabling and disabling data paths.[5]

The Board thought Ellsberry's paragraph 31 was different because it mentions activating "ports," which the Board took to mean "data paths." Appx39-40. But paragraph 31, like Ellsberry's other disclosures, was describing activating memory banks:

> [T]he control unit 204 . . . causes the memory bank switch 206 and 208 *to activate the correct memory bank*. *For example*, if the control unit 204 determines that a particular address is associated with, or mapped to, Bank 1212 coupled to memory bank switch 206, then it causes *Port B to be activated and Port A to be disabled* so that the data is written to the correct memory bank 212.

Appx1852(¶31) (emphasis added). Paragraph 31 thus also talks about "activat[ing] the correct *memory bank*." *Id.* (emphasis added).

Insofar as paragraph 31 refers to "Port A" and "Port B" being activated or disabled, Appx1852(¶31), it is clear in context that those references to the ports

---

[5] Ellsberry could also be read to teach *physically* enabling and disabling memory banks by asserting a "chip select" signal for that memory bank (which would cause it to ignore all commands). Appx9201-02; *see* Appx1853(¶40); Appx2114. But any such embodiment undisputedly would not teach the claims either. Appx9202.

are merely a shorthand for enabling the associated *memory banks*. That is consistent with numerous other passages in Ellsberry expressly equating "Port A" and "Port B" with their corresponding memory banks. *See* Appx1853(¶41) (referring to "a first memory bank (i.e., Port A in Figure 2)" and a "second memory bank (i.e., Port B in Fig. 2)"); Appx1853(¶41) ("two or more memory banks (e.g., Ports A & B)"); Appx1853(¶40) ("one of the two physical memory banks (e.g., either Port A or Port B)"). The "use of 'i.e.' signals an intent to define the word to which it refers." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009); *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003). Here, Ellsberry uses "i.e." (and "e.g.") *to define* "Port A" and "Port B" as shorthand for the corresponding *memory banks*.

The Board nowhere addressed the fact that paragraph 31 equates "ports" with "memory banks." And it disregarded Ellsberry's other disclosures because, in the Board's view, they pertain to different "embodiments" than paragraph 31. Appx39. Even where a patent includes multiple embodiments, however, it is presumed that "terms are normally used consistently throughout the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2015). Ellsberry equates "Port A" and "Port B" with the corresponding memory banks, and consistently refers to enabling those memory banks, not data paths. There is no reason to think Ellsberry's drafters intended that language to have a different meaning—to refer to

61

enabling data paths, rather than memory banks—in paragraph 31 of Ellsberry than it has in every other paragraph.

Because Ellsberry teaches enabling and disabling **memory banks**, not data paths, it cannot teach the claims. *See* Appx8520-22; Appx9863-66. The two approaches are fundamentally different. Ellsberry keeps data paths enabled and uses commands and control signals to functionally enable and disable memory banks, so only one writes the data. *See* pp. 18-21, *supra*. By contrast, enabling and disabling data paths connects and disconnects the DRAM devices, reducing interference from noise and crosstalk. *See* pp. 12-17, *supra*. Ellsberry does not disclose that invention.

## B.    The Board Failed To Explain Its Departure from the Patent Office's Prior Determination

The Board also failed to explain its departure from the Patent Office's earlier findings during prosecution of the '339 patent. During prosecution, the Examiner initially found that Ellsberry's disclosure of enabling **ports** taught enabling a "**data path**." Appx1023 (citing Appx1852(¶31)) (emphasis added). But Netlist explained that the claims were directed to controlling "data paths" to **connect** DRAM devices to the memory controller as needed, and otherwise keep them "disabled to **isolate** the memory devices." Appx1174 (emphasis added). Ellsberry contained no "mechanism" for enabling and disabling data paths in that sense. Appx1174. The Examiner agreed that "Ellsberry doesn't describe any mech-

anisms" for "activating/deactivating data [paths]," Appx1172, and allowed the claims, Appx1207.

In this IPR, Netlist urged that the Examiner had "considered" and rejected the "same arguments" Samsung was making, Appx7793; *see* Appx10989-99, but the Board never addressed those prior findings. That was error. In issuing the '339 patent, the Patent Office, via the Examiner, specifically addressed the same issues raised in this IPR. The Examiner considered not only the same claims and same prior art, but the exact question about how to interpret paragraph 31 of Ellsberry. And he concluded that Ellsberry ***does not*** teach enabling data paths. But in this IPR, the linchpin of the Board's decision was the exact opposite conclusion—that Ellsberry ***does*** teach enabling data paths. The APA requires the Board to provide some "rational explanation" for that about-face. *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1323 (Fed. Cir. 2017).

## C.    Ellsberry Teaches Away from the Asserted Combination

A combination of prior-art references renders claims obvious only where a "skilled artisan would have been motivated to combine [the] references" and "'would have had a reasonable expectation of success in doing so.'" *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 876 F.3d 1350, 1360-61 (Fed. Cir. 2017). A reference does not render claims obvious where it "teaches away" from the invention—where a skilled artisan, "'upon reading the reference, . . . would be

led in a direction divergent from the path that was taken by the applicant.'" *Id.* at 1360; *see Chemours Co. v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1376 (Fed. Cir. 2021) (overturning decision where Board "ignored" that a reference taught away).

The Board found the challenged '339 patent claims obvious by modifying Ellsberry's system to incorporate tristate buffers between the memory controller and DRAM chips, as disclosed by Halbert. Ellsberry, however, teaches away from such a combination for multiple reasons. Ellsberry was concerned with solving an entirely different problem using entirely different means. Ellsberry teaches avoiding added delays in the switch ASIC. Incorporating tristate buffers into Ellsberry would add delays, contrary to Ellsberry's design. At the very least, the Board's failure to consider that argument requires vacatur.

Ellsberry repeatedly emphasizes that its invention enables "real-time" operation of the memory, without added "delays." Appx1850(¶10). Ellsberry discloses a "novel scheme" for routing data to the correct memory bank during a write operation. Appx1853(¶41). Instead of "disabling or deactivating [the] second memory bank," Ellsberry leaves both memory banks enabled and "send[s] commands or instructions to two or more memory banks ... concurrently." Appx1853(¶41). Ellsberry sends data to both banks but sends one bank (the one that should not write the data) a "no-op (no operation) instruction" or "DM [data mask] signal" to direct it to ignore the data. Appx1853(¶41); Appx1853-54(¶42).

Ellsberry explains that this approach avoids "delays caused by otherwise disabling the banks."  Appx1854(¶42); *see* Appx1853(¶41) (enables "switch to operate in real-time and without noticeable delays"); Appx1855(¶57) (similar).

Ellsberry, moreover, repeatedly teaches against adding circuitry to the switch chip that could add delays.  For example, Ellsberry disparages using "FET [field effect transistor] switches . . . to select a data line" because their "switch time is too slow and imprecise to reliably comply with industry standards." Appx1850(¶9); *see* Appx1855(¶57) (similar).  Ellsberry's warning is not arbitrary. As explained above, adding a buffer between the memory controller and the DRAM chips inevitably adds significant delay, which creates timing issues because it takes longer for data to travel from the memory controller to the DRAM chips.  *See* p. 16, *supra*.  As Netlist explained during prosecution, adding a delay at the switch ASIC would "introduce memory timing issues, which Ellsberry is not equipped to address and attempts to avoid."  Appx1155; Appx1174.

The '339 patent, however, goes a different direction because it pursues a different goal.  Its distributed buffers reduce load and noise, and use tristate buffers to regenerate the signals to improve signal quality.  *See* pp. 12-17, *supra*.  But all that adds the very delays that Ellsberry abhors.  Appx10152-53; Appx9189.  The invention accepts those delays in return for the benefits the buffer provides—the reduction in noise and load—and discloses how to account for those delays in the

latency parameter used to control buffer timing. *See* Appx108. Ellsberry thus points in a "direction divergent" from the delay the '339 patent embraces. *Arctic Cat*, 876 F.3d at 1360-61. Certainly, Ellsberry offered the Board no basis to conclude "a POSA would have had a 'reason to attempt'" adding such a delay. *Chemours*, 4 F.4th at 1376.

The Board concluded that skilled artisans would be motivated to combine Ellsberry with Halbert to achieve the claimed invention, Appx30, but nowhere addressed Netlist's argument that "Ellsberry disparages" the invention's solution, Appx8523. The Board found only that Ellsberry "does not use FET switches"— missing the point that Ellsberry's commentary on FET switches is an example of Ellsberry teaching away from adding delay. Appx47. The Board's "fail[ure] to address" that argument requires vacatur. *Provisur*, 50 F.4th at 122.

## III. THE BOARD'S DECISION ON OTHER LIMITATIONS AND CLAIMS WAS UNEXPLAINED

The Board's analysis of other limitations and claims does not satisfy the APA's requirements.

### A. The Board's Unreasoned Analysis of "Undisputed" Claims and Limitations Requires Remand

Under the APA, the Board may not accept an argument simply because the patent owner "'d[id] not challenge'" it. *Icon Health*, 849 F.3d at 1047. But for most limitations of claim 1 and the vast majority of challenged claims, the Board's

analysis was limited to summarizing Samsung's "contentions" and finding that Netlist "does not dispute" them.  Appx31-37; Appx62-63.  *Icon Health* forecloses that shortcut.  849 F.3d at 1047.

### B.     The Board Failed To Address Netlist's Arguments on Claims 7, 16, and 21

Remand is also required on at least claims 7, 16, and 21 because the Board failed to address Netlist's argument that those claims' "module control signal" limitations are not disclosed by the prior art.

The Board must "fully and particularly set out the bases upon which it reached its decision." *Provisur*, 50 F.4th at 123.  "An agency violates this standard when it fails entirely to consider a party's arguments." *Johnson v. Merit Sys. Prot. Bd.*, No. 2023-1996, 2024 WL 2290014, at *6 (Fed. Cir. May 21, 2024) (citing *Provisur*, 50 F.4th at 123-24).  This Court regularly vacates and remands when the Board fails to "meaningfully address" a party's arguments that particular limitations are not disclosed by the prior art. *VirnetX Inc. v. Cisco Sys., Inc.*, 776 F. App'x 698, 702-03 (Fed. Cir. 2019); *Provisur*, 50 F.4th at 123-24; *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1371 (Fed. Cir. 2020).

The Board made just that error here.  Dependent claim 7 contains an additional limitation requiring the module controller to "use the ***module control signals*** to control timing of the first time period in accordance with the latency parameter." Appx118(20:40-43) (emphasis added).  Claims 16 and 21 similarly

67

require using "***module control signals***" to control timing "in accordance with the latency parameter." Appx119-20 (22:55-58, 24:41-46) (emphasis added).

As Netlist argued below, Ellsberry does not disclose any "module control signal" that can be used to "control timing . . . in accordance with the latency parameter." Appx8554-55 (citing Appx222). Netlist pointed out that Samsung's Petition identified particular signals—signals "in response to a 'write command on address/command'"—as Ellsberry's "module control signals." Appx8554-55 (citing Appx222). But Samsung identified ***different*** signals—Ellsberry's "EMRS" command—as communicating the supposed "latency parameters." Appx8555. Because the signals Samsung identified as Ellsberry's "module control signals" do not include any "latency parameters," Netlist argued, Ellsberry did not disclose using "module control signals" to "control timing . . . in accordance with the latency parameter" as required by claims 7, 16, and 21.

The Board never addressed that argument. It characterized Netlist as arguing that Samsung "has not shown that Ellsberry includes a latency parameter as part of the signals sent to the memory bank switch via control bus 210." Appx59. But the Board overlooked the argument's significance—that Ellsberry's alleged "module control signals" did not include any "latency parameter" and thus could not be used to control timing "in accordance with the latency parameter." *See* Appx59; Appx8554-55. The Board thus never grappled with whether

68

Ellsberry discloses "module control signals" that are "use[d] . . . to control timing . . . in accordance with the latency parameter," as required by claims 7, 16, and 21. *See* Appx58-59.

The Board's apparent failure to even understand Netlist's argument, much less to "meaningfully address" it, requires vacatur and remand. *VirnetX*, 776 F. App'x at 702; *Provisur*, 50 F.4th at 123-24. Without any explanation for why the Board concluded the "module control signal" limitations were met, this Court "cannot reasonably discern whether the Board followed a proper path in determining that the asserted prior art teaches or suggests" those limitations. *Alacritech*, 966 F.3d at 1371. Its ultimate conclusion of obviousness, "by extension," is unsustainable. *Id.*

## CONCLUSION

The Board's decision should be reversed. In the alternative, it should be vacated and remanded.

October 15, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken

Blair A. Silver
   *Counsel of Record*
IRELL & MANELLA LLP
750 17th Street N.W., Suite 850
Washington, D.C.  20006
(202) 777-6500
bsilver@irell.com

Jason Sheasby
H. Annita Zhong
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
(310) 277-1010

Jeffrey A. Lamken
Rayiner Hashem
Jennifer Elizabeth Fischell
Lidiya Mishchenko
Kayvon Ghayoumi
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com

Elizabeth Kathleen Clarke
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700

Sara Margolis
Catherine Martinez
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-8160

*Counsel for Appellant Netlist, Inc.*

**<u>ADDENDUM</u>**

# ADDENDUM TABLE OF CONTENTS

Page

Final Written Decision (Oct. 18, 2023) (Paper 45) ..........................................Appx1

Decision Denying Rehearing (Feb. 9, 2024) (Paper 48) ...............................Appx67

U.S. Patent No. 10,949,339...............................................................................Appx87

Trials@uspto.gov                                              Paper 45
571-272-7822                                    Entered: October 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————————

IPR2022-00639
Patent 10,949,339 B2

———————————

Before JON M. JURGOVAN, DANIEL J. GALLIGAN, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a)*

———————————

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed a motion for joinder and a petition in
IPR2023-00204 and have been joined as petitioners in this proceeding. *See*
Paper 33.

IPR2022-00639
Patent 10,949,339 B2

# I.    INTRODUCTION

## A.    *Background and Summary*

Samsung Electronics Co., Ltd. ("Samsung") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–35 ("challenged claims") of U.S. Patent 10,949,339 B2 (Ex. 1001, "the '339 patent"). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.") to the Petition. Samsung filed an authorized Preliminary Reply (Paper 13) ("Reply"), and Patent Owner filed an authorized Preliminary Sur-Reply (Paper 14) ("Sur-Reply"). We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 15 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 27, "Resp."), Petitioner filed a Reply (Paper 31), and Patent Owner filed a Sur-Reply (Paper 36). We joined Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC as petitioners in this proceeding, and we refer to Samsung and these entities collectively as "Petitioner." *See* Paper 33.

Petitioner and Patent Owner requested oral argument (Papers 34 and 35). A hearing was conducted on July 19, 2023. Paper 44 ("Tr.").

Petitioner objected to evidence (Papers 17, 28, 37) and filed a Motion to Exclude (Paper 38). Patent Owner filed an Opposition to Petitioner's Motion to Exclude (Paper 40), and Petitioner filed a Reply (Paper 41) in support of its Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claims are unpatentable.

IPR2022-00639
Patent 10,949,339 B2

B.    *Real Parties in Interest*

Petitioner entities, Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC identify themselves as real parties in interest.  Pet. xxxii; IPR2023-00204, Paper 3, 1.

Patent Owner identifies itself as the sole real party in interest.  Paper 3, 1.

C.    *Related Matters*

The parties advise that the '339 patent is related to the following pending matters:

- *Samsung Electronics Co., Ltd. et al. v Netlist, Inc.,* No. 1:21-cv-01453 (D. Del. filed Oct. 15, 2021)
- *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 2:21-cv-00463 (E.D. Tex. filed Dec. 20, 2021)
- U.S. Patent Application No. 17/202,021.

Petitioner contends that the '339 patent is related to the following matters, which are no longer pending:

- *In the Matter of Certain Memory Modules and Components Thereof*, Inv. No. 337-TA-1089 (USITC filed Oct. 31, 2017) (U.S. Patent No. 9,606,907)
- *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1023 (USITC filed Sept. 1, 2016) (U.S. Patent No. 8,516,185)
- U.S. Patent Application No. 16/841,552 (abandoned)
- IPR2018-00362 (U.S. Patent No. 9,606,907)
- IPR2018-00363 (U.S. Patent No. 9,606,907)

IPR2022-00639
Patent 10,949,339 B2

- IPR2018-00364 (U.S. Patent No. 9,606,907)
- IPR2018-00365 (U.S. Patent No. 9,606,907)
- IPR2017-00577 (U.S. Patent No. 8,516,185)

Pet. xxxii–xxxiii; Paper 3, 1.

D.    *Overview of the '339 Patent (Ex. 1001)*

The '339 patent is titled "Memory Module with Controlled Byte-Wise Buffers." Ex. 1001, code (54). The memory module communicates with a memory controller and comprises double data rate (DDR) dynamic random access memory (DRAM) devices arranged in multiple ranks each of the same width as the memory module. *Id.* at code (57). The module controller is configured to receive and register input control signals for a read or write operation from the memory controller and to output registered address and control signals to the DRAM devices. *Id.* The memory module further comprises byte-wise buffers controlled by a set of module control signals to actively drive respective byte-wise sections of each data signal associated with the read or write operation between the memory controller and the selected rank. *Id.*

Figure 3C of the '339 patent is shown below.

IPR2022-00639
Patent 10,949,339 B2

Figure 3C:



Figure 3C shows a layout of memory devices 412', data transmission
circuits 416', and control circuit 430' on printed circuit board (PCB) 410' of
memory module 402'. Ex. 1001, 3:57–60, 9:10–13. Memory devices 412'
are arranged in ranks on PCB 410'. *Id.* at 9:27–31. Memory devices 412'
are connected to data transmission circuits 416' arranged along the bottom
edge of memory module 410'. *Id.* at 9:18–26. Data transmission circuits
416' are further connected to memory control system 420' via data lines
450'. *Id.* at 7:59–61. Memory system controller 420' connects to control
circuit 430' via address and control lines 440'. *Id.* at 7:64–65. Control
circuit 430' in turn connects with memory devices 412' via lines 442'. *Id.* at
10:17–21. Control circuit 430' receives commands and address signals from
memory system controller 420' and generates appropriate control and
address signals to select memory devices 412' and carry out the command
(e.g., a read or write operation). *Id.* at 7:56–58, 8:23–26, 10:33–50.

Figure 5 of the '339 patent is shown below.

IPR2022-00639
Patent 10,949,339 B2



**FIG. 5**

Figure 5 shows a data transmission circuit 416. *Id.* at 4:4–6. Data
transmission circuit 416 includes control logic circuitry 502 to control
various components including buffers, switches, and multiplexers. *Id.* at
15:26–33. The embodiment of Figure 5 is 1-bit wide and switches a single
data line 518 between the memory controller 420 and memory devices 412.
*Id.* at 15:33–35. In a write operation, data entering data line 518 is driven
onto two data paths, labeled path A and path B after passing through write
buffer 503. *Id.* at 15:45–48. Ranks of memory devices 412 are divided into
groups in ranks A and C associated with path A, and ranks B and D,
associated with path B. *Id.* at 15:48–58. Control circuit 430 provides enable
control signals to control logic circuitry 502 to select either path A or B to
direct the data. *Id.* at 16:7–11. First tri-state buffer 504 in path A is enabled,
and second tristate buffer in path B is disabled with its output in a high-
impedance condition. *Id.* at 16:13–16. Data is directed along path A to

terminal Y1 connected to the first group of memory devices 412, ranks A and C. *Id.* at 16:16–20. If an "enable B" signal is received, then first tristate buffer 504 opens path A and the second tristate buffer 504 closes path B, thus directing the data to second terminal Y2 that is connected to the second group of memory devices 412 in ranks B and D. *Id.* at 16:21–25.

E.    *Illustrative Claim*

Claims 1, 11, 19, and 27 are independent claims and the rest are dependent. Claim 1, reproduced below with Petitioner's identifiers in brackets, is illustrative of the claimed invention:

[1pre] A N-bit-wide memory module mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide, the memory module comprising:

[1a] a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and configured to be releasably coupled to corresponding contacts of the memory socket;

[1b] double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks;

[1c1] a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, wherein the module controller is configurable to receive from the memory controller via the address and control signal lines input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals,

[1c2] wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals; and

[1d1] a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals,

[1d2] wherein each respective byte-wise buffer of the plurality of byte-wise buffers has a first side configured to be operatively coupled to a respective set of data signal lines, a second side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side,

[1d3] wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines;

[1e] wherein the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals, wherein the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period; and

[1f] wherein the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period.

Ex. 1001, 19:9–67.

IPR2022-00639
Patent 10,949,339 B2

### F.    Evidence[2]

Petitioner relies upon the following prior art references:

| Reference | | Date | Exhibit No. |
|---|---|---|---|
| Ellsberry[3] | US 2006/0277355 A1 | Dec. 7, 2006 | 1005 |
| Halbert[4] | US 7,024,518 B2 | Apr. 4, 2006 | 1006 |

Pet. 1, 11–13.

### G.    Asserted Challenge to Patentability

Petitioner asserts the following ground of unpatentability:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–35 | § 103(a) | Ellsberry, Halbert |

Pet. 1.

## II.  ANALYSIS

### A.    Principles of Law

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2021).

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

---

[2] Petitioner also relies upon the Declaration of Dr. Vivek Subramanian (Ex. 1003).
[3] Petitioner contends Ellsberry is prior art under pre-AIA 35 U.S.C. § 102(b).  Pet. 11.
[4] Petitioner contends Halbert is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 12.

invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

> B.    *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–697.

Petitioner contends that a person of ordinary skill in the art in the field of the '339 patent in 2009 would have had an advanced degree in electrical or computer engineering and two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field. Pet. 2 (citing Ex. 1003 ¶¶ 50–51). Petitioner contends such person would have been familiar with various standards of the day, including JEDEC industry standards, and would have been knowledgeable about the

IPR2022-00639
Patent 10,949,339 B2

design and operation of standardized DRAM and SDRAM memory devices and memory modules and how they interacted with the memory controller of a computer system. *Id.* (citing Ex. 1003 ¶ 51; Ex. 1041).

Patent Owner indicates that it applies the skill level of a person of ordinary skill in the art proposed by Petitioner for this proceeding. Resp. 31.

On this record, we accept Petitioner's statement of the level of ordinary skill in the art except that we omit the qualifier "at least" before years of experience because it may encompass levels that are beyond ordinary and render the level ambiguous. Otherwise, we find Petitioner's statement of the level of ordinary skill in the art consistent with the '339 patent and the applied prior art references. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

C.    *Claim Construction*

We construe claim terms "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). There is a presumption that claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art in the context of the specification. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Nonetheless, if the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs.*" Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In determining the meaning of the disputed claim limitation, we look

principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing Phillips, 415 F.3d at 1312–17). Only disputed claim terms must be construed, and then only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### 1. "Rank" and "Rank Select Signal"

Petitioner discusses the terms "rank" and "rank select signal" in the claim construction section of its Petition. Pet. 8–10. Petitioner contends that a "rank select signal" is also known as a "chip-select signal" and alleges that the '339 patent uses the terms consistently with the JEDEC standards of the time. *Id.* at 8–9. Petitioner also contends that the term "bank" has been replaced over time with "rank." *Id.* at 9–10 (citing Ex. 1041, 318–20 (discussing DIMMs, ranks, banks, and arrays), 413 (Fig. 10.5)). Although Petitioner cites a definition of "rank" (*id.* at 9), Petitioner does not propose that this definition should be applied in this case. *See id.* at 8–10. Patent Owner does not dispute Petitioner's discussion of the terms "rank" and "rank select signal." *See* Resp. As there is no evidence of any dispute concerning these terms, we need not construe them. *See Nidec, supra.*

### 2. "Fork-in-the-Road" versus "Straight Line"

Petitioner contends that the '339 patent only discloses a "fork-in-the-road" configuration as opposed to a "straight line" configuration. Pet. 10–11. Petitioner alleges that Patent Owner "has tried (unsuccessfully) to construe similar claims to cover a 'straight line' layout where the claimed ranks are on the same data path without any 'fork in the road.'" *Id.* at 10

IPR2022-00639
Patent 10,949,339 B2

(citing Ex. 1003 ¶¶ 170–171; Ex. 1034, 36; Ex. 1076, 30–35). Petitioner contends that "it is not necessary to resolve this potential claim construction dispute because the Ellsberry reference discussed below discloses the same layout found in the 339 Patent, thus rendering the claims obvious either way." *Id.* (citing Ex. 1062, 12–23, 44–45; Ex. 1003 ¶¶ 172, 297, 436). Petitioner does not propose construction of any claim term, particularly not one related to the "fork-in-the-road" or "straight line" configuration. *See id.* at 10–11.

Patent Owner argues that in the district court litigation, the "drive" terms (e.g., "actively drive" in claim 1 (e.g., limitation 1(e)) were construed as "enabling only one of the data paths while the other possible paths are disabled," which "takes into consideration [Petitioner's] argument that the '339 patent is about fork-in-the-road . . . while also accounting for the fact . . . that the claims do not require there necessarily be more than one possible path." Resp. 31 (citing Ex. 2016, 10; Ex. 2006, 57:21–60:19). Patent Owner argues this construction should be adopted here. *Id.  See also* Sur-Reply 27–28.

Petitioner argues that its disagreement with Patent Owner concerning claim construction "is not relevant here." Reply 1. We agree as concerns the "fork-in-the-road" or "straight line" distinction.

Petitioner and Patent Owner have not identified any dispute concerning specific claim language that requires interpretation as "fork-in-the-road" or "straight line" configuration. Consequently, there is no dispute as to claim language before us that we need to resolve. *See Nidec*, *supra*.

IPR2022-00639
Patent 10,949,339 B2

### 3.   Means Plus Function

Petitioner contends "it is . . . not necessary to determine whether any terms of the 339 Patent are governed by § 112, ¶6, given that <u>Ellsberry</u> alone or in view of <u>Halbert</u> matches the disclosure of the 339 Patent." Pet. at 10–11 (citing Pet. 11–38 (§§IV.E–G)). When claims do not mention the word "means," there is a rebuttable presumption that § 112, ¶ 6 does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703–04 (Fed. Cir. 1998)). Neither Petitioner nor Patent Owner provide any evidence to rebut the presumption here that § 112, ¶ 6 does not apply to the '339 patent's claims in the absence of any mention of the word "means." Accordingly, we do not construe any limitation of the '339 patent's claims as "means plus function" under § 112, ¶ 6.

### D.   Obviousness Over the Combination of Ellsberry and Halbert

Petitioner contends that claims 1–35 of the '339 patent are unpatentable as obvious over the combination of Ellsberry and Halbert. Pet. 44–145. Patent Owner counters that claims 1–35 are patentable. Resp. 31–79. We address Ellsberry and Halbert and their combination in the following section and conclude that Petitioner has shown claims 1–35 unpatentable for the reasons that follow.

### 1.   Ellsberry (Ex. 1005)

Ellsberry is titled "Capacity-Expanding Memory Device." Ex. 1005, code (54). Ellsberry describes that "[a] control unit and memory bank switch are mounted on a memory module to selectively control write and/or read operations to/from memory devices communicatively coupled to the memory bank switch." *Id.* at code (57). "By selectively routing data to and

IPR2022-00639
Patent 10,949,339 B2

from the memory devices, a plurality of memory devices may appear as a single memory device to the operating system." *Id.*

Figure 2 of Ellsberry is shown below.



Fig. 2

Figure 2 "illustrates a block diagram of a capacity-expanding memory system 200 according to one embodiment." *Id.* ¶ 28. In Figure 2, system 200 has a DIMM interface 202 that couples to a "memory socket and communication bus over which data, memory addresses, commands, and control information are transmitted." *Id.* "The capacity-expanding feature of the invention is accomplished by a combination of control unit 204 and one or more memory bank switches 206 & 208." *Id.* Figure 2 of Ellsberry illustrates system 200 with control ASIC 204 that receives addresses and commands from DIMM interface 202 and generates corresponding control signals on bus 210 and addresses on bus 220 to selectively connect memory

15

IPR2022-00639
Patent 10,949,339 B2

banks 212–228 to DIMM interface 202 via switch ASICs 206, 208. *Id.*

¶¶ 28–29. Ellsberry also teaches that the command scheme for a control unit

operating multiple banks includes a Posted CAS_n[5] parameter pertaining to

latency. *Id.* ¶ 19, Fig. 8B, n.3, Fig. 9.

>    2.    *Halbert (Ex. 1006)*

Halbert is titled "Dual-Port Buffer-to-Memory Interface" and

discloses a memory module with selectable ranks of memory devices.

Ex. 1006, codes (54), (57). Halbert's Figure 4 is shown below.



In Figure 4, memory module 100 includes a module controller 110; data

interface circuit 120; and a memory device array 140/142. *Id.* at 4:36–39.

Module controller 110 synchronizes operation of module 100 with the

attached memory system. *Id.* at 4:40–41. Module controller 110 also

---

[5] "CAS" stands for Column Address Strobe.

IPR2022-00639
Patent 10,949,339 B2

provides timing and synchronization signals to data interface circuit 120. *Id.*
at 4:45–47. Data interface circuit 120 provides for m-bit-wide data transfers
between the memory module and the system memory data bus, and Rxm-bit-
wide data transfers between the interface circuit and the memory device
array. *Id.* at 4:49–53. In Figure 4, R is 2 because the memory device array
comprises two ranks 140 and 142, each capable of performing m-bit-wide
data transfers. *Id.* at 4:52–55.

Bidirectional buffer 122 is coupled to a bi-directional module data
port that can be connected to a system memory data bus. *Id.* at 4:60–62. An
m-bit wide path through buffer 122 receives and drives data signals DQ on
the system memory data bus. *Id.* at 4:62–64. Two bi-directional data
registers 126 and 128 connect, respectively, to memory device array ranks
140 and 142. *Id.* at 5:6–7. Each data register can drive an m-bit-wide word
to that rank. *Id.* at 5:8–11.

Multiplexer/demultiplexer 124 multiplexes data signals DQ0 from
register 126 and DQ1 from register DQ1 to buffer 122 when the module is
reading from memory device array 140/142. *Id.* at 5:15–19. When the
module is writing to the memory device array, data signals MDQ from
buffer 122 can be channeled to either DQ0 or DQ1. *Id.* at 5:19–22.

Module controller 110 synchronizes operation of the data port buffer
122, MUX/deMUX 124, and data registers 126 and 128 via control signals.
*Id.* at 5:23–25. Buffers 122, 126, and 128 are illustrated as bidirectional
tristate buffers. *Id.* at Figs. 4, 9.

### 3. *Motivation to Combine Ellsberry and Halbert*

Petitioner contends that one of ordinary skill in the art would have
been motivated to combine Ellsberry and Halbert. Pet. 44–47. Specifically,

IPR2022-00639
Patent 10,949,339 B2

Petitioner annotates Ellsberry's Figure 4 as shown below to demonstrate its
proposed combination of Ellsberry and Halbert:



Fig. 4

Pet. 45 (citing Ex. 1003 ¶¶ 256–265). Petitioner's annotated Figure 4,
above, proposes to replace Ellsberry's two bidirectional drivers 402, 404
with Halbert's tristate buffers 126, 128 to interface with memory buses 234,
236, and to add an additional Halbert tristate buffer 122 to interface with
system controller bus 230. *Id.* at 46–47 (citing Ex. 1003 ¶¶ 257–264;
Ex. 1005 ¶ 45, Fig. 4; Ex. 1006, 5:23–65, 9:27–35, Fig. 4; Ex. 1035, 133,
Figs. 4, 7).

According to Petitioner, "[a]dding such a bidirectional buffer to
interface the system memory bus and implementing Ellsberry's bidirectional
drivers with tristate buffers would have been well within the level of skill at

IPR2022-00639
Patent 10,949,339 B2

the time, since both Ellsberry and Halbert teach using bidirectional buffers interfacing with bidirectional busses, as taught in textbooks for decades." *Id.* at 46–47 (citing Ex. 1005 ¶ 45, Fig. 4; Ex. 1006, 5:23–65, 9:27–35, Fig. 4; Ex. 1035, 133, Fig. 4.7; Ex. 1003 ¶¶ 261–263). Petitioner contends that the combination of Ellsberry and Halbert "would have provided nothing more than expected at the time," namely, "providing an operational interface to bidirectional data busses 234 and 236." *Id.* at 47 (citing Ex. 1003 ¶ 264).

Petitioner's reasons to combine Ellsberry and Halbert, and Patent Owner's arguments against the combination, are addressed below.

> a)    *Reducing Bus Conflicts*

Petitioner contends that one of ordinary skill in the art would have considered it obvious to use Halbert's tristate buffers to interface with Ellsberry's bidirectional buses to eliminate bus conflicts in accordance with standard protocols. Pet. 46 (citing Ex. 1003 ¶¶ 257–264); *see also id.* at 78, 81.

We agree with Petitioner that one of ordinary skill in the art would have combined Ellsberry and Halbert to avoid bus conflicts. Pet. 46 (citing Ex. 1003 ¶¶ 257–264). Ellsberry discloses embodiments which enable only one of its ports at a time by enabling or disabling bidirectional drivers 402, 404 as appropriate. Ex. 1005 ¶¶ 31, 40. A person of ordinary skill in the art would have understood that the drivers on a bidirectional bus need to be turned off to allow other devices to drive data on that bus without creating a conflict. Ex. 1003 ¶¶ 239–240, 260; Ex. 1035, 89–90. Hence, Ellsberry's drivers 402, 404 implementing Halbert's tristate buffers 126, 128, when selectively operated as high or low, or high-impedance, states, prevent data on buses 234 and 236 being output simultaneously onto the "fork in the

IPR2022-00639
Patent 10,949,339 B2

road" during a read operation (in the opposite direction of the blue arrow in the previous figure). *Id.* at 45–46 (citing Ex. 1003 ¶¶ 257–264). The additional Halbert tristate buffer 122 which interfaces with the memory controller bus 230 prevents bus conflicts with other memory modules attached to the memory controller bus. Ex. 1006, Fig. 4 [122]; Ex. 1006, 7:54–61; Ex. 1003 ¶ 259. Accordingly, we agree with Petitioner that one of ordinary skill in the art would have seen the benefit of combining Ellsberry and Halbert to avoid bus conflicts.

Patent Owner and its expert argue that bus conflicts are not a concern for write operations, but only for read operations where data from different groups of memory ranks could collide on the data bus 230. Resp. 55–58, 66 (citing Pet. § VI.A.3(a); Ex. 2006, 188:17–189:2, 189:5–12, 189:13–17, 189:22–190:16; Ex. 2007, 68:16–20, 69:16–19, 70:20–23, 72:19–22, 114:9–22; Ex. 2005 ¶ 128); Sur-Reply 27. Since the claims are directed to write operations, Patent Owner argues that conflicts in read scenarios would not motivate the combination. Sur-Reply 27 (citing Resp. 55–58; Reply 31).

In cases where there is a known problem and the proposed combination is a predictable solution to it, a reason to combine has been shown. *See KSR*, 550 U.S. at 420 (placing a sensor on a nonmoving point was a predictable solution to known wire-chafing problem); *Intel v. Qualcomm Inc.*, 21 F.4th 784, 799 (Fed. Cir. 2021) (a reference's switch was a known solution to a feedthrough problem). Petitioner has demonstrated that the problem of bus conflicts was known in DIMMs, and that tristate buffers were a solution to it. Pet. 78 (citing Ex. 1035, 89–90); Ex. 1003 ¶¶ 239–240, 264, 366, 373. Using Halbert's tristate buffers in Ellsberry

amounts to combining familiar elements according to known methods to yield predictable results. *KSR*, 550 U.S. at 416.

b)    *Reducing Load*

Petitioner contends that one of ordinary skill in the art would have combined Halbert and Ellsberry, which each teach to reduce the load experienced by the memory controller to a single load rather than the loads of multiple ranks of memories. Pet. 45–46 (citing Ex. 1005 ¶¶ 6–9, 12, 45, Fig. 4; Ex. 1006, 3:67–4:5, 4:18–22, Fig. 4; Ex. 1001, 4:27–47, Fig. 5; Ex. 1003 ¶¶ 257–264).

Patent Owner contends that Ellsberry was already capable of tristate functionality in order to present a single load, and that a person of ordinary skill in the art would have considered it redundant to combine the disclosures of Ellsberry and Halbert. Resp. 68 (citing Ex. 2005 ¶ 121; *South-Tek Sys., LLC v. Engineered Corrosion Sols.*, LLC, 748 F.App'x 1003, 1007 (Fed. Cir. 2018)); Sur-Reply 29–30. Patent Owner contends that Petitioner has not met its burden to explain why a person of ordinary skill in the art would have included the tristate functionality in Ellsberry's bidirectional signal drivers 402, 404. Resp. 68.

We agree with Petitioner and its expert, Dr. Subramanian, that Ellsberry discloses that its memory bank switch includes signal drivers to present a single load to a bus coupled to the memory bank switch, but does not provide the details of how that is done, such that one of ordinary skill in the art would have looked to Halbert for details concerning implementing Ellsberry's bidirectional drivers with Halbert's tristate buffers to present a single load to the system memory controller. Pet. 46–47 (citing Ex. 1003

IPR2022-00639
Patent 10,949,339 B2

¶¶ 257–264); Reply 31–32 (citing Ex. 2007, 104:25–106:8, 108:10–22, 109:17–113:4).

Although Patent Owner argues that Ellsberry and Halbert are redundant in teaching to provide a single load to the system memory controller, we do not think this would deter a person of ordinary skill in the art from combining the references. A person of ordinary skill in the art would be curious, naturally, how others solved this problem and would have been drawn to implement Ellsberry's bidirectional drivers with Halbert's tristate buffers. *Intel Corp. v. PACT XXP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) (that the references address the same problem and one reference solves that problem through a different mechanism is a reason to combine under *KSR* and Federal Circuit precedent).

To the extent that Patent Owner argues that the memory-controller-side tristate buffer 122 interfacing with bus 230 is redundant to the memory-side tristate buffers 126, 128, we find a person of ordinary skill in the art would have understood that the tristate buffer 122, in the high-impedance state, prevents the bus 230, and hence the system memory controller, from experiencing the load imposed by the circuitry in the data buffer between tristate buffer 122 and tristate buffers 126, 128. Ex. 2007, 110:24–111:6. It would also enable more exact timing of enabling and disabling the tristate buffers 122, 126, 128 as data traverses the memory buffer, which would pass through buffer 122 and buffers 126, 128 at slightly different times. Ex. 1006, Figs. 4, 6 [e.g., compare timing of DQ, MDQ, DQ0/DQ1, RDQ0_IN, RDQ0_OUT, RDQ1], 6:66–7:30. In addition, it would prevent the system memory controller from experiencing the memory module's load when communicating with other memory modules on system bus 230. *See*

IPR2022-00639
Patent 10,949,339 B2

Ex. 1003 ¶¶ 241, 259, 374, 399; Ex. 1006, Figs. 4, 6, 9, 6:66–7:6, 8:10–18 (memory module is activated by Active command).  In addition, Halbert's Figure 4 teaches the person of ordinary skill that the tristate buffers should be arranged in this way.  Ex. 1006, 4:60–62 (bidirectional buffer 122 is connected to the system memory data bus).  Consequently, a person of ordinary skill in the art would have had reason to add Halbert's tristate buffer 122 to interface with Ellsberry's bus 230.

*c)    Saving Power by Disabling Write Drivers*

Petitioner contends that a person of ordinary skill in the art "would have . . . understood that driving the data busses only for an interval as necessary for transmitting [a] burst of data according to the JEDEC protocol would . . . save power, thus further motivating her to follow those timing protocols in accordance with [Halbert's] disclosure."  Pet. 81 (citing Ex. 1003 ¶ 366).  Petitioner contends that the combination of Ellsberry and Halbert "would be well within the level of skill at the time, since the JEDEC standards were designed to be implemented by memory systems at the time."  *Id.* (citing Ex. 1003 ¶ 367).

Patent Owner argues that Halbert does not mention power concerns and leaves the write path enabled between memory operations, and that Petitioner's expert, Dr. Subramanian, presents no analysis of the amount of power savings achieved to justify making the combination.  Resp. 4 (citing Ex. 1006, Fig. 6; Ex. 2005 ¶¶ 104–108; Ex. 1003 ¶ 366), 47 (citing Ex. 2007, 72:5–8; Ex. 2005 ¶ 107), 58–59; Sur-Reply 28–29.

In Reply, Petitioner argues that it would have been obvious to use Halbert's tristate buffers (elements 122, 126, 128 in Figure 4) to enter the high impedance state whenever not actively sending data to save power.

23

IPR2022-00639
Patent 10,949,339 B2

Reply 25 (citing Ex. 2007, 14:11–22, 17:21–19:12, 24:5–26:24, 37:9–24, 57:1–58:2; *see also* Ex. 1092, 123:16–125:11). Petitioner contends that Figures 3, 5, and 6 of Halbert disclose that "the data paths are actively driven only during the data bursts." *Id.* (emphasis omitted) (citing Ex. 1003 ¶ 362; Pet. 79–80). Petitioner further contends that the motivation to save power "need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." Reply 26 (emphasis omitted) (citing *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006)). Petitioner contends that Patent Owner's expert concedes that power savings were a concern with devices such as laptop computers implementing DDR2 and DDR3 memory modules. *Id.* (citing Ex. 2013, 5; Ex. 1092, 123:16–23, 124:13–20, 125:2–11; Ex. 2010, 2). Petitioner argues that its expert, Dr. Subramanian, explained that buffers should be placed in a high-impedance state when not actively driving data because otherwise the total energy that will be lost would be significant. *Id.* at 26–27 (citing Ex. 2007, 59:7–60.8, 120:12–121:7, 121:19–122:11; Ex. 1003 ¶¶ 366, 422, 662). According to Petitioner, he quantified the total energy lost as "the capacitance of the line multiplied by the voltage to which it is charged, squared and multiplied by half, approximately." *Id.* at 26–27 (quoting Ex. 2007, 60:4–8).

In Sur-Reply, Patent Owner contends that "[n]o prior art references taught . . . enabling the data path only for [a] burst period would save a sufficient amount of power to be desirable." Sur-Reply 28. Patent Owner further asserts that "[t]he argument also does not address the lack of

IPR2022-00639
Patent 10,949,339 B2

teaching, or reasonable expectation of success in timing the enablement of the data paths correctly." *Id.* (citing Ex. 2013, 5; Ex. 2021, 37, 43).

Petitioner's and Patent Owner's experts agree that at least in some applications (e.g., laptop computers), one of ordinary skill in the art would have considered power savings an important priority in the design of a memory module. Ex. 1003 ¶¶ 366, 422, 662; Ex. 2007, 18:8–18, 37:20–24, 57:1–10; Ex. 1092, 123:16–125:11; Ex. 2013, 5; Ex. 2010, 2. The record thus establishes that excessive power consumption was a known problem in the art. The record further establishes that Halbert's tristate buffers in the high-impedance state would have been effective in saving power when a memory module was not actively conducting a read or write operation. Ex. 1003 ¶ 366; Ex. 2007, 18:8–18, 27:21–25, 37:20–24, 57:1–10; Ex. 1092, 123:16–125:11.

We do not agree with Patent Owner's argument that the references must teach the problem of power consumption and describe a way of addressing it in order for one of ordinary skill in the art to combine the references. Resp. 4, 47; Sur-Reply 28. The case here is similar to *KSR* and *Qualcomm* where a predictable solution to a known problem was found obvious. *See KSR*, 550 U.S. at 420; *Qualcomm*, 21 F.4th at 799, *supra*.

As to Patent Owner's argument that Petitioner's expert did not show that the amount of power savings achieved would be significant enough to justify implementing Ellsberry's bidirectional drivers with Halbert's tristate buffers, we do not agree. Resp. 4, 47; Sur-Reply 28. Both Petitioner's and Patent Owner's experts agree that power savings would have been desired for memory modules by a person of ordinary skill in the art. Ex. 1003 ¶¶ 366, 422, 662; Ex. 2007, 18:8–18, 37:20–24, 57:1–10; Ex. 1092,

IPR2022-00639
Patent 10,949,339 B2

123:16–125:11; Ex. 2013, 5; Ex. 2010, 2. The evidence shows that putting
the tristate buffers in high impedance states and enabling only when
necessary to drive data would have resulted in power savings, which would
have been an improvement.

To the extent Patent Owner argues that Petitioner's expert's testimony
is not supported by underlying facts and data as required (see 37 C.F.R.
§ 42.65(a)), we find that the record provides sufficient support. Resp. 4,
58–59. Petitioner's expert provided on the record the equation by which
power consumption can be calculated. Ex. 2007, 60:4–8. In addition, the
JEDEC standard indicates power savings are desirable by providing a
"power-saving, power-down mode" in its DDR SDRAM specification.
Ex. 1009, 1. We also note that a textbook in the record indicates that
"excess power consumption means excess heat generation, higher operating
cost, and perhaps the addition of a fan and air filter." Ex. 1035, 135. And
Patent Owner's own expert agrees that power consumption is a problem that
one of ordinary skill in the art would have recognized at the time of the '339
patent. Ex. 1092, 123:16–125:11. Petitioner shows that implementing
Ellsberry's bidirectional drivers with Halbert's tristate buffers and adding an
additional buffer similar to Halbert's tristate buffer 122 would have solved
this problem. Ex. 2013, 5; Ex. 1092, 114:7–115:1, 123:16–23, 124:13–20,
125:2–11; Ex. 2010, 2. Accordingly, we do not agree with Patent Owner's
argument.

We determine that the problem of saving power would have provided
a reason for one of ordinary skill in the art to combine Halbert's tristate
buffers with Ellsberry's bidirectional drivers with a reasonable expectation
of success.

IPR2022-00639
Patent 10,949,339 B2

### d)    Compatibility of Ellsberry and Halbert

Patent Owner argues that Ellsberry and Halbert have incompatible architectures.  Resp. 60–64; Sur-Reply 30–31.  According to Patent Owner, Halbert uses concurrent read/write operations in all memory ranks.  Resp. 60 (citing Ex. 1006, 4:55–59).  Patent Owner's expert contends that "Halbert's architecture is for a design in which all memory banks are enabled and no data paths are disabled."  Ex. 2005 ¶ 134, *cited in* Resp. 61.  In contrast, Patent Owner argues, "Petitioner's unpatentability theory requires Ellsberry to assume a configuration in which some data paths are disabled and only some memory banks can be accessed."  Resp. 60–61 (citing Pet. 73–74, 102).

As we noted in our Institution Decision, Halbert teaches that "[g]*enerally*, multiple ranks will receive the same address and commands, and will perform memory operations with the interface circuit concurrently." Inst. Dec. 28–29 (citing Ex. 1006, 4:57–59).  Halbert's use of the word "generally" means that it is not always the case that memory ranks perform memory operations concurrently.  Inst. Dec. 28–29.  Thus, as shown in Halbert's Figure 4, memory module 100 may receive data DQ of $m$ bits from the memory controller and store them in either rank 140 or 142 in a write operation, or may transmit data DQ of $m$ bits to the memory controller after reading them from rank 140 or 142 in a read operation.  Ex. 1006, 4:49–57. We agree with Petitioner that Patent Owner's expert attempts to redefine the term "generally" in Halbert to mean "manufacturing variances," when the word clearly refers to multiple ranks receiving the same address and commands in the same sentence.  Reply 33.  Our opinion has not changed that replacing Ellsberry's bidirectional drivers with Halbert's tristate buffers

IPR2022-00639
Patent 10,949,339 B2

is merely "combining familiar elements according to known methods to yield predictable results." Inst. Dec. 28 (citing *KSR*, 550 U.S. at 416).

>    e)    *Omission of Halbert's MUX/DeMUX from the Combination*

Petitioner contends that a person of ordinary skill would have understood that Halbert's MUX would not be needed in Ellsberry. Pet. 46 (citing Ex. 1003 ¶ 262; Ex. 1005 ¶ 46, Fig. 7; Ex. 1006, 5:66–6:65, 7:7–13, Figs. 5–6). Petitioner's contention is supported by Dr. Subramanian, who states a person of ordinary skill in the art would have understood that the functionality of Halbert's MUX/DeMUX 124 is not necessary in Ellsberry. Ex. 1003 ¶ 262.

Patent Owner does not dispute Petitioner's contention that Halbert's MUX would not be needed in Ellsberry. *See* Resp.

In the absence of contrary evidence, we accept Petitioner's contention that one of ordinary skill in the art would have omitted Halbert's MUX/DeMUX in making the combination.

>    f)    *Latency Differences Between Memory Devices and Modules*

Patent Owner argues that SDRAM device latency and module latency are different things, and that without the inventor of the '339 patent's teaching, one would not have known how to time the enablement or disablement of a data path in a data buffer. Resp. 49–50 (citing Ex. 2009, 27).

Petitioner contends that Patent Owner's argument relates to unloaded latency when the system is idle, and loaded latency when a memory module is saturated with memory requests. Reply 30 (citing Ex. 2009, 15; Ex. 1092, 246:19–247:5). Petitioner contends that those latencies are not the latency

28

relevant here, which is the CAS latency (including CAS latency (CL) and Posted CAS latency or Additive latency (AL)) which is configured during initialization and does not change during normal operation. *Id.* We agree with Petitioner that the latencies Patent Owner mentions do not relate to the CAS latency at issue in this case. Patent Owner's argument does not undermine Petitioner's combination.

g)    *Predictability of Latency through Data Buffer*

Patent Owner argues that latency through a data buffer varies in a complex and unknown manner such that one of ordinary skill in the art "would not have had a reasonable expectation of success to achieve the correct timing and synchronization for the data buffer data path needed for the modification." Resp. 3, 50–51; Sur-Reply 7–11 (citing Ex. 1085; Ex. 1092, 49–64; Ex. 2007, 227:1–20, 254:2–5; Ex. 2012, 2, 5–7; U.S. Patent No. 8,787,060, 18:31–37, Figs. 6A–6B; Ex. 2008, Figs. 5–6; Ex. 2009, 27; Ex. 2020, 1–2; Ex. 1006, 7:37–41, Fig. 7; Ex. 2005 ¶¶ 92–94); *see also* Sur-Reply 25–26.

Petitioner disagrees and argues that U.S. Patent No. 7,532,537 ("'537 patent") teaches that if there is a data buffer on the module, then including "one additional clock cycle" in the CAS latency can provide sufficient time budget for the data buffer to perform its functions while still complying the timing requirements shown in the JEDEC standards. Reply 9–10 (Ex. 1014, 21:28–52; Ex. 1092, 174:8–175:21, 179:14–181:6).

Petitioner further argues that Ellsberry teaches to include one additional clock cycle in the CAS latency for the data buffer to perform its functions while still complying with JEDEC's timing requirements. Reply 10 (citing Ex. 1005, Fig. 8B, n.1; Ex. 2007, 181:9–182:22, 204:11–205:24,

IPR2022-00639
Patent 10,949,339 B2

230:25–234:16; Pet. 36–37, 75–78).

Petitioner contends Halbert is even more detailed and provides precise timing diagrams for the data buffer while teaching compliance with JEDEC's timing requirements for a DIMM without a data buffer (such as a Registered DIMM ("RDIMM")). *Id.* at 10–11 (citing Pet. 78–81; Ex. 1003 ¶¶ 196–198; Ex. 1006, 3:42–57, 6:1–4, Figs. 5–6; Ex. 1092, 279:15–280:6).

Although Patent Owner argues that it was learned after the '339 patent that shorter stubs and traces would reduce latency (Sur-Reply 9), Patent Owner does not dispute that adding an additional clock cycle, as taught by the '537 patent, Ellsberry, and Halbert, would be sufficient to address latency through a data buffer, as Petitioner proposes. *See* Reply 6–11. Consequently, Patent Owner's argument fails to show that a person of ordinary skill in the art would not have had a reasonable expectation of success in arriving at the '339 patent's claims.

        *h)*     *Conclusion on Motivation to Combine*

Petitioner has shown that one of ordinary skill in the art would have reasons to combine Ellsberry and Halbert. Specifically, one of ordinary skill in the art would have looked to Halbert for details on how Ellsberry's bidirectional drivers would be implemented using Halbert's tristate buffers. In addition, one of ordinary skill in the art would have been led to add a buffer to Ellsberry similar to Halbert's buffer 122 to receive and drive signals on the interface with the system memory controller. One of ordinary skill in the art would have appreciated that the Ellsberry-Halbert combination would have reduced or eliminated bus conflicts, presented a single load to the system memory controller, and would have saved power

IPR2022-00639
Patent 10,949,339 B2

by not expending it unless actively executing a read or write operation, notwithstanding Patent Owner's arguments to the contrary.

Accordingly, Petitioner has shown by a preponderance of the evidence that one of ordinary skill in the art would have combined Ellsberry and Halbert with a reasonable expectation of success.

### 4. Claim 1

Petitioner contends that claim 1 of the '339 patent is unpatentable over the combination of Ellsberry and Halbert. Pet. 47–86. We consider Petitioner's contentions for each limitation of claim 1 shown below.

### a) Preamble 1pre

The preamble of claim 1 recites:

> [1pre] A N-bit-wide memory module mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide, the memory module comprising:

Ex. 1001, 19:9–15. Petitioner contends that Ellsberry teaches an N-bit wide memory module 106 mountable via DIMM interface 202 in a memory socket of computer system 100, which is configured to communicate address and control signals with processing unit 102 via communication path 110. Pet. 47–48 (citing Ex. 1005, Figs. 1–3, 5, 6). Petitioner contends that Ellsberry teaches that the N-bit with data signal lines include sets of data signal lines (9 sets) with each set a byte wide (8 bits). *Id.* at 48–49 (citing Ex. 1005 ¶¶ 2, 3, 11, 14, 23, 26–30, 34, Figs. 1, 2 (data buses 230, 232), 5, 6; Ex. 1003 ¶¶ 267–278).

IPR2022-00639
Patent 10,949,339 B2

Patent Owner does not dispute that Ellsberry teaches the preamble of claim 1. *See* Resp.

Petitioner shows that Ellsberry teaches the preamble of claim 1. Accordingly, we need not address whether the preamble is limiting. *See, e.g.*, *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002).

### b) Limitation 1a

Limitation 1a of claim 1 of the '339 patent recites "a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and configured to be releasably coupled to corresponding contacts of the memory socket." Ex. 1001, 19:16–20. Petitioner contends that Ellsberry alone or combined with Halbert teaches the claimed PCB. Pet. 49–51 (citing Ex. 1003 ¶¶ 279–295). Specifically, Petitioner contends that Ellsberry teaches a substrate 502/602 with an edge interface 506. *Id.* at 49–50 (citing Ex. 1005 ¶¶ 2, 21, 27, 28, 47, 50, claim 10, Figs. 5, 6). Petitioner also contends that Halbert teaches that its DIMM is a circuit board with an edge connector with contacts releasably connecting to corresponding contacts of a memory socket. *Id.* at 50–51 (citing Ex. 1006, 2:3–14, Figs. 1, 8; Ex. 1003 ¶¶ 288–295).

Patent Owner does not dispute Petitioner's contention that Ellsberry alone or combined with Halbert teaches limitation 1a of claim 1. *See* Resp.

Petitioner shows that Ellsberry alone and combined with Halbert teach limitation 1a of claim 1.

IPR2022-00639
Patent 10,949,339 B2

### c)    *Limitation 1b*

Limitation 1b of claim 1 of the '339 patent recites "double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks." Ex. 1001, 19:21–23. Petitioner contends that Ellsberry discloses DDR DRAM devices 512 coupled to substrate 502/602 that are arranged in nine 8-bit memory devices, or nine pairs of 4-bit memory devices. Pet. 51–54 (citing Ex. 1005 ¶¶ 3, 26, 30–32, 40, 46, 47, Figs. 2, 5, 6, 11, 13; Ex. 1003 ¶¶ 296–305).

Patent Owner does not dispute Petitioner's contention that Ellsberry teaches limitation 1b of claim 1. *See* Resp.

Petitioner shows that Ellsberry teaches limitation 1b of claim 1.

### d)    *Limitation 1c1*

Limitation 1c1 of claim 1 of the '339 patent recites

> a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, wherein the module controller is configurable to receive from the memory controller via the address and control signal lines input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals.

Ex. 1001, 19:24–33. Petitioner contends Ellsberry teaches controllers (e.g., ASIC 204 and controllers 300, 510, 604, 1102, 1104, 1302) connected to PCB 502, 602 and operatively connected to DDR DRAM memory devices 512. Pet. 55–61. Petitioner further contends the controllers receive address and control signals System Address/CMD from processing unit 102. *Id.* at 56. Petitioner further contends the input and address signals are for a write operation to write N-bit-wide write data from the processing unit 102 into

IPR2022-00639
Patent 10,949,339 B2

one of the multiple N-bit-wide ranks and to output registered address and command signals on bus 220 in response to the received input address and control signals from the processing unit. *Id.* (citing Ex. 1005 ¶¶ 3, 10, 11, 29, 20, 36, 39, 40, 42, 45, 47, Figs. 2, 3, 5, 6, 8, 11, 13; Ex. 1003 ¶¶ 306–318).

Patent Owner does not dispute Petitioner's contentions with respect to limitation 1c1 of claim 1. *See* Resp.

Petitioner shows that Elsberry teaches limitation 1c1 of claim 1 of the '339 patent.

e)    *Limitation 1c2*

Limitation 1c2 of claim 1 of the '339 patent recites "wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals." Ex. 1001, 19:33–39. Petitioner contends that Ellsberry teaches that the registered address and control signals on bus 220 cause bank 1 to perform a memory write operation under control of control ASIC 204. Pet. 61–65. Specifically, the control ASIC 204 outputs control signals on bus 210 in response to the input address and control signals from processing unit 102 to cause N-bit-wide write data to be written to Bank 1. Pet. 61 (citing Ex. 1005 ¶¶ 29–31, 39, 42, 52, Figs. 2–4, 8A, 11, 13; Ex. 1003 ¶¶ 319–326).

Patent Owner does not dispute Petitioner's showing with respect to limitation 1c2 of claim 1. *See* Resp.

IPR2022-00639
Patent 10,949,339 B2

Petitioner shows that Ellsberry teaches limitation 1c2 of claim 1 of the '339 patent.

### f)    Limitation 1d1

Limitation 1d1 of claim 1 of the '339 patent recites "a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals." Ex. 1001, 19:53–55. Petitioner contends that in Ellsberry switch ASICs 206 and 208, device 400 and bank switches 1106 and 1304 are byte-wise buffers coupled to PCB 502, 602 and are configured to receive module control signals from the control ASIC on control bus 210. Pet. 65–67 (citing Ex. 1005 ¶¶ 29, 30, 45, 47, Figs. 2–6, 11, 13; Ex. 1003 ¶¶ 327–333).

Patent Owner does not dispute Petitioner's showing that Ellsberry teaches limitation 1d1 of claim 1. *See* Resp.

Petitioner shows that Ellsberry teaches limitation 1d1 of claim 1 of the '339 patent.

### g)    Limitation 1d2

Limitation 1d2 of claim 1 of the '339 patent recites

> wherein each respective byte-wise buffer of the plurality of
> byte-wise buffers has a first side configured to be operatively
> coupled to a respective set of data signal lines, a second side
> that is operatively coupled to at least one respective DDR
> DRAM device in each of the multiple N-bit-wide ranks via
> respective module data lines, and a byte-wise data path between
> the first side and the second side.

Ex. 1001, 19:40–49. Petitioner contends that Ellsberry teaches that the byte-wise buffer is the switch ASIC 206, 208 which is connected on a first side to the data buses 230, 232 coupled to DIMM interface 202, 230, DQ(3:0), DQ(7:4) and a second side that is operatively coupled to at least one DDR

IPR2022-00639
Patent 10,949,339 B2

DRAM device in each of the multiple N-bit wide banks via data bus 234, 236 (Figs. 2, 4), and "/4" (Fig. 11) and "/8" (Fig. 13). Pet. 68–71. Petitioner further contends Ellsberry teaches a byte-wise data path between data bus 230 and either data bus 234 (Port A) or data bus 236 (Port B) (Figs. 2, 4) or the 8-bit data path between DQ(3:0)/DQ(7:4) (Figs. 11, 13). *Id.* at 68–71 (citing Ex. 1005 ¶¶ 29, 47, 50, Figs. 2, 5, 6, 11–13; Ex. 1003 ¶¶ 343–347).

Patent Owner does not dispute Petitioner's showing with respect to limitation 1d2 of claim 1. *See* Resp.

Petitioner shows that Ellsberry teaches limitation 1d2 of claim 1 of the '339 patent.

### h)     Limitation 1d3

Limitation 1d3 of claim 1 of the '339 patent recites

> wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines.

Ex. 1001, 19:49–52. Petitioner contends that Ellsberry discloses limitation 1d3. Pet. 71–73 (citing Ex. 1003 ¶¶ 343–347). Specifically, Petitioner contends that "wherein the each respective byte-wise buffer is disposed on the PCB" is disclosed by Ellsberry's switch ASIC 206, 208 in Fig. 2, memory bank switch 508 in Figures 5 and 6, and bank switch 1106 in Figure 11, and substrates 502 and 602 in Figures 5 and 6. *Id.* at 71. Petitioner contends that "at a respective position corresponding to the respective set of the plurality of sets of data signal lines" is disclosed by Ellsberry's data buses 230, 232 in Figure 2. *Id.* at 71–73 (citing Ex. 1003 ¶ 343–347; Ex. 1005 ¶¶ 29, 47, 50, Figs. 2, 5, 6, 11–13; Ex. 1010, 8–9 (showing edge pin assignment to data line sets pins); Ex. 1062, 25–26)).

IPR2022-00639
Patent 10,949,339 B2

Patent Owner does not dispute Petitioner's showing with respect to limitation 1d3 of claim 1. *See* Resp.

Petitioner shows that Ellsberry teaches limitation 1d3 of claim 1 of the '339 patent.

### i)    Limitation 1e

Limitation 1e of claim 1 of the '339 patent recites

wherein the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals, wherein the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period.

Ex. 1001, 19:53–61. Petitioner contends that Ellsberry alone or combined with Halbert teaches limitation 1e of claim 1. Pet. 73–81. Specifically, Petitioner contends that Ellsberry discloses that switch ASIC 206, 208, 400 includes a control block including read/write logic 406 ("logic") to control the 8-bit data path between data bus 230 and either data bus 234 (Port A) or data bus 236 (Port B) in response to module control signals on bus 210. *Id.* at 73. Petitioner contends that the byte-wise data path is enabled through Port B and disabled through Port A, or vice versa, for a "first time period" in accordance with a "latency parameter," Posted CAS_n (Fig. 9), to actively drive through the combination's bidirectional drivers (tristate buffers) a respective byte-wise section of the N-bit wide write data from the first side (data bus 230) to the second side (data bus 234 or 236). Pet. 73–75 (citing Ex. 1005 ¶¶ 11, 29, 31, 39, 40, 44–46, 50, Figs. 2, 4, 9; Ex. 1003 ¶¶ 348–368).

IPR2022-00639
Patent 10,949,339 B2

Petitioner contends the "first time period" relates to a data burst under the JEDEC standards which starts in accordance with the latency parameters (AL and CL) and has a duration in accordance with a burst length parameter (BL). Pet. 74 (citing Ex. 1003 ¶¶ 348–368). Petitioner contends that the latency parameters include the Posted CAS latency (AL) and CAS latency (CL). *Id.* at 77 (citing Ex. 1003 ¶¶ 352, 363).

Petitioner presents the following timing diagram, Figure 21, from the JEDEC standard, annotated by Petitioner, to explain these latencies.



[AL = 2 and CL = 3, RL = (AL + CL) = 5, WL = (RL - 1) = 4, BL = 4]

**Figure 21 — Example 1: Read followed by a write to the same bank, where AL = 2 and CL = 3, RL = (AL + CL) = 5, WL = (RL - 1) = 4, BL = 4**

Reply 8 (citing Ex. 1011, 22; Ex. 1092, 43:21–44:2, 91:7–92:16, 93:4–14); *see also* Pet. 76–78. As shown in the annotated Figure 21 above, the JEDEC standard provides a delay between assertion of the command CMD and the strobing of data DQ of RL=AL+CL= 5 clock cycles for a read operation, and WL=RL–1=4 clock cycles for a write operation.

Petitioner contends that Ellsberry teaches including one additional clock cycle in the CAS latency for the data buffer to perform its functions while still complying with JEDEC's timing requirements. Reply 10 (citing Ex. 1005, Fig. 8B, n.1; Ex. 2007, 181:9–182:22, 204:11–205:24, 230:25–234:16; Pet. 36–37, 75–78).

IPR2022-00639
Patent 10,949,339 B2

Petitioner contends that, to the extent Ellsberry alone does not teach limitation 1e, it would have been obvious in view of Halbert. The combination of Ellsberry and Halbert was shown and discussed above in Section II.D.3. Petitioner contends that Halbert teaches using preset latency parameters for timing data transfer bursts and that the data paths are driven only during the data bursts. Pet. 79 (citing Ex. 1006, 1:51, 2:46–60, 6:66–67, 9:55–65, Figs. 3–6; Ex. 1003 ¶ 362). Petitioner contends that Halbert further provides precise timing diagrams for the data buffer while teaching compliance with JEDEC's timing requirements. Reply 10–11 (citing Ex. 1003 ¶¶196–98; Ex. 1006, 3:42–3:57, 6:1–4; Ex. 1092, 279:15–280:6). Petitioner contends that, in the combination "communication failures can be avoided on the shared bidirectional data busses by following the JEDEC timing protocol and driving the bidirectional memory data busses for the duration of the data burst when forwarding the write data from the system memory controller to the memory device." Pet. 80.

### (1)    Enabling and Disabling Data Paths through the Data Buffer

Patent Owner argues that all of Ellsberry's embodiments keep the data paths enabled at all times, and thus do not enable any data paths in accordance with a latency parameter. Resp. 33–42; Sur-Reply 11–15. We agree with Patent Owner that Ellsberry discloses embodiments that use data masking or NOP commands that could function with data paths always enabled. However, we disagree with Patent Owner that Ellsberry is limited to embodiments with always-enabled data paths. As Petitioner contends, Ellsberry discloses "one port disabled" embodiments that use switch ASICs

IPR2022-00639
Patent 10,949,339 B2

206, 208, 400 to enable or disable data paths to respective banks of memory devices.  Pet. 73–74 (citing Ex. 1005 ¶¶ 30–31, 40, Figs. 2, 4).

Ellsberry is very clear that in certain embodiments, the control unit controls the bank switch (switch ASIC) to enable or disable Port A or Port B as appropriate for the memory address received by the control unit. Ex. 1005 ¶¶ 30–31, 40, Figs. 2, 4; Ex. 1003 ¶¶ 231, 358.  The parties refer to this configuration as the "one-port disabled" embodiment.  *See, e.g.*, Pet. 149; Resp. 13.  Ellsberry's Figure 2 and related description shows that the Ports A and B are selectively enabled or disabled to output respective data bytes (Byte 0) and data strobe signals (DQS A0, DQS B0) on data buses 234, 236.  *See* Ex. 1005 ¶ 31 ("[I]f the control unit 204 determines that a particular address is associated with, or mapped to, Bank 1 212 coupled to memory bank switch 206, then it causes Port B to be activated and Port A to be disabled so that the data is written to the correct memory bank 212.").

Thus, we do not agree with Patent Owner's argument that Ellsberry is limited to always-enabled data paths.

*(2)    Using Bidirectional Drivers to Enable or Disable Data Paths*

Patent Owner argues that Ellsberry does not disclose that Ellsberry's bidirectional drivers 402/404 enable or disable data paths.  Resp. 40–43; Sur-Reply 17–21.  However, as just explained, Ellsberry teaches "one port disabled" embodiments which selectively enable or disable Ports A and B of switch ASICs 206, 208, 400.  Ex. 1005 ¶ 31.  Ellsberry's Figure 4 shows that the only elements within the data processing unit 400 (part of the switch ASIC) that the data paths pass through are the bidirectional drivers 402, 404. *Id.* ¶ 45.  This would suggest to one of ordinary skill in the art that the

40

bidirectional drivers 402, 404 are what enables or disables data paths. Ex. 1003 ¶¶ 235, 355, 358; *see KSR*, 550 U.S. at 418 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ"), 421 ("[a] person of ordinary skill is also a person of ordinary creativity, not an automaton"). Review of Halbert's Figure 4 and its bidirectional drivers 122, 126, 128 confirms that these tristate buffers would be used to enable or disable data paths between the system data bus and the buses connected to the respective ranks of memory devices. Ex. 1006, 4:60–64, 5:6–11, 5:51–65, Figs. 3, 5, 6.

Patent Owner argues that Ellsberry does not disclose enabling or disabling the data path by enabling or disabling drivers 402 and 404. Resp. 40–42. Patent Owner contends that Dr. Wolfe, Petitioner's expert in another case involving a different combination of prior art, stated that the bidirectional drivers 402 and 404 did not enable or disable data paths, but instead that pin drivers performed these functions. *Id.* at 41–42 (citing Ex. 2007, 225:12–25, 227:14–228:9, 228:11–25, 229:17–231:3); *see also* Ex. 2005 ¶ 47.

Ellsberry is clear that its memory bank switches 206 and 208 enable one data path to one of Ports A and B, and disable the other. Ex. 1005 ¶ 31. Although Patent Owner alleges that Dr. Wolfe states that pin drivers are what enable and disable data paths (Ex. 2007, 225:12–25), elsewhere, Dr. Wolfe is unequivocal that the bidirectional drivers 402 and 404 are what enable and disable data paths (Ex. 2007, 181:10–12 (Question: "And by 'switch,' which switch are you referring to?" Answer: "[bidirectional drivers] 402 and 404 act as a switch in Ellsberry.")). Petitioner's expert in this case, Dr. Subramanian, also states unequivocally that the bidirectional

IPR2022-00639
Patent 10,949,339 B2

drivers 402 and 404 are what enables and disables data paths through the memory bank switches. Ex. 1003 ¶¶ 159, 239–240. Since Dr. Subramanian is testifying in this case, and Dr. Wolfe is not, we credit Dr. Subramanian's testimony over Dr. Wolfe's. In any case, there is no dispute between the parties that Halbert's tristate buffers would provide the capability to enable or disable data paths. Thus, we agree with Petitioner that Ellsberry's bidirectional drivers enable or disable the data paths through the data buffer. Reply 21 (citing Pet. 79–80; Ex. 1003 ¶ 362). To the extent there is any doubt as to what in Ellsberry's memory bank switch performs these functions, there is no dispute that Halbert's bidirectional buffer 122 and bidirectional data registers 126 and 128 have the capability to enable and disable data paths because they are illustrated in Figure 4 as symbols recognized in the art as tristate buffers. Ex. 1006, Fig. 4; Ex. 2007, 17:21–18:6. Halbert's Figure 6 shows a write operation with "don't care" states, which Patent Owner alleges to mean that the tristate buffers of Halbert's bidirectional buffer 122 and bidirectional data registers 126 and 128 are enabled during these times. However, Petitioner relies on the general knowledge of a person of ordinary skill of the art which includes the JEDEC standards, which show that the data DQ are disabled until the data DQ are output to the memory devices during a write operation. Ex. 1011, 6, 22. We agree with Petitioner that Ellsberry alone or in combination with Halbert, when viewed with the general knowledge of a person of ordinary skill in the art, teaches enabling and disabling data paths through the data buffer.

IPR2022-00639
Patent 10,949,339 B2

### (3)    Use of Posted CAS Latency (AL) Parameter in Ellsberry's Switches

Patent Owner argues that Petitioner has not shown enablement of the data path is done for a first time period in accordance with a latency parameter to drive a byte-wise section of write data from the host side to the memory side of the data buffer. Resp. 33. Specifically, Patent Owner argues that Ellsberry does not use Posted CAS latency (AL) bits to control timing of the enablement of the data path across its switch ASIC. Resp. 34–36 (citing Ex. 1005 ¶ 44; Ex. 2005 ¶¶ 80–81; Ex. 2007, 122:16–126:24, 130:1–133:6, 238:9–244:3); Sur-Reply 27 (citing Ex. 1092, 263:3–15, 211:18–214:24). Patent Owner also argues that Ellsberry does not mention passing CAS latency (CL) bits to switch ASICs 206/208. Resp. 36–40 (citing Ex. 2007, 130:20–131:16, 134:20–135:21, 220:4–25, 229:4–230:11, 259:6–260:6; Ex. 1005 ¶¶ 29, 39, 44–45, Figs. 3, 8A; Ex. 2005 ¶¶ 86–90; Pet. 61–64, 74, 76, 98). We do not agree with Patent Owner's arguments.

Petitioner contends that Patent Owner's expert admitted that "CAS latency" is an example of a "latency parameter" within the meaning of limitation 1e. Reply 7 (citing Ex. 1092, 166:8–13). Petitioner contends that the JEDEC standards required setting CAS (CL) latency, Posted CAS (AL) latency, and burst length (BL) during initialization using respective mode register set (MRS) and extended MRS (EMRS) commands. Id. (citing Ex. 1011, 10–11; Ex. 1092, 69:6–70:10, 70:20–74:2, 74:7–76:1, 78:7–79:6, 80:8–24, 86:4–10, 86:25–87:18). Petitioner contends that once these latencies and burst length are set during initialization, they do not need to be changed during normal operation. Id. (citing Ex. 1092, 88:22–89:7, 90:3–91:6; Ex. 1041, 342). Accordingly, Petitioner argues that every read

IPR2022-00639
Patent 10,949,339 B2

and write operation is performed "in accordance with" those "latency" parameters. *Id.* at 8.

Ellsberry teaches that instead of passing EMRS commands directly to the memory devices (SDRAMs), the memory module's control unit passes the commands to the memory bank switch where the values are stored. Ex. 1005 ¶ 44, Fig. 9, *cited in* Pet. 74. As shown in Ellsberry's Figure 9, the command and its parameters are squelched but the Posted CAS_n latency parameter is sent through to the memory bank switch. Ex. 1005 ¶ 44, Fig. 9. Ellsberry states that the squelch function allows the memory devices to be configured to operate in conjunction with the controller/switch devices and host system, rather than be directly programmed by the host system. *Id.* ¶ 44. Patent Owner seems to argue that the memory bank switch merely passes the Posted CAS_n latency parameter (AL) to the memory devices along with the burst length (BL) and CAS latency parameter (CL). Resp. 34 (citing Ex. 1005 ¶ 44; Ex. 2005 ¶¶ 80–81). But in paragraph 44, Ellsberry mentions the Posted CAS_n latency parameter (AL), not the burst length (BL) and CAS latency (CL). *Id.* ¶ 44. And Patent Owner does not explain why the memory bank switch would store the Posted CAS_n latency parameter if it did not use it. *Id.* We find that the memory bank switch is using the Posted CAS_n parameter for some purpose, as discussed below.

Petitioner contends that Ellsberry and the '339 patent disclose that their memory modules are compatible with JEDEC standards. Pet. 36–37 (citing Ex. 1005 ¶¶ 27, 44, 50, Fig. 9 ("Posted CAS_n"); Ex. 1001, 1:63–2:4, 3:35–41, 4:48–53, 5:4–8, 5:44–55, 9:31–36, 15:61–66 ("(CAS) latency"); EX1003 ¶¶ 247–250). In addition to the JEDEC standards, Petitioner relies on the '537 patent as providing general knowledge that a person of ordinary

IPR2022-00639
Patent 10,949,339 B2

skill in the art would have known at the time of the '339 patent. Pet. viii;
Reply 9–10; *see Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330,
1337 (Fed. Cir. 2020) ("[T]he inquiry into whether any 'differences'
between the invention and the prior art would have rendered the invention
obvious to a skilled artisan necessarily depends on such artisan's
knowledge."). The '537 patent is incorporated by reference in the '339
patent. Ex. 1001, 10:48–53; Ex. 1003 ¶ 46.

As shown in Figure 21 from the JEDEC standard, an annotated
version of which is reproduced above in Section II.D.4.i, the JEDEC
standards provide a read latency RL from when a read command is received
by a memory module to when read data DQ is strobed by DQS, as well as a
write latency WL from when a write command is issued to when write data
DQ is strobed by DQS. Ex. 1011, 22. These latencies RL and WL depend
upon the CAS latency CL and the Posted CAS latency (or additive latency)
AL (RL=AL+CL; WL=AL+CL–1). Ex. 1011, 10–11; Ex. 1003 ¶ 352.

Petitioner contends that the Posted CAS latency (or additive latency)
(AL) is in accordance with the claimed "latency parameter" which is set to
account for the time needed for data to traverse the data buffer, which
Petitioner contends is one clock cycle. Reply 10 (citing Ex. 1005, Fig. 8B,
n.1; Ex. 2007, 181:9–182:22, 204:11–205:24, 230:25–234:16; Pet. 36–37,
75–78).

As correctly asserted by Petitioner (Reply 9–10), the '537 patent
teaches that if there is a data buffer on the module, then one additional clock
cycle in the overall CAS latency can provide sufficient time budget for the
data buffer to perform its functions while still complying with the timing
requirements for a registered DIMM, which has no data buffer. Ex. 1014

IPR2022-00639
Patent 10,949,339 B2

(the '537 patent), 10:50–53, 21:28–53; Ex. 1092, 174:8–175:21, 179:14–181:6. Patent Owner contends that Ellsberry and the '537 patent are incompatible because Ellsberry allegedly subtracts—not adds as in the '537 patent—one clock cycle to comply with JEDEC timing requirements. Sur-Reply 13 (citing Ex. 2007, 182:4–183:24, 231:21–234:13; Ex. 1005, Fig. 8B; Reply 10). Specifically, the end of Ellsberry's Figure 8B indicates "NOTES" including "1. if cl_mode = subtract; cl = cl-1 to DDRs." Ex. 1005, Fig. 8B, n.1. According to Dr. Subramanian, Ellsberry's note means that

> the latency specified to the DDRs is reduced by 1 to account for the fact that there is one-cycle clock delay that's been added in. So the net result is, as far as system is concerned, it's showing the same effective latency.

Ex. 2007, 182:16–22.

We agree with Petitioner that the '537 patent teaches to add one clock cycle to account for propagation delay through a data buffer. Ex. 1014, 21:28–53. Primed with this teaching, a person of ordinary skill in the art would have implemented Ellsberry to budget one clock cycle to account for delay through the data buffer. Also, Dr. Subramanian states that Ellsberry's note should be understood as meaning that one cycle has been added to account for propagation delay through the data buffer so one cycle should be subtracted from the overall latency so that the system memory controller encounters the same delay it would have in the absence of the data buffer. Ex. 2007, 182:16–22.

Thus, considering the knowledge of a person of ordinary skill in the art, as evidenced by the teachings of the '537 patent, we find that a person of ordinary skill in the art would have understood that Ellsberry's Posted CAS latency parameter (Fig. 9) would have been useful to account for

IPR2022-00639
Patent 10,949,339 B2

propagation delay through data buffers by adding a clock cycle to the latency period from receiving a write command to strobing the write data into a memory device. Ex. 1003 ¶ 363; Ex. 1014, 21:28–53; Ex. 2007, 182:16–22; Ex. 1092, 174:8–175:21, 179:14–181:6.

Thus, we do not agree with Patent Owner's arguments. As discussed above, Petitioner has established that Ellsberry's switch ASICs use Posted CAS latency (AL) bits to control timing of the enablement of the data path across its switch ASICs 206, 208, 400.

### (4)    FET Switches and Pin Drivers

Patent Owner contends that Ellsberry disclosed that FET switches and pin drivers were too slow to perform high-speed switching, so Ellsberry must leave the data paths enabled at all times. Resp. 12, 43 (citing Ex. 1005 ¶¶ 7–9, 57). As Petitioner notes, Ellsberry does not purport to use FET switches or pin drivers, but rather an integrated ASIC to perform switching at DDR and DDR2 speeds. Reply 19 (citing Ex. 1005 ¶ 57; Ex. 2007, 150:7–153:25, 224:7–226:13, 244:23–245:10, 247:11–249:3 (discussing Ex. 1084)). We agree with Petitioner that Ellsberry achieves high-speed switching because its switch is integrated in an ASIC, and that it does not use FET switches or pin drivers. *See* Ex. 1005 ¶ 57 (noting that FET "based switches are too slow for the required high-speed switching as their switching speed is too imprecise"). Patent Owner's argument does not undermine Petitioner's showing with respect to Ellsberry.

### (5)    Actively Driving Only During Data Bursts: Halbert's "Don't Care" States and JEDEC's High-Impedance States

Patent Owner next argues that Halbert does not disclose limitation 1e. Resp. 43–47; Sur-Reply 21–26. Specifically, Patent Owner argues that

IPR2022-00639
Patent 10,949,339 B2

Halbert does not disclose the use of latency parameters for enabling write data paths. Resp. 44 (citing Ex. 2005 ¶ 114). Patent Owner contends that Halbert's write path is on by default and is only turned off when the module controller detects a read command and switches the direction signal to direct data to the memory devices. *Id.* at 45. Patent Owner contends that Halbert puts the data lines DQ in a high-impedance state only when a read operation is underway, but puts the data lines DQ in a "don't care" state which could be either high or low, but not high-impedance, before and after a write operation. *Id.* Patent Owner's expert, Dr. Brogioli, states that "Halbert's write path is enabled even when there are no memory operations." *Id.* at 45 (citing Ex. 2001 ¶ 104). Patent Owner also contends that an IBM application note (Ex. 2010) concerning DRAM operation and a datasheet (Ex. 2011) for a Texas Instruments JEDEC-compliant memory controller show similar "don't care" states associated with write operations. *Id.* at 46.

Petitioner contends that Halbert's Figures 3, 5, and 6 disclose that "the data paths are actively driven only during the data bursts" consistent with JEDEC timing for read and write operations that use latency parameters. Reply 21 (emphasis omitted) (citing Ex. 1003 ¶ 362; Pet. 79–80; Ex. 1092, 279:15–280:6, 281:10–20, 282:7–18). Petitioner argues that the shaded areas of Halbert's Figure 6 can be high-impedance states. *Id.* at 23. Petitioner further contends that the IBM application note that Patent Owner cites later explains that at the time when there is not a "write operation" or a "read operation," the "DQs are in a high impedance state . . . [which] prevents DQ contention [i.e., a collision] when two or more devices share the data bus." *Id.* at 23–24 (citing Ex. 2010, 2; Ex. 1092, 116:5–8, 117:10–19, 294:18–296:20, 297:10–21). Petitioner further contends that the

IPR2022-00639
Patent 10,949,339 B2

JEDEC standard teaches that "[u]pon completion of a burst [of write data], assuming no other commands have been initiated, the DQs will remain High-Z." *Id.* at 24 (emphasis omitted) (citing Ex. 1009, 26; Ex. 1092, 119:2–18; Ex. 1009, 17; Ex. 1092, 119:22–120:10). Petitioner further contends that Figure 21 of the JEDEC standard shows the DQ data lines are put in a High-Z state—meaning the data path is disabled—except for times when there is a burst of data. *Id.* (citing Ex. 1011, 22; Ex. 1003 ¶ 352).

Although we agree with Patent Owner that Halbert's Figure 6 shows that DQ and MDQ are in "don't care" states at some points of a write operation, as Petitioner indicates, this does not preclude their being in a high-impedance state during those times. Reply 23. Both Ellsberry and Halbert indicate that at least some of their embodiments are compliant with the JEDEC standards. Ex. 1005 ¶ 50; Ex. 1006, 9:55–65. Figure 21 from the JEDEC standard, an annotated version of which is reproduced above in Section II.D.4.i, shows the JEDEC standard for write timing with flat lines highlighted in red before and after a write operation, which signify high-impedance states. Ex. 1011, 22; *see* Ex. 1009 (JEDEC DDR SDRAM Specification), 17 (noting that, for reads, "[u]pon completion of a burst, assuming no other commands have been initiated, the DQs will go High–Z"), 26 (noting that, for writes, "[u]pon completion of a burst, assuming no other commands have been initiated, the DQs will remain High–Z and any additional input data will be ignored").

There are only two options for the states of the data lines when a read or write operation is not underway: "don't care" per Halbert's Figure 6, or high impedance per Halbert's Figure 5 or the JEDEC timing diagram (Ex. 1011, 22). The Supreme Court has stated

IPR2022-00639
Patent 10,949,339 B2

> When there is a design need or market pressure to solve a
> problem and there are a finite number of identified, predictable
> solutions, a person of ordinary skill in the art has good reason to
> pursue the known options within his or her technical grasp. If
> this leads to the anticipated success, it is likely the product not
> of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 421. As Petitioner has shown, a person of ordinary skill in

the art would have recognized that the high-impedance state would be useful

in solving problems known in the art, e.g., avoiding bus conflicts, reducing

load, and saving power. *See* Sects. II.D.3a–c.

Thus, considering all of the evidence, we determine that Patent

Owner's arguments with respect to Halbert's "don't care" states do not

undermine Petitioner's combination.

Therefore, Petitioner shows that Ellsberry alone or in combination

with Halbert teaches limitation 1e of claim 1 of the '339 patent.

<em>j)</em>    <em>Limitation 1f</em>

Limitation 1f of claim 1 of the '339 patent recites

> wherein the byte-wise data path includes first tristate buffers,
> and the logic in response to the module control signals is
> configured to enable the first tristate buffers to drive the
> respective byte-wise section of the N-bit wide write data to the
> respective module data lines during the first time period.

Ex. 1001, 19:62–67. Petitioner contends that Ellsberry alone or combined

with Halbert teaches limitation 1f of the '339 patent. Pet. 81–86.

Specifically, Petitioner contends Ellsberry alone or combined with Halbert

teaches that the data path through Port A or Port B within bidirectional

drivers 402, 404 (Ellsberry Fig. 4) and the control block (Ellsberry Fig. 4) in

response to module control signals on bus 210 are configured to enable

tristate buffers (Halbert Fig. 4) to drive the byte-wise section of the N-bit

50

wide write data to the respective module lines 234 or 236 (Ellsberry Figures 2, 4) during a first time period corresponding to burst and latency parameters. *Id.* at 81–82 (citing Ex. 1005 ¶¶ 31, 45, Figs. 2, 4, 8A; Ex. 1003 ¶¶ 369–377). Petitioner contends that given the data buses are bidirectional, it would have been obvious to implement Ellsberry's bidirectional drivers 402, 404 (Fig. 4) using tristate buffers. *Id.* at 83 (citing Ex. 1003 ¶¶ 372–373).

To the extent Ellsberry does not sufficiently teach limitation 1f, Petitioner contends that it would have been obvious to implement bidirectional drivers 402, 404 using a similar arrangement with Halbert's tristate buffers. Pet. 84–85 (citing Ex. 1005, Fig. 4 (Ellsberry and Halbert combined); Ex. 1006, Fig. 4). Petitioner contends that, to drive the write data onto module data lines 236 on Port B, the control block must enable the tristate buffer in bidirectional driver 404 in the write direction during the first time period. *Id.* at 86 (citing Ex. 1003 ¶ 376).

### (1)    *Enablement of Tristate Buffers by Logic in Response to Module Control Signal*

Patent Owner argues that the combination of Ellsberry and Halbert does not disclose or suggest limitation 1f of claim 1 of the '339 patent. Resp. 65–69; Sur-Reply 31. Specifically, Patent Owner argues that Petitioner has not shown that enablement of tristate buffers was by the logic in response to a module control signal, or "what signals in particular" enable the tristate buffers in Ellsberry's switch ASIC. *Id.* at 65–66.

As Petitioner indicates, Ellsberry's Figure 2 includes a bus 210 (called the "ASIC PIPE" in Figures 11 and 13), which provides signals from the control ASIC 204 that control logic inside of switch ASIC 206 to enable and

IPR2022-00639
Patent 10,949,339 B2

disable the tristate buffers in the switch ASIC. Reply 33–34 (citing *id.* at 2, 14–20; Ex. 1062, 21–23, 69–71). Although Ellsberry's Figure 4 does not show control signals from the control block to the bidirectional drivers 402, 404, one of ordinary skill in the art would have understood, as shown in Ellsberry's Figure 2, that the clock signals to drive the D-flip-flops of bidirectional drivers 402, 404 are coming from control ASIC 204 on control bus 210. Ex. 1005 ¶ 29 ("The control unit 204 is communicatively coupled to the dual memory bank switches 206 & 208 via control bus 210 and indicates to the memory bank switches 206 & 208 how data from the DIMM interface 202 should be received and/or stored."); Ex. 1003 ¶¶ 357–358, 376.

Thus, Patent Owner's argument does not undermine Petitioner's showing.

### (2) *Modifying Ellsberry's Bidirectional Drivers 402/404 to Include Tristate Buffers*

Patent Owner argues that Petitioner has not shown why a person of ordinary skill in the art would have modified Ellsberry's bidirectional drivers 402, 404 to include tristate buffers. Resp. 66–68. We addressed this argument previously and do not find it undermines Petitioner's showing. *See* Sect. II.D.3.a–c.

Patent Owner further argues that there is no evidence that signal drivers 402/404 are enabled only during data bursts. Resp. 68–69. We addressed this argument previously and do not find that it undermines Petitioner's showing. *See* Sect. II.D.4.i.5.

### (3) *Enabling Bidirectional Drivers 402/404 Only During Data Bursts*

Patent Owner contends, as argued for claim limitation 1e, "nothing in Ellsberry or prior art suggests that the signal driver 402/404 on the path

IPR2022-00639
Patent 10,949,339 B2

between bus 230 and bus 234/236 is enabled for driving data only during the data burst period." Resp. 68–69. We addressed this argument previously and find that it does not undermine Petitioner's showing for claim limitation 1f. *See* Sect. II.D.4.i.5.

Therefore, Petitioner shows that Ellsberry alone or in combination with Halbert teaches limitation 1f of claim 1 of the '339 patent.

### k)    *Summary/Conclusion for Claim 1*

Petitioner has shown by a preponderance of the evidence that each and every limitation of claim 1 of the '339 patent is taught or suggested by Ellsberry alone or in combination with Halbert. In addition, Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have modified or combined Ellsberry with Halbert with a reasonable expectation of success in arriving at the claimed invention. Accordingly, we determine that claim 1 is unpatentable as obvious over Ellsberry alone or in combination with Halbert.

### 5.    *Claims 11 and 27*

Petitioner contends Ellsberry alone or with Halbert teaches all limitations of claim 11 and 27. Pet. 108–115 (claim 11), 134–139 (claim 27). Petitioner contends claim 11 is similar to claim 1 and recites a pair of 4-bit memory devices, as in claim 2. Pet. 108–115 (citing Ex. 1005, Figs. 2, 6, 11; Ex. 1003 ¶¶ 450–490). Petitioner contends claim 27 is like claims 1 and 10, and requires a write operation and a read operation. *Id.* (citing Ex. 1003 ¶¶ 609–659).

Patent Owner argues that claims 11 and 27 are patentable for reasons stated above for claim 1. Resp. 69. For the reasons stated above, we disagree. *See* Sect. II.D.4.a-k; Reply 37.

IPR2022-00639
Patent 10,949,339 B2

Claim 27 includes limitation 27d5 that recites "the logic in response to the second module control signals is configured to enable the second set of tristate buffers for a second time period corresponding to the memory read operation to drive the respective n-bit section of the read data." Ex. 1001, 26:21–27. In relation to limitation 27d5, and in reference to Halbert's Figure 5, Patent Owner argues

> under Dr. Subramanian's/Petitioner's theory as to when the period starts, the second set of tristate buffers would be enabled for a time period shorter than that corresponding to a read operation. This is because according to Dr. Subramanian, the second tristate buffers would only be driving when there is data on DQ0 and DQ1 lines (see 44:10-46:25), but that period ends halfway between T9n and T10. But the data is driven until T10 when the read operation is completed (*id.*, 42:18-43:2), that is, after the period identified by Dr. Subramanian as the time that the second set of tristate buffers are enabled.

Resp. 69; Sur-Reply 32.

We do not agree with Patent Owner's argument. Each component of the memory module, including Halbert's bidirectional buffer 122 and bidirectional registers 126, 128, must remain enabled for the entire burst length (BL), i.e., second time period, during a read operation; otherwise, the data under transfer would be cut off. In this regard, Dr. Subramanian states the following:

> Halbert . . . discloses that the data paths are actively driven only during the data bursts. Ex. 1006 at Figs 3, 5, and 6. For example, Halbert's Fig. 6 shows that a burst of four bits, a1, a2, b1, and b2 is received on DQ from the system and is actively driven in the internal busses of the data buffer, including busses MDQ and DQ0/DQ1 only for the duration of that data burst. *Id.* at Fig. 6 (reproduced below, annotated). I further note that, although Halbert changes the data rate on the data busses RDQ0 and RDQ1 coupled to the memory devices, those busses are still driven only for the duration of the respective data.

IPR2022-00639
Patent 10,949,339 B2

Ex. 1003 ¶ 362.

In addition, Dr. Subramanian states

> A Skilled Artisan would have understood that these timing
> protocols for actively driving the data for a time period in
> accordance with latency parameters and the burst length are
> consistent with the industry standards at the time, including the
> JEDEC standards.

*Id.* ¶ 363. Thus, in making its argument, Patent Owner is conflating the time periods needed for data to pass through different components rather than considering that each component along the data path must be enabled for the "second time period" during a read operation.

Patent Owner's argument does not undermine Petitioner's showing with respect to claims 11 and 27.

### 6. Claims 3 and 14

Claim 3 depends from claim 2 and recites

> wherein the byte-wise data path further includes a set of write
> buffers configurable to receive the respective byte-wise section
> of the N-bit wide write data from the respective set of data
> signal lines before the first tristate buffers regenerate and drive
> the respective byte-wise section of the N-bit wide data to the
> second side of the each respective byte-wise buffer.

Ex. 1001, 20:19–25. Thus, claim 3 recites write buffers arranged in the byte-wise data path before tristate buffers. *Id.* Petitioner contends that Ellsberry alone or combined with Halbert teaches this feature. Pet. 89–93 (citing Ex. 1005 ¶¶ 12, 27, 45, 50, claim 2, Figs. 2, 4, 11; Ex. 1003 ¶¶ 395–407). Petitioner argues that claim 14, reciting a similar limitation as claim 3, is unpatentable for the same reasons. Pet. 115 (citing Ex. 1003 ¶¶ 497–502).

IPR2022-00639
Patent 10,949,339 B2

> With respect to claims 3 and 14, Patent Owner argues
>
> if tristate functionality is inserted into signal driver 402 (and 404) and the driver is placed into Hi-Z, then that configuration would already present a single load without the need for the driver at bus 230. EX2007, 106:21-108:16. This would render the added write buffers redundant in functionality.

Resp. 70–71; *see also* Sur-Reply 32.  Patent Owner argues that Petitioner is using improper hindsight instead of considering how one of ordinary skill in the art would have implemented the design.  *Id.* at 71.

We do not agree with Patent Owner's argument, which is very similar to the one we previously addressed concerning the write operation.  *See* Sect. II.D.3.b.  Halbert's Figure 4 clearly teaches that the tristate buffers should interface with the system bus and memory buses, and one of ordinary skill in the art would have carried this teaching over to Ellsberry's memory module.  Ex. 1003 ¶¶ 256–265.

       7.   *Claim 6*

Claim 6 depends from claim 1 and recites "wherein the logic is configurable to enable the first tristate buffers at a beginning of the first time period and to disable the first tristate buffers at an end of first time period." Ex. 1001, 20:36–39.  Petitioner contends that Ellsberry alone or combined with Halbert teaches claim 6.  Pet. 97 (citing Ex. 1005; Fig. 4; Ex. 1003 ¶¶ 421–423).

To explain its argument, Patent Owner presents Halbert's Figure 6 annotated by Patent Owner, as shown below.

IPR2022-00639
Patent 10,949,339 B2



Resp. 72.  Figure 6 of Halbert, above, depicts a timing diagram for two consecutive write operations for the memory module in Halbert's Figure 4. Ex. 1006, 3:9–10.  In reference to annotated Figure 6, Patent Owner contends that Dr. Subramanian stated that the claimed "first time period" starts between T4n and T5 (depicted as a red dotted line) and ends between T7n and T8 (also depicted as a red dotted line) in Halbert's Figure 6.  Resp. 71–72.  Patent Owner further argues that Dr. Subramanian stated that the first tristate buffer is enabled after T5 (depicted as a green dotted line) and thus the "first time period" would be enabled after the beginning of the first time period, contrary to claim 6.  *Id.* at 73–74.

As previously explained in Section II.D.5, each component along the data path must be enabled for the entire burst length (BL) or the data will be cutoff.  Petitioner's contention is that the time it takes for the data to pass

IPR2022-00639
Patent 10,949,339 B2

through each tristate buffer accords with the burst length (BL). Pet. 74;

Reply 36. Dr. Subramanian's testimony is consistent with Petitioner's

contention:

> The DQ is driven specifically approximately halfway between
> T4n and T5. And it is complete -- in this specific case where we
> are talking about a burst length of 4, it is complete halfway
> between T6n and T7. Of course, because there are propagation
> delays in the system, it continues to shift a little in time while
> the duration is maintained to account for the propagation
> delays.

Ex. 2007, 86:8–16. Thus, Patent Owner's argument overlooks that data

passes through different components along a data path at different times.

Resp. 72–74; Sur-Reply 32. Petitioner is correct that Ellsberry alone or

combined with Halbert teaches that the first tristate buffers are enabled at the

start of the first time period, which follows the additive latency (AL), and

disabled afterward, the duration of which accords with the burst length (BL).

Patent Owner's argument does not undermine Petitioner's showing

with respect to claim 6.

### 8. Claims 7, 16, and 21

Claim 7 depends from claim 1 and recites "wherein the module

controller is configured to use the module control signals to control timing

of the first time period in accordance with the latency parameter." Ex. 1001,

20:40–43. Claim 16 is similar. *Id.* at 22:55–58. Claim 21 is also similar but

is directed to control timing for first and second memory operations using

the latency parameter. *Id.* at 24:41–46.

Petitioner contends Ellsberry alone or combined with Halbert teaches

claim 7. Pet. 98–99 (citing Ex. 1005, Fig. 4 (modified by Petitioner);

Ex. 1003 ¶¶ 424–426). Petitioner contends that Ellsberry alone or with

IPR2022-00639
Patent 10,949,339 B2

Halbert also teach claims 16 and 21 for the same reasons as claim 7. Pet. 116 (citing Ex. 1003 ¶¶ 506–508); Pet. 122 (citing Ex. 1005 ¶ 46; Ex. 1003 ¶¶ 563–565).

Patent Owner argues that Petitioner has not shown that Ellsberry includes a latency parameter as part of the signals sent to the memory bank switch via control bus 210. Resp. 74–75. Patent Owner also argues that there is no evidence that the CAS latency (CL) or additive latency (AL) are ever used to control operation of the switch ASICs. *Id.* at 75.

We disagree with these contentions because Petitioner has shown that Ellsberry teaches that the Posted CAS_n (AL) latency parameter is sent to and stored in the switch ASICs using an EMRS command, the JEDEC standard teaches that the AL latency parameter is sent using an EMRS command, and the '537 patent teaches to add a clock cycle to the latency parameter to account for propagation delay through a data buffer. *See* Sects. II.D.4.i.3, II.D.4.i.5; Ex. 1005 ¶ 44.

> 9. *Claim 19*

Petitioner contends that "[c]laim 19 is similar to claim 1 except that it requires a read operation rather than a write operation, and a second read operation similar to claim 10." Pet. 116. Petitioner contends that Ellsberry alone or combined with Halbert renders claim 19 obvious for similar reasons as claim 1. Pet. 116–120 (citing Ex. 1003 ¶¶ 515–550; Ex. 1005, code (57), ¶¶ 10, 12, 30, 32, 40, 45–47, 50, Fig. 8A; Ex. 1011, 6, 21–38, 46; Ex. 1051, 6, 24–41, 49).

Patent Owner argues that Ellsberry does not involve data path enablement or disablement. Resp. 75. As explained, we disagree. Ellsberry

IPR2022-00639
Patent 10,949,339 B2

teaches "one-port-disabled" embodiments that enable or disable data paths using switch ASICs. *See* Sect. II.D.4.i.1.

Patent Owner also argues that Halbert does not disclose data paths enabled after the first period and before the second time period between memory operations. Resp. 75–76. As explained, although Halbert's Figure 6 shows data paths in a "don't care" state, as Petitioner contends, this does not preclude that they would be in the high-impedance state, and the JEDEC standards show that data paths are disabled between memory operations. *See* Sect. II.D.4.h.5; Ex. 1011, 22.

Patent Owner's arguments do not undermine Petitioner's showing with respect to claim 19.

> 10.    *Claim 28*

Claim 28 depends from claim 27 and recites "wherein the logic is configurable to keep the first set of tristate buffers and the second set of tristate buffers disabled when the memory module is not targeted by the memory controller for any memory operations." Ex. 1001, 26:33–37.

Petitioner contends that Ellsberry alone or combined with Halbert teaches claim 28 for the same reasons stated for claims 6 and 19. Pet. 139–140 (citing Ex. 1003 ¶¶ 660–662). Petitioner contends the person of ordinary skill in the art would have understood that the system memory data bus can be shared by multiple modules. *Id.* at 139 (citing Ex. 1006, Fig. 8). Halbert's Figure 8 is reproduced below:

IPR2022-00639
Patent 10,949,339 B2



Fig. 8

Ex. 1006, Fig. 8. Halbert's Figure 8 shows that memory controller 20 is connected to memory modules 100A, 100B, 100C on a multi-drop memory bus 22. *Id.* at 7:54–61.

Petitioner contends that a person of ordinary skill in the art would have been motivated to disable the first and second sets of tristate buffers when the claimed memory module is not targeted by the memory controller for any memory operations to follow JEDEC timing protocols, save power, and avoid bus conflicts on the multi-drop memory bus, among other reasons. Pet. 140 (citing Ex. 1005 ¶ 46; Ex. 1035, 89–90, 132–133).

Patent Owner repeats arguments we have considered and rejected, including that Ellsberry is silent as to when its write drivers are enabled or disabled; and that Halbert's write drivers are enabled even when there are no memory operations. Resp. 77–78. As discussed, Ellsberry discloses "one-port-disabled" embodiments that selectively enable or disable write drivers associated with Ports A and B to write data to one bank or the other. *See* Sect. II.D.4.i.1. Although Halbert's Figure 6 shows write drivers enabled

IPR2022-00639
Patent 10,949,339 B2

when no memory operations are under way, there is no statement in Halbert prohibiting disabling the write drivers may occur when there are no memory operations, and the JEDEC standard teaches that they should be disabled at that time. *See* Sect. II.D.4.i.5.

> 11.  *Claim 34*

Claim 34 depends from claim 27 and recites "wherein the first set of tristate buffers are enabled for the first time period in accordance with a latency parameter." Ex. 1001, 28:23–25.

Petitioner contends that Ellsberry alone or with Halbert discloses claim 34 for the same reasons stated for limitation 1f of claim 1 and claim 7. Pet. 144 (citing Ex. 1003 ¶¶ 705–707).

Patent Owner again argues that Ellsberry is silent with respect to enabling or disabling drivers. Resp. 78. As discussed, Ellsberry discloses "one-port-disabled" embodiments which enable and disable data paths and thus we do not agree with Patent Owner's argument. *See* Sect. II.D.4.i.1.

Patent Owner also argues that Halbert's drivers are in a "don't care" state, and thus are always enabled, and could not be enabled in accordance with a latency parameter. Resp. 78–79. As explained, Halbert's Figure 6 does not preclude high-impedance states for data paths, and JEDEC teaches to disable the data paths when not performing a memory operation. *See* Sect. II.D.4.h.5; Ex. 1006, Fig. 6; Ex. 1011, 22.

> 12.  *Claims 2, 4, 5, 8–10, 12, 13, 15, 17, 18, 20, 22–26, 29–33, and 35*

Petitioner contends that claims 2, 4, 5, 8–10, 12, 13, 15, 17, 18, 20, 22–26, 29–33, and 35 are unpatentable as obvious over Ellsberry alone or with Halbert. Pet. 86–89, 93–96, 99–108, 115–116, 120–134, 140–145.

IPR2022-00639
Patent 10,949,339 B2

Patent Owner presents no additional arguments specific to these claims except for claims 10 and 18. *See* Resp. For claims 10 and 18, Patent Owner argues that these claims involve both read and write, and that the data paths for both are disabled when there are no read or write operations. Sur-Reply 32. Patent Owner argues the prior art does not teach independent control of read/write data paths. *Id.*

"A sur-reply may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence other than deposition transcripts of the cross-examination of any reply witness." 37 C.F.R. § 42.23(b). Patent Owner's argument concerning disablement of both data paths when there are no read or write operations, and independent control of the read and write data paths, amounts to new argument. This new argument further is not supported by corresponding language in the claims. To the extent this argument is not new, we have addressed it with respect to claim 27. *See* Sect. II.D.5.

We have carefully reviewed Petitioner's contentions in relation to these claims. Petitioner has shown by a preponderance of the evidence that the combination of Ellsberry and Halbert, when considered with the general knowledge of a person of ordinary skill in the art at the time of the '339 patent, discloses all of the limitations of claims 2, 4, 5, 8–10, 12, 13, 15, 17, 18, 20, 22–26, 29–33, and 35.

### 13. Conclusion

Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have combined Ellsberry and Halbert with a reasonable expectation of success for the reasons Petitioner contends. We further determine that the Ellsberry alone or in combination with Halbert,

IPR2022-00639
Patent 10,949,339 B2

when considered in conjunction with the general knowledge that a person of ordinary skill in the art would have had, as represented, for example, by the JEDEC standards and the '537 patent, teaches and suggests each and every limitation of claims 1–35. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 1–35 are unpatentable as obvious over the combination of Ellsberry and Halbert.

E.    *Collateral Estoppel*

Petitioner raises collateral estoppel as precluding Patent Owner from re-litigating the patentability of the claims in the '339 patent. Pet. 41–44; Reply 1–2. As we have decided this case on the merits, we need not, and do not, reach Petitioner's collateral estoppel arguments.

F.    *Motion to Exclude*

Petitioner seeks to exclude Exhibits 2006, 2009, 2012, and 2020–2024. Paper 38. Because we do not rely on any of these Exhibits in a manner adverse to Petitioner, we dismiss the Motion to Exclude as moot.

III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claims 1–35 of the '339 patent are unpatentable.

IV.    ORDER

Accordingly, it is:

ORDERED that claims 1–35 of the '339 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is moot;

IPR2022-00639
Patent 10,949,339 B2

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2. [6]

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–35 | 103 | Ellsberry, Halbert | 1–35 | |

---

[6] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2022-00639
Patent 10,949,339 B2

FOR PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Mark Speegle
Sean Lee
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
mark.speegle@bakerbotts.com
sean.lee@bakerbotts.com
dlsamsungnetlistiprs@bakerbotts.com

Matthew A. Hopkins
Michael R. Rueckheim
Ryuk Park
WINSTON & STRAWN LLP
mhopkins@winston.com
Winston-IPR-Netlist@winston.com

FOR PATENT OWNER:

Hong Annita Zhong
Phillip Warrick
Jason Sheasby
Jonathan M. Lindsay
IRELL & MANELLA LLP
hzhong@irell.com
pwarrick@irell.com
jsheasby@irell.com
jlindsay@irell.com
netlistipr@irell.com

Trials@uspto.gov                                                      Paper 48
571-272-7822                                             Date: February 9. 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————

IPR2022-00639
Patent 10,949,339 B2

———————

Before JON M. JURGOVAN, DANIEL J. GALLIGAN, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges*.

JURGOVAN, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request on Rehearing of Final Written Decision
*37 C.F.R. 42.71(d)*

———————

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed a motion for joinder and a petition in
IPR2023-00204 and have been joined as petitioners to this proceeding. *See*
Paper 33.

IPR2022-00639
Patent 10,949,339 B2

## I.    INTRODUCTION

Samsung Electronics Co., Ltd. ("Samsung") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claims 1–35 ("challenged claims") of U.S. Patent 10, 949,339 B2 (Ex. 1001, "the '339 patent"). Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7) to the Petition. Samsung filed an authorized Preliminary Reply (Paper 13), and Patent Owner filed an authorized Preliminary Sur-Reply (Paper 14). We instituted *inter partes* review under 35 U.S.C. § 314(a). Paper 15 ("Inst. Dec.").

During the trial, Patent Owner filed a Response (Paper 27, "PO Resp."), Petitioner filed a Reply (Paper 31, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 36, "PO Sur-Reply"). We joined Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC as petitioners in this proceeding, and we refer to Samsung and these entities collectively as "Petitioner." *See* Paper 33.

We entered a Final Written Decision determining all challenged claims unpatentable. Paper 45 ("Final Dec."). Patent Owner filed a Request for Rehearing (Paper 47, "Req. Reh'g") pursuant to 37 C.F.R. § 42.71(d), which we now consider.

A party is permitted to file a single request for rehearing of a final written decision. 37 C.F.R. § 42.71(d). "The burden of showing a decision should be modified lies with the party challenging the decision." *Id.* "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed." *Id.*

IPR2022-00639
Patent 10,949,339 B2

We determine that Patent Owner's assertions do not show that the Board misapprehended or overlooked any matters, and we deny Patent Owner's Request for Rehearing for the following reasons.

## II.    ANALYSIS

Patent Owner alleges that the Final Written Decision misapprehended or overlooked the following: (A) Ellsberry "activates" and "disables" one port by disabling devices, not data paths (Req. Reh'g 1–4); (B) Halbert and the general knowledge of JEDEC do not fix this gap in Ellsberry (*id.* at 4–8); (C) Patent Owner's arguments for why the prior art did not teach using a latency parameter to enable a write data path (*id.* at 8–11); and (D) there is no motivation to enable data paths during a write (*id.* at 11–15). We address Petitioner's arguments sequentially below.

### A.    *Ellsberry's Alleged Enabling and Disabling of Devices and Not Data Paths*

Patent Owner argues that Ellsberry's switch ASICs are always enabled, contrary to the claims. Req. Reh'g 1. Patent Owner contends that the Board misread Ellsberry's so-called "one port disabled" embodiment as using the switch ASICs to enable or disable data paths to respective banks of memory devices. *Id.* (citing Final Dec. 39–40; Pet. 73–74; Ex. 1005 ¶¶ 30–31, 40, Figs. 2, 4). According to Patent Owner, the Board overlooked Patent Owner's argument that Ellsberry says nothing about disabling or enabling data paths in the cited paragraphs. *Id.* (citing PO Resp. 13, 21, 41–43; PO Sur-Reply 17–21).

At the outset, we note that a rehearing request is not an opportunity for the requesting party to reargue its case, present new arguments, or express disagreement with the Final Written Decision. We considered

IPR2022-00639
Patent 10,949,339 B2

Patent Owner's arguments and evidence in rendering the Final Written Decision. PO Resp. 13, 21, 41–43; PO Sur-Reply 11–15, 17–21; Final Dec. 39–40; Ex. 1005 ¶¶ 30–31, 40, Figs. 2, 4; Ex. 1003 ¶¶ 231, 358. Even considering Patent Owner's repeat and new arguments in the Request for Rehearing, we are not swayed to modify our Final Written Decision.

Patent Owner's arguments confuse and selectively consider different Ellsberry embodiments. In the so-called "one port disabled" embodiment, the control unit controls the memory bank switches (switch ASICS) to enable one port and disable the other so that data is written to the correct memory bank. Ex. 1005 ¶¶ 31, 40. As we explained in our Final Written Decision, enabling a port means that the data path through the port is enabled, and disabling a port means that the data path through that port is disabled. Final Dec. 39–40. Thus, Patent Owner's argument that the data paths through the switch ASICs are always enabled is incorrect concerning Ellsberry's "one port disabled" embodiment. Req. Reh'g 1.

Distinct from the "one port disabled" embodiment, Ellsberry has an "always on" or "no ports disabled" embodiment with two modes of operation. Ex. 1005 ¶ 33. Column mode operation sends write-data to both ports of the memory bank switch and the control unit uses a data mask signal to select the target memory device. *Id.* Row/bank mode sends read or write commands only to the targeted memory device and sends a NOP (no-operation) to the non-targeted memory device. *Id.* ¶¶ 33, 40. Ellsberry explains that in these two modes "the control unit and switch architecture can control data to and from the memory banks without the delays caused by otherwise disabling the banks." *Id.* ¶ 42. As described in Ellsberry, the

"always on" or "no ports enabled" embodiment is distinct from the "one port disabled" embodiment.

Accordingly, Patent Owner's and Dr. Brogioli's explanations of how Ellsberry operates with a memory bank switch (switch ASIC) with "always on" enabled ports may be correct for the embodiment with column and row/bank modes of operation (Req. Reh'g 1–4), but it is not for the "one port disabled" embodiment, which enables or disables data paths through the ports under control of the control unit. Although Patent Owner argues about what exactly is inside of Ellsberry's switch ASICs that performs enabling and disabling (e.g., pin drivers, FET switches, etc.), we clearly indicated that the evidence at trial showed that the signal drivers 402, 404 perform this function. Final Dec. 40–42. Patent Owner also focuses on its attacks on Ellsberry individually and loses sight of Petitioner's combination of Ellsberry with Halbert, which discloses a bidirectional buffer 122 and bi-directional data registers 126, 128 with tristate buffers to perform these functions. *Id.* at 42.

Patent Owner presents several other repeat and new arguments that are manifestly incorrect. Patent Owner erroneously equates ports of the memory bank switch (switch ASIC) with physical memory banks. Req. Reh'g 2. Ellsberry clearly shows Ports A and B as parts of the switch ASICs, not the physical memory banks. Ex. 1005, Fig. 2. Patent Owner argues that the control unit does not communicate with the switch ASICs. Req. Reh'g 2. Ellsberry discloses that the control unit communicates with the switch ASICs via control bus 210. Ex. 1005 ¶ 29, Fig. 2. Patent Owner argues that deactivating is not the same as disabling the data path through the switch ASIC as required by the claims. Req. Reh'g 2–3. Patent Owner

made no such argument in its briefings, and, in any case, Ellsberry discloses disabling. PO Resp. 13 (Patent Owner stating that a port is disabled by deactivating it); Ex. 1005 ¶¶ 40–42. Nor do we agree with Patent Owner's repeated argument that disabling a port means disabling memory banks. Req. Reh'g 3–4. Disabling a port means disabling the data path through the memory bank switch (switch ASIC) that is connected to those memory banks. Ex. 1005 ¶ 31.

For at least the foregoing reasons, Patent Owner's arguments concerning Ellsberry's enabling or disabling of data paths are incorrect and unavailing.

B.     *Board's Alleged Gap Filling of Ellsberry with Halbert and JEDEC*

Maintaining its erroneous argument that Ellberry's memory bank switches (switch ASICs) do not enable or disable data paths, Patent Owner repeats its argument during trial that, while Halbert has the capability to enable and disable data paths with its bidirectional buffer 122 and bidirectional data registers 126 and 128, it does not actually teach doing so because Halbert has "don't care" states before its write operations. Req. Reh'g 4–6. Patent Owner argues that "gap-filling" a reference with general knowledge in a JEDEC standard (Ex. 1011, 6, 22) is improper, that Petitioner did not rely on that general knowledge in its briefings, and that general knowledge is not a patent or printed publication under 35 U.S.C. § 311(b). Req. Reh'g 6–7.

Petitioner relied upon Ellsberry to teach enabling and disabling ports. *See, e.g.*, Pet. 73–75 (citing Ex. 1005 ¶¶ 31, 40, Fig. 2), 119, 134, 139–140. It would have been clear to a person of ordinary skill in the art considering

IPR2022-00639
Patent 10,949,339 B2

Ellsberry that a port may be disabled before it is enabled during a write operation to the extent that is required in the claims. Pet. 79–81; Reply 23–26 (citing Ex. 1009, 17, 26; Ex. 1011, 22; Ex. 2007, 57:2–10, 28:15–29:2; Ex. 2010, 2; Ex. 1003 ¶¶ 352, 362). Ellsberry's memory bank switch (or switch ASIC) is after all a "switch" that enables one port and disables the other, and vice versa. Ex. 1005 ¶ 31. Thus, Ellsberry had no deficiency that required "gap-filling" by Petitioner.

Halbert's "don't care" state does not preclude disabling data paths before enabling them in a write operation according to Ellsberry. Pet. 80 (citing Ex. 1006, Fig. 6). Patent Owner relies on an application note (Ex. 2010) and datasheet (Ex. 2011) to show "don't care" states prior to a write operation. Req. Reh'g 6 (citing PO Resp. 46; Ex. 2010 3, 5–8; Ex. 2011, 13, Table 3). As Petitioner explained, however, when viewed in their entireties, the application note, datasheet, and the JEDEC standards all teach that the data paths should be placed in high-impedance states (disabled) when not performing a read or write operation. Pet. Reply 23–24 (citing Ex. 2010, 2; Ex. 1009, 17, 26; Ex. 1011, 22; Ex. 1003 ¶¶ 352, 362; Pet. 79–80; Ex. 1006, Figs. 3, 5, 6). The general knowledge reflected in the JEDEC standards relied on in the Petition, as well as the application note and datasheet, reinforce Petitioner's contention that the data paths would be disabled before they are enabled during a write operation. *See, e.g.*, Pet. 3, 16, 36, 54, 63, 76–77, 100, 103, 105, 116–117, 123, 144 (citing Ex. 1011, 6, 22). And contrary to Patent Owner's argument, the JEDEC standard (Ex. 1011) is a "printed publication" under 35 U.S.C. § 311(b). Ex. 1011, 1–2. It is clearly a printed document and it is published. *Id.*

IPR2022-00639
Patent 10,949,339 B2

Even if Petitioner had needed to "gap-fill" with the general knowledge of the JEDEC standard, Patent Owner misapprehends *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1363–64 (Fed. Cir. 2016), which does not prohibit gap-filling with the general knowledge of a person of ordinary skill in the art. So long as supported by a reasoned explanation and evidence, the use of general knowledge is not only proper, it is required under *Graham*. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (background knowledge of skilled artisan may provide motivation to combine); *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020) (holding that general knowledge of skilled artisan may supply missing limitation and that obviousness analysis "necessarily depends on such artisan's knowledge").

Patent Owner next argues that the JEDEC standard (Ex. 1011) pertains to the operation of DDR2 SDRAMs and not the internal operation of the data buffers to which they are connected. Req. Reh'g 7 (citing Final Dec. 42, 49; Ex. 1011, 6, 22; PO Resp. 3, 49–52 & n.9, 54; Ex. 2005 ¶¶ 91–93; Ex. 2009, 27). Patent Owner's argument overlooks that, when enabled, a data buffer (corresponding to Ellsberry's memory bank switch with Halbert's tristate buffers in Petitioner's combination) is connected to the SDRAMs (Ellsberry's "SDRAM DDR devices") so what is output from the data buffer is what is input to the SDRAM. *See, e.g.*, Ex. 1005 ¶¶ 26, 31, 40, Fig. 2. Nor does Patent Owner explain why the JEDEC standard must disclose the internal workings of the switch ASIC when Petitioner's combination of Elbert and Halbert discloses these features. *See, e.g.*, Pet. 79, 85.

For the foregoing reasons, Patent Owner's arguments are unpersuasive.

### C.    The Board's Alleged Overlooking of Patent Owner's Arguments for Why the Prior Art Did Not Teach Using a Latency Parameter to Enable a Write Data Path

Patent Owner argues that the Board improperly shifted the burden to prove validity to Patent Owner by faulting Patent Owner for not explaining why Ellsberry's memory bank switch (switch ASIC) would store the Posted CAS_n latency (or additive latency (AL)) parameter if it did not use it for some purpose. Req. Reh'g 8 (citing Final Dec. 44). Patent Owner argues that Ellsberry is silent on what the memory bank switch does with the Posted CAS_n latency (AL) parameter. *Id.* Patent Owner further argues that the Board, while stating that the skilled artisan would have implemented Ellsberry to budget one clock cycle to account for the delay through the data buffers, overlooked that the Posted CAS_n latency (AL) parameter has "nothing to do with operation of the data buffers." *Id.* at 9 (citing Final Dec. 46–47).

As we explained in the Final Written Decision, the read and write latencies RL and WL depend on the CAS latency (CL) and Posted CAS latency (or additive latency) (AL) (RL=AL+CL; WL=AL+CL–1). Final Dec. 45 (citing Ex. 1011, 10–11; Ex. 1003 ¶ 352). Petitioner contends that the Posted CAS latency (AL) parameter accounts for the time needed for data to traverse the data buffer (corresponding to Ellsberry's memory bank switch modified with Halbert's tristate buffers). Pet. 36–37, 75–78; Pet. Reply 10 (citing Ex. 1005, Fig. 8B, note 1; Ex. 2007, 181:9–182:22, 204:11–205:24, 230:25–234:16). In the Final Written Decision, we agreed with Petitioner that U.S. Patent No. 7,532,537 B2 (Ex. 1014, "the '537

IPR2022-00639
Patent 10,949,339 B2

patent"), which constitutes general knowledge of a skilled artisan, teaches to budget one clock cycle to account for delay through the data buffer, and the skilled artisan would have understood that Ellsberry's Posted CAS latency parameter would have been useful for this purpose. Final Dec. 46–47 (citing Ex. 1014, 21:28–53; Ex. 1003 ¶ 363; Ex. 2007, 182:16–22; Ex. 1092, 174:8–175:21, 179:14–181:6).

Patent Owner contends that Petitioner's reliance on the '537 patent in its Reply was "improper sandbagging" because it was not set forth in a challenge ground in the Petition. Req. Reh'g 10. We disagree. Petitioner's reliance on the '537 patent's teaching in support of its contention that it would have been obvious to add one clock cycle to account for the data buffer (corresponding to Ellsberry's memory bank switch modified with Halbert's tristate buffers) has a nexus to Patent Owner's argument that Ellsberry never disclosed enabling or disabling the data path in accordance with a latency parameter (PO Resp. 33–40), and it is a fair extension of Petitioner's contention that the combination of Ellsberry and Halbert in view of the general knowledge of a skilled artisan taught the claimed enabling of the data path in accordance with the latency parameter (Pet. 36–37, 73–81). Thus, Petitioner's reliance on the '537 patent in the Reply is not a new argument but an extension of what Petitioner had contended in the Petition. Accordingly, Petitioner's Reply argument was not improper. *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023). Patent Owner had the opportunity to address Petitioner's contentions concerning the '537 patent in its Sur-Reply, and Patent Owner availed itself of this opportunity. PO Sur-Reply 13.

### D.    Allegation That There is No Motivation to Enable Data Paths During a Write

Patent Owner contends that the Board overlooked that "Petitioner never provided an independent reason for further modifying Ellsberry and Halbert to disable and then enable the otherwise always-on data paths and use latency parameters." Req. Reh'g 11–12 (citing Final Dec. 19, 22–23).

Patent Owner's arguments are premised on the incorrect assumption that all of Ellsberry's embodiments have "always on" data paths when, as explained, that is not the case. *See* Sect. II.A, *supra*. Ellsberry's "one port disabled" embodiment does not use "always on" data paths but selectively enables and disables them. *Id.*

Patent Owner further misapprehends that Ellsberry teaches to use the Posted CAS (AL) latency parameter, as does the JEDEC standard, which is used to avoid bus conflicts by accounting for the time necessary for signals to traverse a data buffer (corresponding to Ellsberry's memory bank switch with Halbert's tristate buffers). *See* Sect. II.C, *supra*.

Contrary to Patent Owner's assertion, Petitioner did provide reasons for using Ellsberry's Posted CAS (AL) latency parameter in the combination of Ellsberry and Halbert—to avoid bus conflicts, reduce load, and save power. Pet. 31–36, 44–47, 80–81; Final Dec. 17–19 (motivation), 19–21 (bus conflicts), 21–23 (reducing load), 23–26 (saving power).

Patent Owner argues that the Board relied on an "obvious to try" rationale based on "a finite number of identified, predictable solutions" that was not raised by Petitioner. Req. Reh'g 12 (citing Final Dec. 49–50). However, the issue was raised by the parties' arguments. Patent Owner argued that the "don't care" state in Halbert's Figure 6 means that the write

path is enabled even when there are no memory operations. PO Resp. 45. Petitioner argued that Halbert's data lines can be in a high-impedance (disabled) state in the "don't care" state. Pet. Reply 23. Patent Owner's and Petitioner's arguments presented the possibility that Halbert's "don't care" encompassed the two options of enabled and high-impedance states, thereby raising the issue of "obvious to try," which we were compelled to address in the Final Written Decision. Final Dec. 49–50; *KSR*, 550 U.S. at 421.

Patent Owner argues that "don't care" and "high impedance" are mutually exclusive states. Req. Reh'g 12. We do not agree. The "don't care" state does not preclude a data path from being disabled in the high-impedance state. Final Dec. 49 (citing Ex. 1005 ¶ 50; Ex. 1006, 9:55–65; Ex. 1009, 17, 26; Ex. 1011, 22).

Patent Owner argues that the Board applied the wrong legal analysis and that the "obvious to try" rationale requires identification of a problem and predictable solution. Req. Reh'g 12–13. Petitioner identified the problems of bus conflicts, excessive loading, and excessive power consumption. Pet. 31–36, 44–47, 80–81. Petitioner showed that disabling the data paths was a predictable solution to those problems. Pet. 47, 78, 80–81.

Even setting aside the "obvious to try" rationale, in Ellsberry's "one port disabled" embodiment, the memory bank switch disables the port connected to memory device for which a memory operation is not underway, and Halbert's "don't care" state does not preclude disabling the port and its associated data path according to Ellsberry's teaching. Ex. 1005 ¶¶ 31, 40, Fig. 2. Petitioner showed by a preponderance of the evidence that a person of ordinary skill in the art would have had motivation to combine Ellsberry

IPR2022-00639
Patent 10,949,339 B2

and Halbert to avoid bus conflicts, reduce load, and save power even without the "obvious to try" rationale.  Pet. 31–36, 44–47, 80–81.

Patent Owner argues that neither the Board nor Petitioner ever explained the underlying and necessary reasoning for the rationales to combine Ellsberry and Halbert in the Institution Decision.  Req. Reh'g 13 & n.2.  We do not agree with this assertion.  The Institution Decision (Inst. Dec. 20, 28) merely recognized that the showing that Petitioner made in the Petition (Pet. 31–36, 44–47, 80–81) fits into rationales identified in *KSR* as sufficient to establish a motivation to combine.  550 U.S. at 416–417.

Patent Owner argues that "bus conflicts are indisputably not a concern for write operations, and the Board never found otherwise."  Req. Reh'g 14 (citing Final Dec. 20; PO Resp. 55–58; PO Sur-Reply 21, 27).  We addressed this argument in the Final Written Decision and decided that bus conflicts are a concern.  Final Dec. 20 (citing Pet. 78; Ex. 1035, 89–90; Ex. 1003 ¶¶ 239–240, 264, 366, 373).  We are not inclined to change our view, as explained below.

Dr. Subramanian stated that, in order to drive data on shared, bidirectional data busses in read and write operations, "each driver has to be able to turn off to avoid bus conflicts."  Ex. 1003 ¶ 373.  Dr. Subramanian refers to Dr. Harold Stone's textbook (*id.* (citing Ex. 1035, 89–90, 133 (Fig. 4.7))), which explains that, on a shared data bus, a conflict between read and write drivers "creates a low impedance path from $V_{CC}$ to ground through the output stages of the conflicting gates" and that the "high current through this path can burn out both driving gates."  Ex. 1035, 89–90.  Hence, the evidence of record showed that bus conflicts are a concern not only for read operations, but also for write operations.

IPR2022-00639
Patent 10,949,339 B2

Patent Owner asserts that Dr. Subramanian, Dr. Wolfe, and Dr. Brogioli testified that bus conflicts are not a concern for write operations. PO Resp. 55–58, 66 (citing Ex. 2006, 188:17–189:2, 189:5–17, 189:22–190:16; Ex. 2007, 68:16–20, 69:16–19, 70:20–23, 72:19–22, 114:9–22, 117:19–21, 117:25–118:2; Ex. 2005 ¶ 128); PO Sur-Reply 21, 27. This testimony, however, does not address the driver "burn out" type of bus conflict that Dr. Subramanian discussed in Dr. Stone's textbook. Req. Reh'g 14 (citing PO Resp. 55–58; PO Sur-Reply 21, 27); Ex. 1003 ¶¶ 373–374; Ex. 1035, 89–90, 133; *see also* Pet. Reply 31 (citing, *inter alia*, Ex. 1003 ¶¶ 373–374 and asserting that "if Ellsberry's or Halbert's *write* drivers were enabled while data is *read* from the coupled memories, that could cause devastating bus conflicts" (emphases omitted)). Also, Dr. Wolfe's testimony was given in the context of Ellsberry's "always on" embodiment which does not disable ports, unlike its "one port disabled" embodiment, which selectively enables and disables its ports. Ex. 2006, 186:23–189:3. Dr. Subramanian's testimony with respect to Halbert indicated that even if it is not necessary to disable read direction drivers outside of a write operation, it is still beneficial to do so in order to reduce power consumption and loading, and to prevent loopback conflicts. Ex. 2007, 68:5–22, 69:7–21, 70:20–23, 73:13–16, 114:9–115:7.

Patent Owner further argues that "whether a skilled artisan might have sought to avoid bus conflicts for unclaimed reasons (i.e., read operations) . . . is irrelevant." Req. Reh'g 14 (citing Final Dec. 19–20). We disagree with Patent Owner's suggestion that the reasoning to combine is limited to claimed features. *See Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1370 (Fed. Cir. 2017) ("The Board was not required to limit its motivation to

combine inquiry to the problem faced by the inventor . . .").  Rather, "[a]ny motivation to combine references, whether articulated in the references themselves or supported by evidence of the knowledge of a skilled artisan, is sufficient to combine those references to arrive at the claimed" subject matter.  *Id.* at 1370–71; *see also Intel Corp. v. PACT XXP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023) ("It's enough for Intel to show that there was a known problem of cache coherency in the art, that Bauman's secondary cache helped address that issue, and that combining the teachings of Kabemoto and Bauman wasn't beyond the skill of an ordinary artisan.").  Furthermore, Patent Owner's argument overlooks that some claims of the '339 patent are directed to read operations.  Ex. 1001, 20:56–21:22 (claim 10), 22:64–23:28 (claim 18), 23:29–24:29 (claim 19), 25:29–26:31 (claim 27), 26:38–49 (claim 29), 26:50–27:9 (claim 30), 27:10–21 (claim 31), 27:26–28:22 (claim 33).

The '339 patent also discusses data collisions, i.e., bus conflicts, power dissipation, and loading as concerns. *See, e.g.*, Ex. 1001, 2:5–12, 4:27–47, 7:37–43.  Likewise, Ellsberry mentions loading and bus conflicts (i.e., activating and disabling ports of memory bank switch to write data to the correct memory bank) as concerns.  Ex. 1005 ¶¶ 12, 27, 31, 50, claim 2. Halbert seeks to reduce loading, and describes timing that avoids bus conflicts in successive write operations.  Ex. 1006, 3:67–4:8, 6:66–7:30, Fig. 6.  Thus, the '339 patent addresses the same or similar problems as Ellsberry and Halbert.  Pet. 14–15, 20, 31–38, 44–47, 80–81.  "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent" may provide a motivation to combine.  *KSR*, 550 U.S. at 420–21.

IPR2022-00639
Patent 10,949,339 B2

Patent Owner argues that, in the Final Written Decision, the Board "fell back to unargued and unsupported known-problems-with-predictable-solutions and familiar-elements-combined-using known methods-with-predictable-results rationales" which "violated the APA and lacks any explanation of the underlying predicates." Req. Reh'g 14 (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("*Magnum*")). Here, as we explained in the Final Written Decision, Petitioner presented contentions that amounted to rationales recognized in *KSR* as establishing a reason to combine Ellsberry and Halbert. Final Dec. 19–20 (citing Pet. 78; Ex. 1035, 89–90; Ex. 1003 ¶¶ 239–240, 264, 366, 373). Thus, Patent Owner's reliance on *Magnum* is misplaced.

Patent Owner next argues that, since "Ellsberry and Halbert were redundant in presenting a single load already," "there is no 'reduction' in load to support this motivation." Req. Reh'g 14 (citing Final Dec. 22; PO Resp. 68; PO Sur-Reply 29–30). As we explained, a person of ordinary skill in the art considering Ellsberry would naturally be curious how others solved the loading problem and would have looked to Halbert's solution of using tristate buffers. Final Dec. 22 (citing *Intel*, 61 F.4th at 1380). Patent Owner further argues that the rationale does not teach how to configure Halbert's tristate buffers. Req. Reh'g 15. However, Halbert teaches how to configure the tristate buffers (*see, e.g.*, Halbert's Figure 4), so we do not find this argument persuasive.

Patent Owner argues that "there is no evidence of power concerns in Ellsberry solved by Halbert or by not disabling data paths on write commands" and that "Halbert leaves the data path enabled during write commands, suggesting that power savings is negligible and of no concern."

IPR2022-00639
Patent 10,949,339 B2

Req. Reh'g 15 (citing Final Dec. 23–26; Ex. 2007, 72:5–8). Patent Owner contends that the Board overlooked this argument in its Final Written Decision, and invoked a predictable-solutions-to-a-known-problem rationale that was never argued and unproven. *Id.* (citing PO Resp. 4, 47; Ex. 2005 ¶¶ 107–108; PO Sur-Reply 28–29; Final Dec. 25; *In re Magnum Oil Tools*, 829 F.3d at 1381).

We considered Patent Owner's arguments concerning power consumption and did not agree with them. Final Dec. 23–26 (citing PO Resp. 4, 47; PO Sur-Reply 28–29). Patent Owner incorrectly premises its arguments on equating Halbert's "don't care" state with the enabled state when, as explained, it encompasses both enabled and disabled states. Also, the expert testimony in this case established that power savings would be an important priority in at least some applications and that it was a known problem in the art. *Id.* at 25–26 (citing Ex. 1003 ¶¶ 366, 422, 662; Ex. 2007, 18:8–18, 37:20–24, 57:1–10; Ex. 1092, 123:16–125:11; Ex. 2013, 5; Ex. 2010, 2). The record further established that Halbert's tristate buffers in the high-impedance state would have been effective in saving power when a memory module was not actively conducting a read or write operation. *Id.* (citing Ex. 1003 ¶ 366; Ex. 1009, 1; Ex. 1035, 135; Ex. 2007, 18:8–18, 27:21–25, 37:20–24, 57:1–10, 60:4–8; Ex. 1092, 114:7–115:1, 123:16–125:11; Ex. 2013, 5; Ex. 2010, 2).

## III.    CONCLUSION

We have considered Patent Owner's arguments in its Request for Rehearing but they do not persuade us to modify our Final Written Decision.

## IV.    ORDER

In consideration of the foregoing, it is hereby:

IPR2022-00639
Patent 10,949,339 B2

ORDERED that Patent Owner's Request for Rehearing of our Final Written Decision is *denied*.

IPR2022-00639
Patent 10,949,339 B2

In summary:

Outcome of Decision on Rehearing:

| Claim(s) | 35 U.S.C § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 1–35 | 103 | Ellsberry, Halbert | 1–35 | |

Final Outcome of Final Written Decision after Rehearing:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–35 | 103 | Ellsberry, Halbert | 1–35 | |

IPR2022-00639
Patent 10,949,339 B2

FOR PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Mark Speegle
Sean Lee
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
mark.speegle@bakerbotts.com
sean.lee@bakerbotts.com
dlsamsungnetlistiprs@bakerbotts.com

Matthew A. Hopkins
Michael R. Rueckheim
Ryuk Park
WINSTON & STRAWN LLP
mhopkins@winston.com
Winston-IPR-Netlist@winston.com

FOR PATENT OWNER:

Hong Annita Zhong
Phillip Warrick
Jason Sheasby
Jonathan M. Lindsay
IRELL & MANELLA LLP
hzhong@irell.com
pwarrick@irell.com
jsheasby@irell.com
jlindsay@irell.com
netlistipr@irell.com

US010949339B2

(12) **United States Patent**
Lee et al.

(10) Patent No.: **US 10,949,339 B2**
(45) Date of Patent: *****Mar. 16, 2021**

(54) **MEMORY MODULE WITH CONTROLLED BYTE-WISE BUFFERS**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventors: **Hyun Lee**, Ladera Ranch, CA (US);
**Jayesh R. Bhakta**, Cerritos, CA (US)

(73) Assignee: **NETLIST, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/470,856**

(22) Filed: **Mar. 27, 2017**

(65) **Prior Publication Data**

US 2017/0337125 A1    Nov. 23, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 13/970,606, filed on Aug. 20, 2013, now Pat. No. 9,606,907, which is a (Continued)

(51) **Int. Cl.**
**G06F 12/00** (2006.01)
**G11C 8/12** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. **G06F 12/00** (2013.01); **G11C 5/025** (2013.01); **G11C 5/04** (2013.01); **G11C 5/066** (2013.01); **G11C 8/12** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,249,253 A    2/1981 Gentili et al.
4,571,676 A    2/1986 Mantellina et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    102576565 B    9/2015
JP    09237492    9/1997
(Continued)

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Patent Owner's Preliminary Response, filed Apr. 9, 2017.
(Continued)

*Primary Examiner* — Edward J Dudek, Jr.
*Assistant Examiner* — Ralph A Verderamo, III
(74) *Attorney, Agent, or Firm* — Morgan, Lewis & Bockius LLP

(57)    **ABSTRACT**

A memory module is configured to communicate with a memory controller. The memory module comprises DDR DRAM devices arranged in multiple ranks each of the same width as the memory module, and a module controller configured to receive and register input control signals for a read or write operation from the memory controller and to output registered address and control signals. The registered address and control signals selects one of the multiple ranks to perform the read or write operation. The module controller further outputs a set of module control signals in response to the input address and control signals. The memory module further comprises a plurality of byte-wise buffers controlled by the set of module control signals to actively drive respective byte-wise sections of each data signal associated with the read or write operation between the memory controller and the selected rank.

**35 Claims, 13 Drawing Sheets**



Samsung Electronics Co., Ltd.
Exhibit 1001, p. 1

## US 10,949,339 B2

Page 2

### Related U.S. Application Data

continuation of application No. 12/761,179, filed on Apr. 15, 2010, now Pat. No. 8,516,185, which is a continuation-in-part of application No. 12/504,131, filed on Jul. 16, 2009, now Pat. No. 8,417,870.

(51) **Int. Cl.**
| | |
|---|---|
| *G11C 5/02* | (2006.01) |
| *G11C 5/04* | (2006.01) |
| *G11C 5/06* | (2006.01) |

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,592,011 | A | 5/1986 | Mantellina et al. |
| 4,739,473 | A | 4/1988 | Ng |
| 5,060,188 | A | 10/1991 | Zulian et al. |
| 5,313,624 | A | 5/1994 | Harriman |
| 5,345,412 | A | 9/1994 | Shiratsuchi |
| 5,463,590 | A | 10/1995 | Watanabe |
| 5,513,135 | A | 4/1996 | Dell et al. |
| 5,532,954 | A | 7/1996 | Bechtolsheim et al. |
| 5,537,584 | A | 7/1996 | Miyai et al. |
| 5,541,448 | A | 7/1996 | Carpenter |
| 5,572,691 | A | 11/1996 | Koudmani |
| 5,617,559 | A | 4/1997 | Le et al. |
| 5,630,096 | A | 5/1997 | Zuraveleff |
| 5,649,159 | A | 7/1997 | Le et al. |
| 5,655,113 | A | 8/1997 | Leung |
| 5,717,851 | A | 2/1998 | Yishay et al. |
| 5,724,604 | A | 3/1998 | Moyer |
| 5,729,716 | A | 5/1998 | Lee et al. |
| 5,784,705 | A | 7/1998 | Leung |
| 5,802,541 | A | 9/1998 | Reed |
| 5,905,401 | A | 5/1999 | Sher |
| RE36,229 | E | 6/1999 | Cady |
| 5,953,280 | A | 9/1999 | Watsui |
| 5,973,392 | A | 10/1999 | Senba et al. |
| 6,011,710 | A | 1/2000 | Wieggers |
| 6,061,754 | A | 5/2000 | Cepulis |
| 6,070,217 | A | 5/2000 | Connolly et al. |
| 6,141,245 | A | 10/2000 | Bertin |
| 6,173,357 | B1 | 1/2001 | Ju |
| 6,188,641 | B1 | 2/2001 | Uchida |
| 6,205,516 | B1 | 3/2001 | Usami |
| 6,223,650 | B1 | 5/2001 | Stuck |
| 6,260,127 | B1 | 7/2001 | Olarig et al. |
| 6,262,938 | B1 | 7/2001 | Lee |
| 6,438,062 | B1 | 8/2002 | Curtis |
| 6,446,158 | B1 | 9/2002 | Karabatsos |
| 6,480,439 | B2 | 11/2002 | Tokutome et al. |
| 6,546,476 | B1 | 4/2003 | Gillingham |
| 6,553,449 | B1 | 4/2003 | Dodd et al. |
| 6,618,791 | B1 | 9/2003 | Dodd et al. |
| 6,636,446 | B2 | 10/2003 | Lee |
| 6,683,372 | B1 | 1/2004 | Wong et al. |
| 6,704,910 | B2 | 3/2004 | Hong |
| 6,717,855 | B2 | 4/2004 | Underwood |
| 6,721,860 | B2 | 4/2004 | Klein |
| 6,747,887 | B2 | 6/2004 | Halbert et al. |
| 6,788,592 | B2 | 9/2004 | Nakata et al. |
| 6,832,303 | B2 | 12/2004 | Tanaka |
| 6,948,084 | B1 | 9/2005 | Manapat et al. |
| 7,024,518 | B2 * | 4/2006 | Halbert ............... G06F 13/1689 711/101 |
| 7,093,066 | B2 | 8/2006 | Klein |
| 7,130,308 | B2 | 10/2006 | Haddock et al. |
| 7,133,960 | B1 | 11/2006 | Thompson et al. |
| 7,191,302 | B2 | 3/2007 | Usami |
| 7,225,303 | B2 | 5/2007 | Choi |
| 7,289,386 | B2 | 10/2007 | Bhakta et al. |
| 7,334,150 | B2 | 2/2008 | Ruckerbauer et al. |
| 7,379,361 | B2 | 5/2008 | Co et al. |
| 7,464,225 | B2 | 12/2008 | Tsern |
| 7,532,537 | B2 | 5/2009 | Solomon et al. |

| | | | |
|---|---|---|---|
| 7,730,254 | B2 | 6/2010 | Risse |
| 7,865,674 | B2 * | 1/2011 | Gower ............... G06F 13/1684 365/189.02 |
| 7,881,150 | B2 | 2/2011 | Solomon et al. |
| 7,916,574 | B1 | 3/2011 | Solomon et al. |
| 7,990,746 | B2 | 8/2011 | Rajan |
| 8,001,434 | B1 | 8/2011 | Lee et al. |
| 8,081,536 | B1 | 12/2011 | Solomon et al. |
| 8,089,795 | B2 | 1/2012 | Rajan |
| 8,130,560 | B1 | 3/2012 | Rajan et al. |
| 8,189,328 | B2 | 5/2012 | Kanapathippillai |
| 8,233,303 | B2 | 7/2012 | Best |
| 8,244,971 | B2 | 8/2012 | Rajan |
| 8,250,295 | B2 | 8/2012 | Amidi et al. |
| 8,335,894 | B1 | 12/2012 | Rajan |
| 8,417,870 | B2 | 4/2013 | Lee et al. |
| 8,516,188 | B1 | 8/2013 | Solomon et al. |
| 8,689,064 | B1 | 4/2014 | Lee et al. |
| 8,756,364 | B1 | 6/2014 | Bhakta et al. |
| 8,782,350 | B2 | 7/2014 | Lee et al. |
| 8,856,464 | B2 | 10/2014 | Karamcheti |
| 9,606,907 | B2 * | 3/2017 | Lee ...................... G11C 5/025 |
| 2001/0008006 | A1 | 7/2001 | Klein |
| 2002/0048195 | A1 | 4/2002 | Klein |
| 2002/0112119 | A1 | 8/2002 | Halbert et al. |
| 2003/0070052 | A1 | 4/2003 | Lai |
| 2004/0098528 | A1 | 5/2004 | Janzen |
| 2005/0010737 | A1 | 1/2005 | Ware et al. |
| 2005/0257109 | A1 | 11/2005 | Averbui |
| 2005/0281096 | A1 | 12/2005 | Bhakta et al. |
| 2006/0117152 | A1 | 6/2006 | Amidi et al. |
| 2006/0262586 | A1 | 11/2006 | Solomon et al. |
| 2006/0277355 | A1 | 12/2006 | Ellsberry et al. |
| 2007/0070569 | A1 | 3/2007 | Tsern |
| 2007/0293094 | A1 | 12/2007 | Aekins |
| 2008/0025137 | A1 | 1/2008 | Rajan et al. |
| 2008/0046631 | A1 | 2/2008 | Takaku et al. |
| 2008/0104352 | A1 | 5/2008 | Talbot |
| 2008/0162790 | A1 | 7/2008 | Im |
| 2009/0103387 | A1 | 4/2009 | Shau |
| 2009/0228631 | A1 * | 9/2009 | Marulkar ............ G06F 13/1605 711/100 |
| 2009/0248969 | A1 | 10/2009 | Wu et al. |
| 2010/0070690 | A1 | 3/2010 | Amer et al. |
| 2010/0091540 | A1 | 4/2010 | Bhakta et al. |
| 2010/0125681 | A1 | 5/2010 | Patel |
| 2011/0090749 | A1 | 4/2011 | Bhakta et al. |
| 2011/0125966 | A1 | 5/2011 | Amidi et al. |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | H10092169 | A | 9/1997 |
| JP | 2010320270 | | 12/1998 |
| JP | 2000285674 | | 10/2000 |
| JP | 2000314485 | A | 10/2000 |
| JP | 2002184176 | | 6/2002 |
| JP | 2003007963 | | 1/2003 |
| JP | 2008046989 | | 2/2008 |

#### OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1003, 'Declaration of Dr. Harold Stone,' filed Dec. 22, 2017.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1009, 'JEDEC Standard Double Data Rate DDR SDRAM Specification, JESD79 Jun. 2000,' filed Dec. 22, 2017.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1010, 'JEDEC Standard 21-C, DDR SDRAM Registered DIMM Design Specification Jan. 2002,' filed Dec. 22, 2017.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1011, 'JEDEC Standard DDR2 SDRAM Specification, JESD79-2B Jan. 2005,' filed Dec. 22, 2017.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1012, 'Declaration of John J. Kelly Regarding

## US 10,949,339 B2

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

Records of Joint Electron Device Engineering Council JEDEC,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1022, 'Decision Denying Institution of Inter Partes Review of U.S. Pat. No. 8,516,185, *SanDisk Corp. v. Netlist, Inc.*, IPR2014-01029, Paper No. 11 Dec. 16, 2014,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1023, 'Decision Denying Institution of Inter Partes Review of U.S. Pat. No. 8,516,185, *Smart Modular Techs. Inc.* v. *Netlist, Inc.*, IPR2014-01369, Paper No. 12 Mar. 9, 2015,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1024, 'Excerpts from the Hearing in Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 May 8, 2017,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1025, 'Complainant Netlist, Inc.'s Initial Post-Hearing Brief, Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 May 30, 2017 excerpts relevant to '185 patent,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1026, 'Respondents' Post-Hearing Brief, Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 May 30, 2017 excerpts relevant to '185 patent,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1027, 'High-quality versions of demonstrative graphics included in Respondents' Post-Hearing Brief (Ex.1026),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1028, 'Complainant Netlist Inc.'s Reply Post-Hearing Brief, Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 (Jun. 9, 2017) (excerpts relevant to '185 patent),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1029, 'Respondents' Reply Post-Hearing Brief, Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 (Jun. 9, 2017) (excerpts relevant to '185 patent),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1030, 'High-quality versions of demonstrative graphics included in Respondents' Reply Post-Hearing Brief (Ex. 1029),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1031, 'Institution of Inter Partes Review of U.S. Pat. No. 8,516,185, *SK hynix Inc. et al.* v. *Netlist, Inc.*, IPR2017-00577, Paper No. 8 (Jul. 7, 2017),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1032, 'Final Written Decision, *Diablo Techs., Inc.* v. *Netlist, Inc.*, IPR2014-00882, Paper No. 33 (Dec. 14, 2015),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1033, '*Netlist, Inc.* v. *Diablo Techs., Inc.*, No. 2016-1742 (Fed. Cir. Jul. 25, 2017),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1034, 'Netlist's Infringement Claim Chart for U.S. Pat. No. 9,606,907 Jun. 14, 2017,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1035, 'Stone, H.S. Microcomputer Interfacing, Reading, MA: Addison Wesley, 1982,' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1039, 'Intel E7525 Memory Controller Hub (MCH) Chipset Datasheet (Jun. 2004),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1040, 'Initial Determination, Certain Memory Modules and Components Thereof, and Products Containing Same, Inv. No. 337-TA-1023 (Nov. 14, 2017) (redacted excerpts),' filed Dec. 22, 2017.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1041, 'Bruce Jacob et al., Memory System: Cache, DRAM, Disk (2008) (excerpts),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1042, 'Direct RDRAM datasheet (2000),' filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00363, Petition for Review of U.S. Pat. No. 9,606,907, filed Dec. 22, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00363, Preliminary Response, filed Apr. 10, 2018.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00364, Petition for Inter Partes Review of U.S. Pat. No. 9,606,907, filed Dec. 27, 2017.
Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00365, Petition for Inter Partes Review of U.S. Pat. No. 9,606,907, filed Dec. 27, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petition for Inter Partes Review, filed Dec. 30, 2016.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Patent Owner's Preliminary Response, filed Apr. 9, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Patent Owner's Response, filed Sep. 15, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners' Objections to Evidence, filed Sep. 22, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners Motion to Exclude Certain Inadmissible Testimony of Patent Owners Expert Carl Sechen, filed Jan. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners Request for Oral Hearing, filed Jan. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, PO Request for Oral Argument, filed Jan. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, PO Motion for Observations, filed Jan. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners' Response to Patent Owner's Motion for Observations, filed Jan. 23, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, PO's Opposition to Petitioner's Motion to Exclude, filed Jan. 23, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners' Reply in Support of Motion to Exclude Certain Inadmissible Testimony of Patent Owner's Expert Carl Sechen, filed Jan. 30, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Petitioners' Updated Exhibit List, filed Feb. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Patent Owner's Updated Exhibit List, filed Feb. 9, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Trial Instituted Document, filed May 15, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Order Trial Hearing, filed Jan. 25, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Hearing Transcript, filed Mar. 22, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Final Written Decision, filed May 3, 2018.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1002, 'Excerpts of FH for U.S. Pat. No. 8,756,364,' filed Dec. 30, 2016.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1003, 'Declaration of Harold Stone,' filed Dec. 15, 2017.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1007, 'JEDEC JESD79 publication (Jun. 2000),' filed Dec. 30, 2016.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1008, 'JEDEC Declaration for DDR Specification,' filed Dec. 30, 2016.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1015, 'Texas Instruments 74LS245 datasheet (2002),' filed Dec. 30, 2016.

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 3

**US 10,949,339 B2**

Page 4

(56)         **References Cited**

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1017, '2000-03 Samsung CMOS SDRM data sheet,' filed Sep. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1019, 'Final Decision [IPR2014-01011],' filed Sep. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1020, 'Final Decision [IPR2014-00883],' filed Dec. 30, 2016.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1023, 'Gordon_Moore_1965_article,' filed Dec. 30, 2016.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1024, 'Deposition Transcript of Carl Sechen (Dec. 8, 2017),' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1025, 'Supplemental Declaration of Harold S. Stone (Dec. 15, 2017),' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1026, 'Xilinx CoolRunner XPLA3 CPLD product specification (2000),' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1027, 'Xilinx Programmable Logic Design Quick Start Handbook (2004),' filed Jan. 9, 2018.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1028, 'Xilinx TQFP package datasheet (2000),' filed Jan. 9, 2018.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1029, 'Xilinx VQFP package datasheet (2002),' filed Feb. 9, 2018.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1030, 'Xilinx CS280 package datasheet (1999),' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 1031, 'Petitioners Demonstratives,' filed Apr. 9, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 2001, 'Exhibit 2001,' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 2002, 'Exhibit 2002,' filed Dec. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 2003, 'Exhibit 2003,' filed Feb. 9, 2018.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 2004, 'Exhibit 2004,' filed Dec. 30, 2016.

Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibits 2005, 'Exhibit 2005,' filed Sep. 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Preliminary Response, filed Apr. 10, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petitioners' Updated Exhibit List, filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Response, filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petitioners' Objections to Evidence, filed Oct. 31, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petitioners' Reply to Patent Owner's Response, filed Feb. 6, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Objections to Evidence, filed Feb. 13, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petitioners' Request for Oral Hearing, filed Feb. 28, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Request for Oral Argument, filed Feb. 28, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Motion to Exclude, filed Feb. 28, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petitioners' Opposition to Patent Owner's Motion to Exclude, filed Mar. 14, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Patent Owner's Reply to Petitioner's Opposition to Motion to Exclude, filed Mar. 21, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Notice of Accord Filing Date, filed Jan. 10, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Trial Instituted Document, filed Jul. 7, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Order—Request for Oral Argument—37 CFR 42.70, filed Apr. 2, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1003, 'Declaration of Harold S. Stone,' filed Jan. 5, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1007, 'JEDEC JESD79 publication (Jun. 2000),' filed Jan. 5, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1009, 'TI 74LS245 datasheet (2002),' filed Apr. 10, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1010, 'JEDEC Declaration,' filed Jan. 5, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1011, 'IPR2014-01369 Aug. 23, 2014 Petition for Inter Partes Review,' filed Jan. 5, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1012, 'IPR2014-01029 Jun. 24, 2014 Petitioner for Inter Partes Review,' filed Apr. 10, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1025, 'US Patent Application Publication 2011/0016250,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1026, 'Netlist's post-hearing brief,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1027, 'Hynix's post-hearing brief,' filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1028, 'Demonstrative Graphics from hynix's post-hearing brief,' filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1029, 'Netlist's reply post-hearing brief,' filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1030, 'hynix's reply post-hearing brief,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 1031, 'Demonstrative Graphics from hynix's reply post-hearing brief,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2001, 'Exhibit 2001,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2002, 'Exhibit 2002,' filed Jun. 21, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2003, 'Exhibit 2003,' filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2004, 'Exhibit 2004,' filed Oct. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2005, 'Exhibit 2005,' filed Dec. 30, 2016.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2006, 'Exhibit 2006,' filed Dec. 30, 2016.

Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibits 2007, 'Exhibit 2007,' filed Dec. 30, 2016.

Anonymous. (Dec. 1996). "Applications Note: Understanding DRAM Operation," IBM, 10 pages.

Altera, ACEX iK, Programmable Logic Device Family, Data Sheet, May 2003, Ver 3.4.

Behrens, S. "HP Printer Memory Explained", The ZonkPage, Last Updated Jan. 21, 2004. Accessed Feb. 10, 2013, Retrieved from the Internet: URL<http://warshaft.com/hpmem.htm>. 7pp.

English Translation of the Notice of Grounds for Rejection, Korean Patent Application No. 2012-7004038, dated May 11, 2016.

Examination Report, European Patent Application No. 10730021.2, dated Apr. 14, 2014.

**US 10,949,339 B2**

Page 5

(56)　　　　**References Cited**

OTHER PUBLICATIONS

Response to Examination Report, European Patent Application No. 10730021.2, dated Jun. 4, 2014.

Examination Report, European Patent Application No. 10730021.2, dated Apr. 29, 2015.

Inter Partes Review Case No. IPR2014-01029, Petition for Inter Partes Review of U.S. Pat. No. 8,516,185, filed on Jun. 24, 2014.

Inter Partes Review Case No. IPR2014-01029, Exhibit 1008 to Petition for Inter Partes Review, "Declaration of Charles J. Neuhauser, Ph.D. under 37 C.F.R. § 1.68," filed on Jun. 24, 2014.

Inter Partes Review Case No. IPR2014-01029, Supplemental Petition for Inter Partes Review of U.S. Pat. No. 8,516,185, filed on Jul. 23, 2014.

Inter Partes Review Case No. IPR2014-01029, Patent Owner's Preliminary Response pursuant to 37 C.F.R. § 42.107, filed on Oct. 17, 2014.

Inter Partes Review Case No. IPR2014-01029, Decision Denying Institution of Inter Partes Review 37 C.F.R. § 42.108, issued Dec. 16, 2014.

Inter Partes Review Case No. IPR2014-01369, Corrected Petition for Inter Partes Review of Claims 1-19 of U.S. Pat. No. 8,516,185, filed on Sep. 22, 2014.

Inter Partes Review Case No. IPR2014-01369, Exhibit 1008 to Corrected Petition for Inter Partes Review, "Declaration of Dr. Nader Bagherzadeh under 37 C.F.R. § 1.68," filed on Sep. 22, 2014.

Inter Partes Review Case No. IPR2014-01369, Exhibit 1013 to Corrected Petition for Inter Partes Review, "Webster's II New College Dictionary," filed on Sep. 22, 2014.

Inter Partes Review Case No. IPR2014-01369, Exhibit 1014 to Corrected Petition for Inter Partes Review, "Standard Dictionary of Electrical and Electronics Terms," IEEE 1988, filed on Sep. 22, 2014.

Inter Partes Review Case No. IPR2014-00882, Corrected Petition for Inter Partes Review of U.S. Pat. No. 7,881,150, filed on Jul. 8, 2014.

Inter Partes Review Case No. IPR2014-00882, Exhibit 1007 to Petition for Inter Partes Review, "Declaration of Dr. Srinivasan Jagannathan," filed on Jun. 22, 2014.

Inter Partes Review Case No. IPR2014-00883, Corrected Petition for Inter Partes Review of U.S. Pat. No. 8,081,536, filed on Jul. 8, 2014.

Inter Partes Review Case No. IPR2014-00883, Exhibit 1011 to Petition for Inter Partes Review, "Declaration of Dr. Srinivasan Jagannathan," filed on Jun. 21, 2014.

Inter Partes Review Case No. IPR2014-01011, Corrected Petition for Inter Partes Review of U.S. Pat. No. 7,881,150, filed on Jul. 8, 2014.

Inter Partes Review Case No. IPR2014-01011, Exhibit 1007 to Petition for Inter Partes Review, "Declaration of Dr. Srinivasan J Jagannathan." filed on Jun. 22,2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-00882, Patent Owner's Preliminary Response Pursuant to 37 C.F.R. § 42.107, filed Oct. 7, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-00882, Decision—Institution of Inter Partes Review 37 C.F.R. § 42.108, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 8,081,536, IPR Case No. IPR2014-00883, Patent Owner's Preliminary Response Pursuant to 37 C.F.R. § 42.107, filed Oct. 7, 2014.

Inter Partes Review of U.S. Pat. No. 8,081,536, IPR Case No. IPR2014-00883, Decision—Institution of Inter Partes Review 37 C.F.R. § 42.108, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Patent Owner's Preliminary Response Pursuant to 37 C.F.R. § 42.107, filed Oct. 7, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Decision—Institution of Inter Partes Review 37 C.F.R. § 42.108, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Exhibit 3001 to Decision—Institution of Inter Partes Review, Excerpts from IEEE Dictionary, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Exhibit 3002 to Decision—Institution of Inter Partes Review, Excerpts from IEEE Dictionary, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Exhibit 3003 to Decision—Institution of Inter Partes Review, Excerpts from Oxford English Dictionary, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-01011, Exhibit 3004 to Decision—Institution of Inter Partes Review, Excerpts from Oxford English Dictionary, issued Dec. 16, 2014.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner's Reply, filed May 19, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner Request for Oral Argument, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Patent Owner Motion for Observations, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Patent Owner Request for Oral Argument, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Order Trial Hearing, filed Jun. 8, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Patent Owner's Submission on Propriety of Petitioner Reply, filed Jun. 9, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner's Response to Motion for Observations, filed Jun. 10, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner's Response to Netlist's Submission, filed Jun. 13, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Patent Owner's Objections to Petitioner's Demonstrative Exhibits, filed Jun. 23, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Patent Owner's Demonstrative Exhibits, filed Jun. 24, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner's Updated Exhibit List, filed Jun. 24, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Supplemental Declaration of Dr. Jagannathan, filed May 19, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, May 10, 2016 Deposition of Carl Sechen, filed May 19, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Petitioner's Demonstrative Exhibits, filed Jun. 24, 2016.

Inter Partes Review of U.S. Pat. No. 7,881,150, Case No. IPR2015-01020, Exhibit 2007, "Deposition of Dr. Srinivasan Jagannathan on May 25, 2016," filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Petitioner's Reply, filed May 19, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Petitioner Request for Oral Argument, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Patent Owner Motion for Observations, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Patent Owner Request for Oral Argument, filed Jun. 2, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Patent Owner's Submission on Propriety of Petitioner Reply, filed Jun. 9, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Petitioner's Response to Motion for Observations, filed Jun. 10, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Petitioner's Response to Patent Owner Submission, filed Jun. 13, 2016.

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Patent Owner's Objections to Petitioner's Demonstrative Exhibits, filed Jun. 23, 2016.

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 5

**US 10,949,339 B2**

Page 6

(56) **References Cited**

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Patent Owner1s Demonstrative Exhibits, filed Jun. 24, 2016.
Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Petitioner1s Updated Exhibit List, filed Jun. 24, 2016.
Inter Partes Review of U.S. Pat. No. 8,081,536, Case No. IPR2015-01021, Supplemental Declaration of Dr. Jagannathan, filed May 19, 2016.
Inter Partes Review of U.S. Pat. No. 8,756,364, Case No. IPR2017-00549, Exhibit 1003, "Declaration of Harold S. Stone," filed Dec. 30, 2016.
Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Petition for Inter Partes Review, filed Jan. 5, 2017.
Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibit 1003, "Declaration of Harold S. Stone," filed Jan. 5, 2017.
Inter Partes Review of U.S. Pat. No. 8,516,185, Case No. IPR2017-00577, Exhibit 1010, Declaration of John J. Kelly Regarding Records of Joint Electron Device Engineering Council (JEDEC), filed Jan. 5, 2017.
Horowitz, "The Art of Electronics," Cambridge Univ. Press, 1989, selected pages.
Huang et al, "An Efficient Parallel Transparent BIST Method for Multiple Embedded Memory Buffers," VLSI Design 2011, p. 379.
Jacob, Bruce L.; "Synchronous DRAM Architectures, Organizations, and Alternative Technologies." University of Maryland, Dec. 10, 2002.
JEDEC Standard No. 21-C Section 4.5.7, 168 Pin Registered SDRAM DIMM Family, Release 7.
JEDEC 21-C, Section 4.6.1, 278 Pin Buffered SDRAM DIMM Family.
JEDEC Standard No. 21-C Section 4.1.2.5, Appendix E, "Specific PD's for Synchronous DRAM (SDRAM)," pp. 1-25.
JEDEC Standard, "Fully Buffered DIMM (FBDIMM): DFx Design for Validation and Test," JESD82-28, Feb. 2008.
JEDEC Standard Double Data Rate (DDR) SDRAM Specification, JESD79 (Jun. 2000).
McCluskey, Edward J., *Logic Design Princ.J.p/es with Emphasis on Testable Semicustom rCircuits*, Prentice Hall, 1986, pp. 104-107 and 119-120.
G. Moore, "Cramming more components onto integrated circuits," Electronics, vol. 38, No. 8, Apr. 19, 1965.
Non-Final Office Action, U.S. Appl. No. 13/412,243, dated Jan. 2, 2014, 20 pages.
Non-final office action, U.S. Appl. No. 13/288,850, dated Oct. 11, 2013, 24 pages.
Non-final office action, U.S. Appl. No. 13/411,344, dated Dec. 31, 2013, 28 pages.
Non-final office action, U.S. Appl. No. 13/473,413, dated Nov. 17, 2011, 46 pages.
Response to non-final office action dated Oct. 14, 2013 for U.S. Appl. No. 13/288,850, filed Jan. 13, 2014, 15 pages.
Response to non-final office action dated Dec. 31, 2013 for U.S. Appl. No. 13/411,344, filed Mar. 31, 2014, 12 pages.
Patent Owner's Response to Office Action mdated ailed Nov. 13, 2012 for Reexamination Control Nos. 95/000,578; 95/000,579, and 95/001,339, filed Jan. 14, 2013, 96 pages.
Patent Owner's Response to Office Action dated Dec. 19, 2012 for Reexamination Control No. 95/001,758, filed Mar. 19, 2013, 61 pages.
Patent Owner's Response to Office Action dated Sep. 26, 2013 for Reexamination Control No. 95/001,758, filed Nov. 26, 2013, 85 pages.
Third Party Requester's Comments after Non-Final Action dated Sep. 26, 2013 for Reexamination Control No. 95/001,758, filed Dec. 26, 2013.
Patent Owner's Appeal Brief for Reexamination Control Nos. 95/000,546 and 95/000,577, filed Oct. 2, 2013, 46 pages.
Patent Trial and Appeal Board Decision on Appeal for Reexamination Control No. 95/001/337, mailed Jan. 16, 2014, 30 pages.

Patent Trial and Appeal Board Decision on Appeal for Reexamination Control No. 95/001/381, mailed Jan. 16, 2014, 24 pages.
Action Closing Prosecution mailed Mar. 27, 2014 for Reexamination Control No. 95/001,758, filed Sep. 14, 2011, 40 pages.
Action Closing Prosecution mailed Mar. 27, 2014 for Reexamination Control No. 95/001,339, filed Jun. 8, 2010, 106 pages.
Petition for Inter Partes Review filed on Jun. 24, 2014 for U.S. Pat. No. 8,516,185, IPR Case No. IPR2014-01029, and all associated documents including cited references and expert declarations, available at https://i,itabtr1als.uspto.gov.
Petition for Inter Partes Review filed on Jun. 22, 2014 for U.S. Pat. No. 7,881,150, IPR Case No. IPR2014-00882 and IPR Case No. IPR2014-01011, and all associated documents including cited references and expert declarations, available at https://ptabtriais.usto.gov.
Petition for Inter Partes Review filed on Jun. 24, 2014 for U.S. Pat. No. 8,081,536, IPR Case No. IPR2014-00883, and all associated documents including cited references and expert declarations, available at https://_tabtrials.uspto._gov.
Reese, "Introduction to Logic Synthesis using Verilog HDL," Morgan&Claypool Publisher, 2006, pp. 1-28.
Notice of Allowance, U.S. Appl. No. 12/504,131, dated Feb. 12, 2013, 52 pgs.
Response to Non-Final Office Action dated Jan. 2, 2014, filed Apr. 2, 2004, for U.S. Appl. No. 13/287,042, filed Nov. 1, 2011, 12 pages.
Office Action dated Apr. 2, 2014, for Japanese Patent Application No. 2012-520662 and English translation thereof, 7 pages.
128Mbit Sdram, Samsung datasheet K4S281632C, Rev. 00. Mar. 2000.
Stone, H.S. Microcomputer Interfacing, Reading, MA: Addison Wesley, 1982.
Texas Instruments SN74LS245 octal bus transceivers with 3-state outputs datasheet, 2002.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Smart Storage Systems, 1nc.'s Invalidity Contentions, dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits E.1-E.7 to "Smart Storage Systems, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits F.1-F.5 to "Smart Storage Systems, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits G.1-G.6 to "Smart Storage Systems, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibit H to "Smart Storage Systems, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Diablo Technologies, 1nc.'s Invalidity Contentions, dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits D-1 to D6 to "Diablo Technologies, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits F-1 to F-5 to "Diablo Technologies, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibits G-1 to G-6 to "Diablo Technologies, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.
U.S. District Court Northern District of California, Case No. 4:13-CV-05889-YGR, *Netlist, Inc. v. Smart Storage Systems, Inc., and Diablo Technologies, Inc.*, Exhibit H to "Diablo Technologies, 1nc.'s Invalidity Contentions," dated Jun. 6, 2014.

(56)         **References Cited**

OTHER PUBLICATIONS

Anonymous. (May 2002). "Hynix HYMD512G726(L)8-K/H/L Registered DDR SDRAM DIMM, 128Mx72 bits Product Description," Rev. 0.1/May, 02, pp. 1-16.

"Elipida Memory to Speak at Intel's Memory Implementers Forum Roundtable Event", Intel Developer Forum, [Online]. Retrieved from the Internet: <URSL: http://www.elpida.com/en/news/2004/02-18.html>, (Jun. 14, 2011), 1 pg.

*Google, Inc.* v. *Netlist, Inc.*, No. 4:08-cv-04144-SBA, Netlist 1nc.'s Answer to Complaint and Counterclaim (N.D. Ca. Filed Nov. 18, 2008).

*Google, Inc.* v. *Netlist, Inc.*, No. C 08-04144 SBA Google 1nc.'s Invalidity Contentions Pursuant to PAT. L.F. 3-3, dated Apr. 13, 2009.

*Google, Inc.* v. *Netlist, Inc.*, No. C08 04144, Complaint for Declaratory Relief, (N.D. Ca Dated Aug. 29, 2008).

1nte(6400/6402 Advanced Memory Buffer Datasheet, published Oct. 2006.

Letter from G. Hopkins Guy III, Orrick, Herrington & Sutcliffe LLP, to R. Scott Oliver, Morrison & Foerster, (Apr. 14, 2009).

Luthra et al. "Interface Synthesis Using Memory Mapping for an FPGA Platform," Proceedings of the 21st International Conference on Computer Design, 2003.

*MetaRAM, Inc.* v. *Netlist, Inc.* No. 3:09-cv-01309-VRW, MetaRam's Reply to Netlist's Counterclaims, (N.D. Ca. Filed Jun. 3, 2009).

*MetaRam, Inc.* v. *Netlist, Inc.*, No. 3:09-cv-01309-VRW, Netlist's Answer to Complaint and Counterclaims, (N.D. Ca, filed May 11, 2009).

*MetaRAM, Inc.* v. *Netlist, Inc.*, No. C09 01309, Complaint for Patent Infringement, (N.D. Ca. Filed Mar. 25, 2009).

Micron "DDR2 SDRAM Registered DIMM (RDIMM)," 2003 Micron Technology, Inc. 18 pages.

Micron "Synchronous DRAM Module MT18LSDT472," 1998, Micron Technology, Inc., 17 pages.

Micron Technical Note,"Decoupling Capacitor Calculations for a DDR Memory Channel," 2004, 3 pages.

Miles J. Murdocca et al., "Principles of Computer Architecture", Prentice Hall, Inc., Upper Saddle River, NJ, 2000, pp. 243-252.

Murdocca et al., "Principles of Computer Architecture," Prentice Hall, 2000, pp. 249-251.

*Netlist, Inc.* v. *MetaRAM, Inc.*, No. 09-165-GMS, MetaRAM, 1nc.'s Answer and Affirmative Defenses to Plaintiff's Complaint, dated Apr. 20, 2009.

*Netlist, Inc.* v. *MetaRAM, Inc.*, No. 1:09-ccv-00165-GMS, Complaint for Patent Infringement, (D. Del. Filed Mar. 12, 2009).

Non-Final Action Closing Prosecution mailed Sep. 1, 2010, for Control No. 95/001,339, filed Apr. 10, 2010, 17 pages.

Non-Final Action Closing Prosecution mailed Jun. 21, 2011, for Control No. 95/001,381, filed Jun. 9, 2010, 34 pages.

Non-Final Action Closing Prosecution mailed Mar. 12, 2012, for Control No. 95/001,337, filed Apr. 19, 2010, 33 pages.

Non-Final Action mailed Aug. 27, 2010, for Control No. 95/000,546, filed May 11, 2010, 16 pages.

Non-Final Action mailed Sep. 8, 2010, for Control No. 95/001,381, filed Jun. 9, 2010, 17 pages.

Non-Final Action mailed Apr. 4, 2011, for Control No. 95/001,339, filed Apr. 20, 2010, 61 pages.(merged with 95/000,578 and 95/000,579).

Non-Final Action mailed Jun. 15, 2011, for Control No. 95/001,381, filed Jun. 9, 2010, 33 pages.

Non-Final Action mailed Sep. 27, 2011, for Control No. 95/001,337, filed Apr. 19, 2010, 19 pages.

Non-Final Action mailed Oct. 4, 2011, for Control No. 95/001,339, filed Apr. 20, 2010, 77 pages.(merged with 95/000,578 and 95/000,579).

Non-Final Action mailed Oct. 14, 2011, for Control No. 95/001,339, filed Apr. 30, 2010, 99 pages.(merged with 95/000,578 and 95/000,579).

Non-Final Office Action dated Nov. 16, 2011, for U.S. Appl. No. 95/001,758 filed Sep. 14, 2011, 25 pages.

Order Granting Request for Inter Partes Reexamination mailed Nov. 16, 2011, for U.S. Appl. No. 95/001,758, filed Sep. 14, 2011, 13 pages.

Order Granting Request for Inter Partes Reexamination mailed Aug. 9, 2010, for Control No. 95/000,546, filed May 11, 2010, 22 pages.

Order Granting Request for Inter Partes Reexamination mailed Aug. 27, 2010, for Control No. 95/001,337, filed Apr. 19, 2010, 21 pages.

Order Granting Request for Inter Partes Reexamination mailed Sep. 1, 2010, for Control No. 95/001,339, filed Apr. 20, 2010, 14 pages.

Order Granting Request for Inter Partes Reexamination mailed Sep. 8, 2010, for Control No. 95/000,381, filed Jun. 9, 2010, 21 pages.

Order Granting Request for Inter Partes Reexamination mailed Jan. 14, 2011, for Control No. 95/000,579, filed Oct. 21, 2010, 12 pages.

Order Granting Request for Inter Partes Reexamination mailed Jan. 18, 2011, for Control No. 95/000,577, filed Oct. 20, 2010, 17 pages.

Right of appeal Notice mailed Feb. 7, 2012, for Control No. 95/001,381, 33 pages.

Right of Appeal Notice mailed Jun. 22, 2012, for Control No. 95/001,337, filed Jun. 4, 2010, 34 pages.

PC133 SDRAM Registered DIMM Design Specification, Revision 1.1, Aug. 1999, 62 pages.

Texas Instruments, "TM2SR72EPN 2097152 by 72-Bit, TM4SRT2EPN 4194304 by 72-Bit, Synchronous Dynamic RAM Modules," 1997, 15 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *Inphi Corporation*, Complaint for Patent Infringement, filed Sep. 22, 2009 in 10 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *INPHI Corporation*, Defendant 1nphi Corporation's Answer to Plaintiff's Complaint for Patent Infringement, filed Nov. 12, 2009 in 6 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *INPHI Corporation*, Defendant 1nphi Corporation's Answer to Plaintiff's First Amended Complaint for Patent Infringement, filed Feb. 11, 2010 in 9 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *INPHI Corporation*, Defendant 1nphi Corporation's Notice of Motion and Motion for Stay Pending Reexaminations and Interference Proceeding Regarding the Patents-In-Suit; Memorandum of Points and Authorities in Support Thereof, filed Apr. 21, 2010 in 28 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *INPHI Corporation*, Plaintiff Netlist 1nc's Opposition to Defendant Inphi Corporation's Motion for Stay Pending Reexaminations and Interference Proceedings Regarding the Patents-In-Suit, filed May 3, 2010 in 23 pages.

U.S. District Court Central District of California, Case No. CV09 06900, *Netlist, Inc.* vs. *Inphi Corporation*, Plaintiff Netlist, Inc's First Amended Complaint for Patent Infringement, filed Dec. 23, 2009 in 8 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Defendant Netlist, 1nc.'s Claim Construction Reply Brief, filed Sep. 22, 2009 in 19 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Defendant Netlist, 1nc.'s Opening Claim Construction Brief, filed Jul. 28, 2009 in 21 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Defendant Netlist, 1nc.'s Opposition to Google Inc's Motion for Summary Judgment of Invalidity, filed Jul. 6, 2010 in 13 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Exhibit A to Joint Claim Construction and Prehearing Statement, filed Jun. 12, 2009 in 2 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Exhibit B to Joint Claim Construction and Prehearing Statement, filed Jun. 12, 2009 in 36 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Joint Claim Construction and Prehearing Statement, filed Jun. 12, 2009 in 5 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Netlist, 1nc.'s Answer to Complaint and Counterclaims, filed Nov. 18, 2008 in 9 pages.

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 7

# US 10,949,339 B2

(56)    **References Cited**

OTHER PUBLICATIONS

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Order Re Claim Construction, filed Nov. 16, 2009 in 1 page.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Plaintiff Google's Reply to Counterclaims, filed Dec. 8, 2008 in 4 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* v. *Netlist, Inc.*, Stipulation Re: Additional Agreed-Upon Claim Constructions, filed Oct. 28, 2009 in 3 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, [Redacted] Google Inc.'s Responsive Patent Construction Brief, filed Aug. 25, 2009 in 30 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, Amended Exhibit A to Joint Claim Construction and Prehearing Statement, filed Oct. 28, 2009 in 1 page.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, Appendix 1 to Google's Responsive Patent Construction Brief, filed Nov. 12, 2009 in 4 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, Attachment 1 to Exhibit B to Joint Claim Construction and Prehearing Statement, filed Jun. 12, 2009 in 7 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, Attachment 2 to Exhibit B to Joint Claim Construction and Prehearing Statement, filed Jun. 12, 2009 in 12 pages.

U.S. District Court Northern District of California, Case No. CV08 04144, *Google Inc.* vs. *Netlist, Inc.*, Complaint for Declaratory Relief, filed Aug. 29, 2008 in 49 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Complaint for Patent Infringement, filed Dec. 4, 2009 in 47 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Defendant Google Inc's Responsive Patent Construction Brief, filed Aug. 4, 2010 in 108 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Exhibit A to Joint Claim Construction and Prehearing Statement under Patent L. R. 4-3, filed Jun. 25, 2010 in 2 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Exhibit B to Joint Claim Construction and Prehearing Statement under Patent L. R. 4-3, filed Jun. 25, 2010 in 23 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Google's Answer to Plaintiff's Complaint for Patent Infringement; and Assertion of Counterclaims, filed Feb. 12, 2010 in 13 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Joint Claim Construction and Prehearing Statement Under Patent Local Rule 4-3, filed Jun. 25, 2010 in 5 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Plaintiff Netlist, Inc.'s Reply Claim Construction Brief, filed Aug. 16, 2010 in 17 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Plaintiff Netlist, Inc.'s Reply to Defendant Google Inc.'s Counterclaim, filed Mar. 8, 2010 in 11 pages.

U.S. District Court Northern District of California, Case No. CV09 05718, *Netlist, Inc.* vs. *Google, Inc.*, Plaintiff Netlist, Inc's Opening Claim Construction Brief, filed Jul. 16, 2010 in 162 pages.

US District Court Civil Docket; *Netlist Inc.* v. *Netlist Inc.*; 4:08cv04144; filed Aug. 29, 2008.

US District Court Civil Docket; *Netlist Inc.* v. *Google Inc.*; 4:09cv5718, filed Dec. 4, 2009 in 10 pages.

US District Court. Civil Docket; *Netlist Inc.* v. *Inphi Corporation*; 2:09cv6900; Date filed Sep. 22, 2009.

Vogt, Pete, "Fully Buffered DIMM (FB-DIMM) Server Memory Architecture: Capacity, Performance, Reliability, and Longevity," Intel, Feb. 18, 2004, 33 pages.

Reexam U.S. Appl. No. 95/000,546 for U.S. Pat. No. 7,289,386, filed May 11, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/000,577 for U.S. Pat. No. 7,289,386, filed Oct. 20, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/000,578 for U.S. Pat. No. 7,619,912, filed Oct. 20, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/000,579 for U.S. Pat. No. 7,619,912, filed Oct. 21, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/001,337 for U.S. Pat. No. 7,636,274, filed Jun. 4, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/001,381 for U.S. Pat. No. 7,532,537, filed Jun. 9, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/001,338; for U.S. Pat. No. 7,532,537, filed Apr. 19, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/001,758 for U.S. Pat. No. 7,864,627, filed Sep. 15, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/001,339 for U.S. Pat. No. 7,619,912, filed Jun. 8, 2010, Netlist, Inc.

Reexam U.S. Appl. No. 95/002,399 for U.S. Pat. No. 8,250,295, filed Sep. 15, 2010, Netlist, Inc.

U.S. Appl. No. 11/075,395, filed Mar. 7, 2005, Netlist, Inc.
U.S. Appl. No. 11/173,175, filed Jul. 1, 2005, Netlist, Inc.
U.S. Appl. No. 11/862,931, filed Sep. 27, 2007, Netlist, Inc.
U.S. Appl. No. 12/577,682, filed Oct. 12, 2009, Netlist, Inc.
U.S. Appl. No. 12/954,492, filed Nov. 24, 2010, Netlist, Inc.
U.S. Appl. No. 12/912,623, filed Oct. 26, 2010, Netlist, Inc.
U.S. Appl. No. 11/335,875, filed Jan. 19, 2006, Netlist, Inc.
U.S. Appl. No. 12/408,652, filed Mar. 20, 2009, Netlist, Inc.
U.S. Appl. No. 12/629,827, filed Dec. 2, 2009, Netlist, Inc.
U.S. Appl. No. 12/955,711, filed Nov. 29, 2010, Netlist, Inc.
U.S. Appl. No. 12/981,380, filed Dec. 29, 2010, Netlist, Inc.
U.S. Appl. No. 13/154,172, filed Jun. 6, 2011, Netlist, Inc.
U.S. Appl. No. 13/287,042, filed Nov. 1, 2011, Netlist, Inc.
U.S. Appl. No. 13/473,413, filed May 16, 2012, Netlist, Inc.
U.S. Appl. No. 13/032,470, filed Feb. 22, 2011, Netlist, Inc.
U.S. Appl. No. 13/287,081, filed Nov. 1, 2011, Netlist, Inc.
U.S. Appl. No. 13/971,231, filed Aug. 20, 2013, Netlist, Inc.
U.S. Appl. No. 12/422,853, filed Apr. 13, 2009, Netlist, Inc.
U.S. Appl. No. 13/412,243, filed Mar. 5, 2012, Netlist, Inc.
U.S. Appl. No. 12/422,925, filed Apr. 13, 2009, Netlist, Inc.
U.S. Appl. No. 13/183,253, filed Jul. 14, 2011, Netlist, Inc.
U.S. Appl. No. 13/745,790, filed Jan. 19, 2013, Netlist, Inc.
U.S. Appl. No. 14/229,844, filed Mar. 29, 2014, Netlist, Inc.
U.S. Appl. No. 12/504,131, filed Jul. 16, 2009, Netlist, Inc.
U.S. Appl. No. 12/761,179, filed Apr. 15, 2010, Netlist, Inc.
U.S. Appl. No. 13/288,850, filed Nov. 3, 2011, Netlist, Inc.
U.S. Appl. No. 13/411,344, filed Mar. 2, 2012, Netlist, Inc.
U.S. Appl. No. 13/952,599, filed Jul. 27, 2013, Netlist, Inc.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 14, 'Patent Owner's Response,' filed Oct. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1047, 'Certified translation of the Examination Decision issued by the State Intellectual Property Office of the P.R.C. (dated May 30, 2018),' filed Feb. 11, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Exhibits 1048, 'Certified translation of the Preliminary Opinion issued by the German Patent and Trademark Office (dated Jan. 8, 2019),' filed Feb. 11, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 19, 'Petitioners' Request for Oral Argument,' filed Feb. 19, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 21, 'Patent Owner Objections to Reply Evidence,' filed Feb. 19, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 20, 'Patent Owner Request for Oral Argument,' filed Feb. 19, 2019.

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 8

## US 10,949,339 B2

Page 9

(56)                **References Cited**

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 22, 'Patent Owner Motion to Exclude,' filed Feb. 19, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 23, 'Corrected Petitioners' Reply to Patent Owner's Response,' filed Feb. 20, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 28, 'Order—Trial Hearing,' filed Mar. 22, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 29, 'Termination Decision Document,' filed Jun. 27, 2019.

Inter Partes Review of U.S. Pat. No. 9,606,907, Case No. IPR2018-00362, Paper 30, 'Record of Oral Hearing,' filed Jun. 27, 2019.

Netlist, Inc., Examination Decision of Request for Invalidation, CN201080039043.0, May 30, 2018, 43 pgs.

Inter Partes Review of U.S. Pat. No. 8,516,185 B2, Case No. IPR2017-00577, Record of Oral Hearing, filed Jun. 19, 2018.

Inter Partes Review of U.S. Pat. No. 8,516,185 B2, Case No. IPR2017-00577, Final Written Decision, filed Feb. 5, 2018.

Inter Partes Review of U.S. Pat. No. 7,532,537 B2, Case No. IPR2017-00667, Final Written Decision, filed Jul. 18, 2018.

Inter Partes Review of U.S. Pat. No. 7,532,537 B2, Case No. IPR2017-00668, Final Written Decision, filed Jul. 18, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00362, Order, *Conduct of the Proceedings*, filed Aug. 2, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00362, and Case No. IPR2018-00363, Decision Granting Institution of Inter Partes Review, filed Aug. 6, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00362, and Case No. IPR2018-00363, Exhibit 3001, 'email from Mehran Arjomand,' filed Jul. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00362, and Case No. IPR2018-00363, Exhibit 3001, 'email from Michael D. Hatcher,' filed Jul. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00364, and Case No. IPR2018-00365, Decision Granting Institution of Inter Partes Review, filed Jun. 29, 2018.

Inter Partes Review of U.S. Pat. No. 9,606,907 B2, Case No. IPR2018-00364, Patent Owner's Objections to Petition Evidence, filed Aug. 20, 2018.

Response, Article 94 3 EPC, EP 18179414.0, dated Aug. 6, 2019, 23 pgs.

Netlist, Inc., Third Party Observation, EP 3404660, Aug. 6, 2019, 34 pgs.

Office Action, EP 18179414, dated Apr. 2, 2019, 6 pgs.

Patent document filed by third party, EP 18179414, Feb. 22, 2019, 10 pgs.

Observations by third parties, EP 18179414.0, Feb. 22, 2019, 1 pg.

Patent Document filed by a third party, Feb. 20, 2019, 10 pgs.

Netlist, Inc., Observations by third parties, EP 3404660, Feb. 20, 2019, 46 pgs.

Reply to Written Opinion prepared by the EPO, EP 18179414.0, dated Jan. 17, 2019, 20 pgs.

Netlist, Inc., Information on Search Strategy, EP 18179414, Oct. 23, 2018, 1 pg.

European Search Report, EP 18179414, dated Oct. 23, 2018, 3 pgs.

European Search Opinion, EP 18179414, dated Oct. 23, 2018, 3 pgs.

Office Action, European Patent Application No. 18179414.0, dated Jul. 30, 2020, 9 pgs.

Netlist, Inc., Communication Pursuant to Article 94 (3) EPC, 18179414.0, dated Mar. 23, 2020, 5 pgs.

Netlist, Inc., United States Court of Appeals for the Federal Circuit, SK Hynix Inc, Corrected Principal Brief of Appeals, Document 26, Case: 19-2340, filed Feb. 3, 2020, 284 pgs.

Netlist, Inc., United States Court of Appeals for the Federal Circuit, SK Hynix Inc., Response and Cross-Appeal Opening Brief for Cross-Appellant Netlist, Inc., Document 28, Case: 19-2340, Mar. 23, 2020, 80 pgs.

Commission Opinion, United States International Trade Commission, Certain Memory Modules and Components Thereof, Investigation No. 337-TA-1089, Apr. 21, 2020, 30 pgs.

Netlist, Inc., Communication Pursuant to Article 94(3) EPC, EP 18179414.0, dated Mar. 23, 2020, 5 pgs.

Notice of Grant, European Patent Application No. 19159900.0, dated Sep. 17, 2020, 61 pgs.

Office Action, European Patent Application No. 18179414.0, dated Sep. 24, 2020, 5 pgs.

* cited by examiner

Figure 1A: (Prior Art)



Figure 1B: (Prior Art)



Figure 2A:  (Prior Art)



Figure 2B: (Prior Art)



Samsung Electronics Co., Ltd.
Exhibit 1001, p. 13

Figure 2C: (Prior Art)



Samsung Electronics Co., Ltd.
Exhibit 1001, p. 14

Figure 2D:  (Prior Art)



Samsung Electronics Co., Ltd.
Exhibit 1001, p.  15



**FIG. 3A**



**FIG. 3B**

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 17

Figure 3C:



Samsung Electronics Co., Ltd.
Exhibit 1001, p. 18

Figure 3D:





*FIG. 4A*



*FIG. 4B*

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 20



**FIG. 5**



**FIG. 6**

US 10,949,339 B2

1

# MEMORY MODULE WITH CONTROLLED BYTE-WISE BUFFERS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation from U.S. patent application Ser. No. 13/970,606, filed Aug. 20, 2013, to be issued as U.S. Pat. No. 9,606,907, which is a continuation from U.S. patent application Ser. No. 12/761,179, filed Apr. 15, 2010, now U.S. Pat. No. 8,516,185, which is a continuation-in-part from U.S. patent application Ser. No. 12/504,131, filed Jul. 16, 2009, now U.S. Pat. No. 8,417,870, each of which is incorporated in its entirety by reference herein.

## BACKGROUND

The present disclosure relates generally to memory subsystems of computer systems, and more specifically to systems, devices, and methods for improving the performance and the memory capacity of memory subsystems or memory "boards," particularly memory boards that include dual in-line memory modules (DIMMs).

Certain types of computer memory subsystems include a plurality of dynamic random-access memory (DRAM) or synchronous dynamic random access memory (SDRAM) devices mounted on a printed circuit board (PCB). These memory subsystems or memory "boards" are typically mounted in a memory slot or socket of a computer system, such as a server system or a personal computer, and are accessed by the processor of the computer system. Memory boards typically include one or more memory modules, each with a plurality of memory devices (such as DRAMs or SDRAMs) in a unique configuration of rows, columns, and banks, which provide a total memory capacity for the memory module.

The memory devices of a memory module are generally arranged as ranks or rows of memory, each rank of memory generally having a bit width. For example, a memory module in which each rank of the memory module is 64 bits wide is described as having an "x64" or "by 64" organization. Similarly, a memory module having 72-bit-wide ranks is described as having an "x72" or "by 72" organization.

The memory capacity of a memory module increases with the number of memory devices. The number of memory devices of a memory module can be increased by increasing the number of memory devices per rank or by increasing the number of ranks. Rather than referring to the memory capacity of the memory module, in certain circumstances, the memory density of the memory module is referred to instead.

During operation, the ranks of a memory module are selected or activated by control signals that are received from the processor. Examples of such control signals include, but are not limited to, rank-select signals, also called chip-select signals. Most computer and server systems support a limited number of ranks per memory module, which limits the memory density that can be incorporated in each memory module.

The memory space in an electronic system is limited by the physical addressable space that is defined by the number of address bits, or by the number of chips selected. In general, once the memory space is defined for an electronic system, it would not be feasible to modify the memory space without an extensive design change. This is especially true for the case in which a memory space is defined by a consortium, such as the Joint Electron Device Engineering

2

Council (JEDEC). A problem arises when a user's application requires a larger addressable memory space than the memory space that the current electronic system is designed to support.

In developing a memory subsystem, consideration is always given to memory density, power dissipation (or thermal dissipation), speed, and cost. Generally, these attributes are not orthogonal to each other, meaning that optimizing one attribute may detrimentally affect another attribute. For example, increasing memory density typically causes higher power dissipation, slower operational speed, and higher costs.

Furthermore, the specifications of the memory subsystem may be guided by physical limitations associated with these attributes. For example, high thermal dissipation may limit the speed of the operation, or the physical size of the memory module may limit the density of the module.

These attributes generally dictate the design parameters of the memory module, usually requiring that the memory system slow down operation speed if the memory subsystem is populated with more memory devices to provide higher density memory cards.

## SUMMARY

In certain embodiments, a memory module is configured to communicate with a memory controller of a computer system via a set of control signal lines and a plurality of sets of data signal lines. Each set of the plurality sets of data signal lines is a byte wide. The memory module has a width of, for example, 32 bits, 64 bits, 72 bits, 128 bits, or 256 bits, etc., and comprises a printed circuit board configured to be coupled to the memory controller via the set of control signal lines and the first number of data signal lines. The module board is mountable in a memory socket of the computer system and has an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and are positioned to be releasably coupled to corresponding contacts of the memory socket. The memory module further comprises memory devices such as double data rate dynamic random access memory (DDR DRAM) devices coupled to the module board and arranged in multiple ranks each of the same width (i.e., N bits) as the memory module. The memory module further comprises a module controller coupled to the module board and operatively coupled to the DDR DRAM devices via a set of registered control lines. The module controller is configured to register input address and control signals for a read or write operation received from the memory controller via the set of address and control signal lines, and to output registered address and control signals onto the set of registered control lines. The read or write operation being targeted at a specific N-bit-wide rank of the multiple N-bit-wide ranks, so that the specific N-bit-wide rank is an only N-bit-wide rank among the multiple N-bit wide ranks selected to perform the read or write operation. The module controller is further configured to output a set of module control signals in response to the input control signals, the set of module control signals including signals that are dependent on which of the multiple N-bit-wide ranks is the specific N-bit-wide rank.

The memory module further comprises a plurality of byte-wise buffers coupled to the circuit board and configured to receive the second module control signals. Each respective byte-wise buffer of the plurality of byte-wise buffers is coupled to a respective set of the plurality of sets of data signal lines and to at least one respective DDR DRAM

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 23

US 10,949,339 B2

3

device in each of the multiple ranks. The plurality of byte-wise buffers are disposed on the module board at respective positions corresponding to respective sets of the plurality of sets of data signal lines. In certain embodiments, each respective byte-wise buffer includes data paths and logic controlling the data paths in response to the second module control signals so that each respective byte-wise buffer is configured to actively drive a respective byte-wise section of each N-bit wide data signal associated with the read or write operation between the respective set of the plurality of sets of data signal lines and the at least one respective DDR DRAM device in the specific N-bit-wide rank. In certain embodiments, the each respective byte-wise buffer includes configurable data paths and logic that configures the data paths in response to the second module control signals so as to enable a respective byte-wise section of each N-bit wide data signal associated with the read or write operation be communicated between the memory controller and the at least one respective DDR DRAM device in the specific N-bit-wide rank. The logic configures the data paths differently depending on which of the multiple N-bit-wide ranks is performing the read or write operation.

In certain embodiments, the byte-wise buffers are configured to present to the memory controller one DDR DRAM device load on each data line of the plurality of sets of data lines during a write operation. In certain embodiments, the control circuit controls the byte-wise buffers in accordance with a CAS latency parameter.

BRIEF DESCRIPTION OF THE DRAWINGS

A complete understanding of the present invention may be obtained by reference to the accompanying drawings, when considered in conjunction with the subsequent, detailed description, in which:

FIG. 1A is a schematic representation of a conventional memory subsystem populated with at least one JEDEC-standard two-rank memory module;

FIG. 1B is a schematic representation of a conventional memory subsystem populated with at least one JEDEC-standard four-rank memory module.

FIG. 2A is a schematic representation of another conventional memory subsystem populated with at least one two-rank memory module.

FIG. 2B is a schematic representation of another conventional memory subsystem populated with at least one four-rank memory module.

FIGS. 2C and 2D schematically illustrate a conventional two-rank memory module and a four-rank memory module, respectively, each comprising a memory buffer.

FIG. 3A is a schematic representation of an example memory subsystem in accordance with an embodiment of the disclosure.

FIG. 3B schematically illustrates another example memory subsystem in accordance with certain embodiments described herein.

FIG. 3C schematically illustrates an example layout of the memory devices, the data transmission circuits, and the control circuit of a memory module in accordance with certain embodiments described herein.

FIG. 3D is a photograph of an example memory subsystem in accordance with certain embodiments described herein.

FIG. 4A schematically illustrates an example memory subsystem comprising a data transmission circuit with a bit width which is the same as that of the individual memory devices.

4

FIG. 4B schematically illustrates an example memory subsystem comprising a data transmission circuit with a bit width different from that as the individual memory devices.

FIG. 5 is a schematic representation of an example embodiment of a data transmission circuit compatible with the memory subsystem of FIGS. 3A.

FIG. 6 is an example timing diagram illustrating operation of the memory system of FIGS. 3A and 5.

For purposes of clarity and brevity, like elements and components bear like designations and numbering throughout the figures.

DETAILED DESCRIPTION

One method for increasing memory space is based on an address decoding scheme. This method is very widely adopted in the electronics industry in designing Application-Specific Integrated Circuit (ASIC) and System-On-Chip (SOC) devices to expand system memories. Another method increases the addressable memory space without extensive alteration of the software or hardware of an existing electronics system. This method combines chip-select signals with an address signal to increase the number of physically addressable memory spaces (e.g., by a factor of 2, by a factor of 4, by a factor of 8, or by other factors as well).

These methods have several shortcomings. For example, since these methods increase the addressable memory space by directly adding memory chips, a heavier load is presented to the outputs of the system controller and the outputs of the memory devices, resulting in a slower system. Also, increasing the number of memory devices results in higher power dissipation. In addition, since an increase in the number of memory devices on each memory module alters the physical properties of the memory module while the system board remains the same, the overall signal (transmission line) wave characteristics deviate from the original design intent or specification. Furthermore, especially when registered DIMMs (RDIMMs) are used, the increase in the number of the memory devices translates to an increase in the distributed RC load on the data paths, but not on the control paths (e.g., address paths), thereby introducing uneven signal propagation delay between the data signal paths and control signal paths. As used herein, the terms "control lines" and "control paths" include address lines or paths and command lines or paths, and the term "control signals" includes address signals and command signals.

FIGS. 1A and 1B illustrate a prior art approach of increasing the number of memory devices. Specifically, FIG. 1A shows a conventional memory subsystem 100 with at least one JEDEC-standard two-rank memory module 110, such as a registered dual inline memory module (RDIMM), only one of which is shown for clarity. Each rank of the memory module 110 comprises a plurality of memory devices 112, such as dynamic random access memory (DRAM) devices or synchronous DRAM (SDRAM) devices. A register 130 receives a plurality of control lines 140 (shown as a single solid line) from the system memory controller 120 and is connected via control lines 142 to the memory devices 112 of each rank of the memory module 110. This memory subsystem 100 connects each data line of an array of data lines 150 (shown as dashed lines) from a system memory controller 120 to corresponding memory devices 112 in the two ranks in each memory module 110. Therefore, during a write operation, the system memory controller 120 sees all the memory devices 112 as its load via the data lines 150, and during a read operation, each memory

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 24

US 10,949,339 B2

5                                                              6

device **112** sees multiple other memory devices **112**, as well as the system memory controller **120**, as its load via the data lines **150**.

FIG. **1B** is a schematic view of another conventional memory subsystem **100'** with at least one JEDEC-standard four-rank memory module **110'** (only one of which is shown for clarity), each rank comprising a plurality of memory devices **112'**. The register **130'** receives the plurality of control lines **140'** (shown as a single solid line) from the system memory controller **120'** and is connected via control lines **142'** to the memory devices **112'** of each rank of the memory module **110'**. Each data line of the array of data lines **150'** (shown as dashed lines) from the system memory controller **120'** is connected (e.g., by four fanouts) to corresponding memory devices **112'** in the four ranks in each memory module **110'**. Therefore, as with the two-rank memory module **110** shown in FIG. **1A**, during a write operation, the system memory controller **120'** sees all the memory devices **112'** as its load via the data lines **150'**, and during a read operation, each memory device **112'** sees multiple other memory devices **112'** and the system memory controller **120'** as its load via the data lines **150'**.

For both the conventional two-rank memory module **110** and the conventional four-rank memory module **110'**, the multiple loads seen by the memory controller **120**, **120'** during write operations and the multiple loads seen by the memory devices **112**, **112'** during read operations cause significant performance issues. For example, for synchronous operation, time delays of the various signals are desired to be substantially equal to one another such that the operation of the memory module **110**, **110'** is synchronized with the system bus of the computer system. Thus, the trace lengths of the memory module **110**, **110'** are selected such that the signals are at the same clock phase. For example, the lengths of the control lines **142**, **142'** from the register **130**, **130'** to each of the memory devices **112**, **112'** are substantially equal to one another. However, for faster clock speeds, small errors in the trace lengths make such synchronous operation difficult or impossible. Therefore, these prior art techniques not only reduce the speed of the memory systems, but they also require hardware modifications to minimize any deviation of the transmission line wave characteristics from the original design specification.

FIGS. **2A** and **2B** illustrate another prior art approach of increasing the number of memory devices. Specifically, FIG. **2A** shows a conventional memory subsystem **200** with at least one two-rank memory module **210**, only one of which is shown for clarity. Each rank of the memory module **210** comprises a plurality of memory devices **212**, such as dynamic random access memory (DRAM) devices or synchronous DRAM (SDRAM) devices. A register **230** receives a plurality of control lines **240** (shown as a single solid line) from the system memory controller **220** and is connected via control lines **242** to the memory devices **212** of each rank of the memory module **210**. This memory subsystem **200** connects each data line of an array of data lines **250** (shown as dashed lines) from a system memory controller **220** to corresponding memory devices **212** in the two ranks in each memory module **210**. Therefore, during a write operation, the system memory controller **220** sees all the memory devices **212** as its load via the data lines **250**, and during a read operation, each memory device **212** sees multiple other memory devices **212**, as well as the system memory controller **220**, as its load via the data lines **250**.

FIG. **2B** is a schematic view of another conventional memory subsystem **200'** with at least one four-rank memory module **210'** (only one of which is shown for clarity), each

rank comprising a plurality of memory devices **212'**. The register **230'** receives the plurality of control lines **240'** (shown as a single solid line) from the system memory controller **220'** and is connected via control lines **242'** to the memory devices **212'** of each rank of the memory module **210'**. Each data line of the array of data lines **250'** (shown as dashed lines) from the system memory controller **220'** is connected (e.g., by four fanouts) to corresponding memory devices **212'** in the four ranks in each memory module **210'**. Therefore, as with the two-rank memory module **210** shown in FIG. **2A**, during a write operation, the system memory controller **220'** sees all the memory devices **212'** as its load via the data lines **250'**, and during a read operation, each memory device **212'** sees multiple other memory devices **212'** and the system memory controller **220'** as its load via the data lines **250'**.

For the memory modules **210**, **210'**, the control lines **242**, **242'** have a "flyby" configuration. In such a configuration, control signals are sent along the control lines **242**, **242'** (e.g., in a single-path daisy-chain) from the register **230**, **230'** to the memory devices **212**, **212'** of a given rank. These control signals reach each memory device **212**, **212'** of the rank sequentially, with the control signals first reaching the memory device **212**, **212'** having the shortest control line **242**, **242'**, then reaching the memory device **212**, **212'** having the next-shortest control line **242**, **242'**, and so on. For example, a control signal may reach the memory device **212**, **212'** having the longest control line **242**, **242'** a significant period of time after the same control signal reaches the memory device **212**, **212'** having the shortest control line **242**, **242'**. For synchronous operation, the memory subsystems **200**, **200'** have the data lines **250**, **250'** configured so that the time delays of the various data signals between the memory controller **220**, **220'** and the particular memory devices **212**, **212'** are substantially tailored such that the data signals and the control signals reach the particular memory device **212**, **212'** so that operation of the memory module **210**, **210'** is synchronized with the system bus of the computer system. Such "fly-by" configurations have been described as operating in "local sync" while having "global async."

For such "fly-by" configurations, the memory controller **220**, **220'** of FIGS. **2A** and **2B** is more complicated than the memory controller **120**, **120'** of FIGS. 1A and 1B in that the memory controller **220**, **220'** accounts for the time delays between the various memory devices **212**, **212'** and adjusts the timing of these signals appropriately for synchronous operation. However, in some situations, the clock cycle time is approximately equal to or less than the time difference (e.g., about 900 picoseconds) between the control signals reaching the memory device **212**, **212'** having the longest control line **242**, **242'** and reaching the memory device **212**, **212'** having the shortest control line **242**, **242'**. Under such situations, synchronous operation is not achievable. Thus, the time difference between the control signals reaching the memory devices **212**, **212'** at the extremes of the control lines **242**, **242'** provide a limit to the clock speed with which the memory module **210**, **210'** may be operated. These time differences, which can be more than one clock cycle, will limit the operational speed and performance of the memory module. In addition, as with the memory subsystems **100**, **100'** of FIGS. 1A and 1B, the "fly-by" memory subsystems **200**, **200'** of FIGS. 2A and 2B suffer from large loads which result in slower clock speeds.

One recent suggestion for the "fly-by" configurations is to provide a memory buffer which handles both the control signals and the data signals. FIGS. **2C** and **2D** schematically

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 25

US 10,949,339 B2

7

illustrate a conventional two-rank memory module **310** and a four-rank memory module **310'**, respectively, each comprising a memory buffer **330**, **330'**. The control lines **340**, **340'** provide conduits for control signals from the memory controller **320**, **320'** to the memory buffer **330**, **330'**, and the control lines **342**, **342'** provide conduits for control signals from the memory buffer **330**, **330'** to the memory devices **312**, **312'**. The plurality of data lines **350**, **350'** (shown as one dashed line for clarity) provide conduits for data signals from the memory controller **320**, **320'** to the memory buffer **330**, **330'**, and data lines (not shown for clarity) on the memory module **310**, **310'** provide conduits for data signals from the memory controller **320**, **320'** to the memory devices **312**, **312'**.

The configurations of FIGS. **2**C and **2**D seek to have both the data signals and the control signals going to the memory buffer **330**, **330'**. However, such configurations have significant drawbacks. To send the data signals to the various memory devices **312**, **312'**, the memory module **310**, **310'** includes an extremely large number of data lines (not shown for clarity) coupling the memory buffer **330**, **330'** to the memory devices **312**, **312'**. For example, in certain circumstances, the memory buffer **330**, **330'** for an LRDIMM is a 628-pin device, which is extremely large. In addition, the logistics of tailoring the time delays of these many data lines is complicated or difficult to provide the desired timing of data signals from the memory buffer **330**, **330'** to the memory devices **312**, **312'**. Also, the memory module **310**, **310'** utilizes significant modifications of the memory controller **320**, **320'** since the memory buffer **330**, **330'** is taking over some of the control of data signal timing that conventional memory controllers have. Even so, the memory modules **310**, **310'** of FIGS. **2**C and **2**D can only operate in asynchronous mode, not synchronous mode, due to the long fly-by times as compared to the desired clock frequencies. For example, for a fly-by delay of 1 nanosecond, if the data rate is 1 Gb/second, there is the possibility of collisions on the data lines during read/write turnaround. To combat such collisions, the data rate can be slowed down or "dead" cycles can be inserted. The memory module **310**, **310'**, as a single unit, cannot be operated in synchronous mode, but operates as locally synchronous, globally (DIMM level) asynchronous.

FIG. **3**A schematically illustrates an example memory subsystem **400** with loadreduced memory modules **402** in accordance with certain embodiments described herein. FIG. **3**B schematically illustrates another example memory subsystem **400'** with loadreduced memory modules **402'** in accordance with certain embodiments described herein. FIG. **3**C schematically illustrates an example layout of the memory devices **412'**, the data transmission circuits **416'**, and the control circuit **430'** of a memory module **402'** in accordance with certain embodiments described herein. FIG. **3**D is a photograph of an example memory subsystem in accordance with certain embodiments described herein. In FIGS. **3**A-**3**C, control lines (e.g., address and control lines **440**, **440'** coupling the system memory controller **420**, **420'** to the memory modules **410**, **410'**) are shown as dashed lines, data lines (e.g., data lines **450**, **450'** coupling the system memory controller **420**, **420'** to the memory modules **410**, **410'**) are shown as solid lines, and in FIGS. **3**A and **3**B, input/output connections are shown as black dots. In certain embodiments, as schematically illustrated by FIGS. **3**A-**3**C, the address and control lines **440**, **440'** coupling the system memory controller **420**, **420'** to the memory module **410**, **410'** (e.g., to the control circuit **430**, **430'**) are separate from the data lines **450**, **450'** coupling the system memory con-

8

troller **420**, **420'** to the memory module **410**, **410'** (e.g., to the data transmission circuits **416**, **416'**). In certain embodiments, the memory subsystem **400**, **400'** is designed, for example, to deliver higher speed and higher memory density with lower thermal dissipation as compared with conventional memory subsystems. In the following discussion, aspects of the example subsystem **400** and corresponding components (e.g., memory modules **402**, memory devices **412**A, **412**B, **412**C, **412**D, data transmission circuits **416**, control circuit **430**) and of the example subsystem **400'** and corresponding components (e.g., memory modules **402'**, memory devices $412'A_1$, $412'A_2$, $412'B_1$, $412'B_2$, $412'C_1$, $412'C_2$, $412'D_1$, $412'D_2$, data transmission circuits **416'**, control circuit **430'**) should be understood to apply to certain other embodiments as well.

As schematically illustrated in FIGS. **3**A and **3**B, the example memory module **402**, **402'** comprises at least one printed circuit board **410**, **410'** and a plurality of memory devices **412**, **412'** mechanically coupled to the at least one printed circuit board **410**, **410'**. The memory module **402**, **402'** further comprises a control circuit **430**, **430'** mechanically coupled to the at least one printed circuit board **410**, **410'**. The control circuit **430**, **430'** is configurable to receive control signals from the system memory controller **420**, **420'** and to transmit module control signals to the plurality of memory devices **412**, **412'**. The memory module **402**, **402'** further comprises a plurality of data transmission circuits **416**, **416'** mechanically coupled to the at least one printed circuit board **410**, **410'** and distributed at corresponding positions relative to the at least one printed circuit board **410**, **410'**. The plurality of data transmission circuits **416**, **416'** is configurable to be operatively coupled to the system memory controller **420**, **420'** and configurable to receive module control signals from the control circuit **430**, **430'**. At least one first data transmission circuit of the plurality of data transmission circuits **416**, **416'** is operatively coupled to at least two memory devices of the plurality of memory devices **412**, **412'**. At least one second data transmission circuit of the plurality of data transmission circuits **416**, **416'** is operatively coupled to at least two memory devices of the plurality of memory devices **412**, **412'**. The at least one first data transmission circuit is configurable to respond to the module control signals by selectively allowing or inhibiting data transmission between the system memory controller **420**, **420'** and at least one selected memory device of the at least two memory devices operatively coupled to the at least one first data transmission circuit. The at least one second data transmission circuit is configurable to respond to the module control signals by selectively allowing or inhibiting data transmission between the system memory controller **420**, **420'** and at least one selected memory device of the at least two memory devices operatively coupled to the at least one second data transmission circuit.

As shown in FIGS. **3**A and **3**B, the memory subsystem **400**, **400'** is configurable to be operationally coupled to a system memory controller **420**, **420'** of a type well-known in the art (e.g., Intel Nehalem EP, EX chipsets; AM D Opteron chipset). The memory subsystem **400**, **400'** typically comprises one or more memory modules **402**, **402'**, such as DIMMs or RDIMMs, additional details of which are shown only for one for clarity. Various types of memory modules **402**, **402'** are compatible with embodiments described herein. For example, memory modules having memory capacities of 512 MB, 1 GB, 2 GB, 4 GB, 8 GB, as well as other capacities, are compatible with embodiments described herein. In addition, memory modules having widths of 4 bytes, 8 bytes, 9 bytes, 16 bytes, 32 bytes, or 32

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 26

9

bits, 64 bits, 72 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. Furthermore, memory modules **402, 402'** compatible with embodiments described herein include, but are not limited to, single in-line memory modules (SIMMs), dual in-line memory modules (DIMMs), small-outline DIMMs (SO-DIMMs), unbuffered DIMMs (UDIMMs), registered DIMMs (RDIMMs), fully-buffered DIMMs (FBDIMMs), mini-DIMMs, and micro-DIMMs.

The one or more memory modules **402, 402'** comprise one or more printed circuit boards (PCBs) **410, 410'**, which may be arranged in a vertical stack (as shown), or in a back-to-back array. Each memory module **402, 402'** in certain embodiments comprises a single PCB **410, 410'**, while in certain other embodiments, each of one or more of the memory modules **402** comprises multiple PCBs **410, 410'**. In some embodiments, the PCBs **410, 410'** are mountable in module slots (not shown) of the computer system. A PCB **410, 410'** of certain such embodiments has at least one edge connector **411** comprising a plurality of electrical contacts which are positioned on an edge of the PCB **410, 410'** (as shown in FIG. 3d) and are configured to be releasably coupled to corresponding contacts of a computer system socket to provide electrical conductivity between the system memory controller **420, 420'** and the various components of the memory modules **402, 401'** on the PCBs **410, 410'**.

At least one memory module **402, 402'** comprises a plurality of memory devices **412, 412'** (such as DRAMs or SDRAMs). The memory devices **412, 412'** of the memory module **402, 402'** may advantageously be arranged in a plurality of rows or ranks. Memory devices **412, 412'** compatible with embodiments described herein include, but are not limited to, random-access memory (RAM), dynamic random-access memory (DRAM), synchronous DRAM (SDRAM), and double-data-rate DRAM (e.g., DDR, DDR2, DDR3, etc.). In addition, memory devices **412, 412'** having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with embodiments described herein. Memory devices **412, 412'** compatible with embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (OGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the memory devices **412, 412'** of the memory module **402, 402'** are arranged in four ranks, although embodiments with less than four ranks (e.g., one rank, two ranks, three ranks) or more than four ranks (e.g., 6 ranks, 8 ranks) per memory module **402, 402'** may be employed. In certain embodiments, each rank comprises eight or nine memory modules, while in certain other embodiments, other numbers of memory modules per rank may also be used. In certain embodiments, as schematically shown in FIG. 3A, the memory devices **412** are arranged in four ranks, denoted A, B, C, and D, and each rank comprises n memory devices. For the sake of this disclosure, in the example memory subsystem **400** of FIG. 3A, rank A comprises memory devices $412A_1, 412A_2, \ldots, 412A_n$; rank B comprises memory devices $412B_1, 412B_2, \ldots, 412B_n$; rank C comprises memory devices $412C_1, 412C_2, \ldots, 412C_n$; and rank D comprises memory devices $412D_1, 412D_2, 412D_n$. For the sake of this disclosure, in the example memory subsystem **400'** of FIG. 3B, rank A comprises memory devices $412'A_1, 412'A_2, \ldots, 412'A_n$; rank B comprises memory devices $412'B_1, 412'B_2, \ldots, 412'B_n$; rank C comprises memory devices $412'C_1, 412'C_2, 412'C_n$; and rank D comprises memory devices $412'D_1, 412'D_2, \ldots, 412'D_n$.

10

In certain embodiments, at least one memory module **402, 402'** comprises one or more electrical components (not shown) which may be mounted on the PCB **410, 410'**, within the PCB **410, 410'**, or both on and within the PCB **410, 410'**, and are operationally coupled to one another and to the plurality of memory devices **412, 412'**. For example, the electrical components may be surface-mounted, through-hole mounted, embedded or buried between layers of the PCB **410, 410'**, or otherwise connected to the PCB **410, 410'**. These electrical components may include, but are not limited to, electrical conduits, resistors, capacitors, inductors, transistors, buffers, registers, logic elements, or other circuit elements. In certain embodiments, at least some of these electrical components are discrete, while in other embodiments, at least some of these electrical components are constituents of one or more integrated circuits.

In certain embodiments, at least one memory module **402, 402'** comprises a control circuit **430, 430'** configured to be operatively coupled to the system memory controller **420, 420'** and to the memory devices **412, 412'** of the memory module **402, 402'** (e.g., via lines **442, 442'**). In certain embodiments, the control circuit **430, 430'** may include one or more functional devices, such as a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a field-programmable gate array (FPGA), a customdesigned semiconductor device, or a complex programmable-logic device (CPLD). In certain embodiments, the control circuit **430, 430'** may comprise one or more custom devices. In certain embodiments, the control circuit **430, 430'** may comprise various discrete electrical elements; while in other embodiments, the control circuit **430, 430'** may comprise one or more integrated circuits.

The control circuit **430, 430'** of certain embodiments is configurable to be operatively coupled to control lines **440, 440'** to receive control signals (e.g., bank address signals, row address signals, column address signals, address strobe signals, and rank-address or chip-select signals) from the system memory controller **420, 420'**. The control circuit **430, 430'** of certain embodiments registers signals from the control lines **440, 440'** in a manner functionally comparable to the address register of a conventional RDIMM. The registered control lines **440, 440'** are also operatively coupled to the memory devices **412, 412'**. Additionally, the control circuit **430, 430'** supplies control signals for the data transmission circuits **416, 416'** (e.g., via lines **432, 432'**), as described more fully below. The control signals indicate, for example, the direction of data flow, that is, to or from the memory devices **412, 412'**. The control circuit **430, 430'** may produce additional chip-select signals or output enable signals based on address decoding. Examples of circuits which can serve as the control circuit **430, 430'** are described in more detail by U.S. Pat. Nos. 7,289,386 and 7,532,537, each of which is incorporated in its entirety by reference herein.

In certain embodiments, at least one memory module **402, 402'** comprises a plurality of data transmission circuits **416, 416'** mounted on the one or more PCBs **410, 410'**, within the one or more PCBs **410, 410'**, or both on and within the one or more PCBs **410, 410'**. The plurality of data transmission circuits **416, 416'** are operatively coupled to the control circuit **430, 430'** (e.g., via lines **432, 432'**), and configured to be operatively coupled to the system memory controller **420, 420'** (e.g., via the data lines **450, 450'**) upon operatively coupling the memory module **402, 402'** to the computer system. In certain embodiments, these data transmission circuits **416, 416'** can be referred to as "load-reducing circuits" or "load-reducing switching circuits." As used herein, the terms "load-reducing" or "load-reducing switch-

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 27

US 10,949,339 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

ing" refer to the use of the data transmission circuits $416$, $416'$ to reduce the load seen by the system memory controller $420$, $420'$ when operatively coupled to the memory module $402$, $402'$. In certain embodiments, as schematically illustrated by FIG. 3A, the memory module $402$ comprises n data transmission circuits $416$, where n is the number of memory devices per rank of the memory module $410$. For example, as schematically shown in FIG. 3A, the memory devices $412$ of the memory module $410$ are arranged in four ranks of n memory devices each, and the memory module $410$ comprises at least a first data transmission circuit $416_1$ and a second data transmission circuit $416_2$. The first data transmission circuit $416_1$ of certain such embodiments is operatively coupled to at least one memory device $412$ of each rank (e.g., memory devices $412A_1$, $412B_1$, $412C_1$, $412D_1$). The second data transmission circuit $416_2$ of certain such embodiments is operatively coupled to at least one memory device $412$ of each rank (e.g., memory devices $412A_2$, $412B_2$, $412C_2$, $412D_2$). In certain embodiments, as schematically illustrated by FIG. 3B, the memory module $402'$ comprises n/2 data transmission circuits $416'$, where n is the number of memory devices per rank of the memory module $410'$. For example, as schematically shown in FIG. 3B, the memory devices $412'$ of the memory module $410'$ are arranged in four ranks of n memory devices each, and the memory module $410'$ comprises at least a first data transmission circuit $416'_1$ and a second data transmission circuit $416'_2$. The first data transmission circuit $416'_1$ of certain such embodiments is operatively coupled to at least two memory devices $412'$ of each rank (e.g., memory devices $412A_1$, $412A_2$, $412B_1$, $412B_2$, $412C_1$, $412C_2$, $412D_1$, $412D_2$). The second data transmission circuit $416'_2$ of certain such embodiments is operatively coupled to at least two memory devices $412'$ of each rank (e.g., memory devices $412'A_3$, $412'A_4$, $412'B_3$, $412'B_4$, $412'C_3$, $412'C_4$, $412'D_3$, $412'D_4$). In certain embodiments, at least one data transmission circuit $416$, $416'$ selectively switches between two or more memory devices $412$, $412'$ so as to operatively couple at least one selected memory device $412$, $412'$ to the system memory controller $420$, $420'$ (e.g., the data transmission circuit $416$, $416'$ is configurable to respond to module control signals by selectively allowing or inhibiting data transmission between the system memory controller $420$, $420'$ and at least one selected memory device $412$, $412'$).

In certain embodiments, the at least one data transmission circuit $416$, $416'$ selectively operatively couples two selected memory devices to the system memory controller $420$, $420'$. For example, as schematically shown in FIG. 3A, the first data transmission circuit $416_1$ is configurable to respond to module control signals by selectively allowing or inhibiting data transmission between the system memory controller $420$ and either selected memory devices $412A_1$ and $412C_1$ or selected memory devices $412B_1$ and $412D_1$), and the second data transmission circuit $416_2$ is configurable to respond to module control signals by selectively allowing or inhibiting data transmission between the system memory controller $420$ and either selected memory devices $412A_2$ and $412C_2$ or selected memory devices $412B_2$ and $412D_2$). Conversely, in a conventional memory module without the data transmission circuits $416$, the two or more memory devices $412$ (e.g., memory devices $412A_1$, $412B_1$, $412C_1$, $412D_1$) are concurrently operatively coupled to the system memory controller $420$. A data transmission circuit $416$ of certain embodiments bidirectionally buffer data signals between the memory controller $420$ and the memory devices $412$ corresponding to the data transmission circuit $416$. For another example, as schematically shown in FIG. 3B, the

first data transmission circuit $416'_1$ is configurable to respond to module control signals by selectively allowing or inhibiting data transmission between the system memory controller $420'$ and either selected memory devices $412'A_1$ and $412'C_1$ or selected memory devices $412'B_1$ and $412'D_1$ and either selected memory devices $412'A_2$ and $412'C_2$ or selected memory devices $412'B_2$ and $412'D_2$), and the second data transmission circuit $416'_2$ is configurable to respond to module control signals by selectively allowing or inhibiting data transmission between the system memory controller $420'$ and either selected memory devices $412'A_3$ and $412'C_3$ or selected memory devices $412'B_3$ and $412'D_3$ and either selected memory devices $412'A_4$ and $412'C_4$ or selected memory devices $412'B_4$ and $412'D_4$).

In certain embodiments, two or more of the data transmission circuits $416$, $416'$ are mechanically coupled to the at least PCB $410$, $410'$ at corresponding positions which are separate from one another. For example, as schematically illustrated by FIG. 3A, the first data transmission circuit $416_1$ and the second data transmission circuit $416_2$ are at corresponding positions which are separate from one another (e.g., the package containing the first data transmission circuit $416_1$ is at a location spaced from the location of the package containing the second data transmission circuit $416_2$). For another example, as schematically illustrated by FIG. 3B, the first data transmission circuit $416'_1$ and the second data transmission circuit $416'_2$ are at corresponding positions which are separate from one another (e.g., the package containing the first data transmission circuit $416'_1$ is at a location spaced from the location of the package containing the second data transmission circuit $416'_2$). In certain embodiments, two or more of the data transmission circuits $416$, $416'$ are distributed across a surface of the PCB $410$, $410'$ of the memory module $402$, $402'$. In certain embodiments, the corresponding positions of two or more data transmission circuits $416$, $416'$ (e.g., first data transmission circuit $416_1$ and second data transmission circuit $416_2$ of FIG. 3A or first data transmission circuit $416'_1$ and second data transmission circuit $416'_2$ of FIG. 3B) are along an edge $411$, $411'$ of the at least one PCB $410$, $410'$ such that a data transmission circuit $416$, $416'$ is located substantially between the edge $411$, $411'$ and at least some of the at least two memory devices $412$, $412'$ to which the data transmission circuit $416$, $416'$ is operatively coupled. For example, as schematically illustrated by FIG. 3A, the first data transmission circuit $416_1$ is located substantially between the edge $411$ and the memory devices $412A_1$, $412B_1$, $412C_1$, $412D_1$ to which the first data transmission circuit $416_1$ is operatively coupled, and the second data transmission circuit $416_2$ is located substantially between the edge $411$ and the memory devices $412A_2$, $412B_2$, $412C_2$, $412D_2$ to which the second data transmission circuit $416_1$ is operatively coupled. For another example, as schematically illustrated by FIG. 3B, the first data transmission circuit $416'_1$ is located substantially between the edge $411'$ and the memory devices $412'A_1$, $412'A_2$, $412'B_1$, $412'B_2$, $412'C_1$, $412'C_2$, $412'D_1$, $412'D_2$ to which the first data transmission circuit $416'_1$ is operatively coupled, and the second data transmission circuit $416'_2$ is located substantially between the edge $411'$ and the memory devices $412'A_3$, $412'A_4$, $412'B_3$, $412'B_4$, $412'C_3$, $412'C_4$, $412'D_3$, $412'D_4$ to which the second data transmission circuit $416'_2$ is operatively coupled.

FIGS. 3C and 3D illustrate the positioning of the data transmission circuits $416'$ in accordance with certain embodiments described herein. In certain embodiments, the position of at least one of the data transmission circuits $416'$

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 28

US 10,949,339 B2

13

14

is generally aligned with one or more of the memory devices **412'** to which the data transmission circuit **416'** is operatively coupled. For example, the one or more of the data transmission circuits **416'** and the memory devices **412'** to which it is operatively coupled can be positioned generally along a line that is substantially perpendicular to the edge **411'** of the PCB **410'**. In certain embodiments, the position of at least one of the data transmission circuits **416'** is generally offset from a line defined by the positions of the one or more of the memory devices **412'** to which the data transmission circuit **416'** is operatively coupled. For example, as shown in FIGS. 3C and 3D, the memory devices **412'** operatively coupled to a data transmission circuit **416'** can be positioned along a line that is substantially perpendicular to the edge **411'** of the PCB **410'** and the data transmission circuit **416'** can be generally offset from this line in a direction generally along the edge **411'** of the PCB **410'**. In certain such embodiments, the data transmission circuits **416'** are sufficiently small in width and breadth (e.g., 2.5 mm by 7.5 mm) to fit between the edge **411'** and the corresponding memory devices **412'** while maintaining the desired size of the memory module **400'**. Other positions and sizes of the separate data transmission circuits **416'** are also compatible with certain embodiments described herein. For example, in certain embodiments, one or more of the data transmission circuits **416, 416'** can be positioned between two or more memory devices **412, 412'**, or can be spaced away from an edge **411, 411'** of the PCB **410, 410'** with one or more memory devices **412, 412'** between the edge **411, 411'** and the one or more data transmission circuits **416, 416'**.

In certain embodiments, the data transmission circuit **416** comprises or functions as a byte-wise buffer. In certain such embodiments, each of the one or more data transmission circuits **416** has the same bit width as does the associated memory devices **412** per rank to which the data transmission circuit **416** is operatively coupled. For example, as schematically illustrated by FIG. 4A (which corresponds generally to FIG. 3A), the data transmission circuit **416** can be operatively coupled to a single memory device **412** per rank, and both the data transmission circuit **416** and the memory device **412** per rank to which the data transmission circuit **416** is operatively coupled can each have the same bit width (e.g., 4 bits, 8 bits, or 16 bits). The data transmission circuit **416** of FIG. 4A has a bit width of 8 bits, and receives data bits **0-7** from the system memory controller **420** and selectively transmits the data bits **0-7** to selected memory devices **412**A, **412**B, **412**C, **412**D in response to the module control signals from the control circuit **430**. Similarly, data transmission circuit **416'** of certain embodiments can function as a byte-wise buffer for associated memory devices **412'**A, **412'**B, **412'**C, **412'**D to which the data transmission circuits **416'** are operatively coupled in response to the module control signals from the control circuit **430'**.

In certain other embodiments, the bit widths of one or more of the memory devices **412** may be different from the bit widths of the one or more data transmission circuits **416** to which they are connected. For example, as schematically illustrated by FIG. 4B (which corresponds generally to FIG. 3B), the data transmission circuits **416** may have a first bit width (e.g., a bit width of 8 bits) and the memory devices **412** may have a second bit width which is less than the first bit width (e.g., one-half the first bit width, or a bit width of 4 bits), with each data transmission circuit **416** operatively coupled to multiple memory devices **412** per rank (e.g., two memory devices **412** in each rank). In certain such embodiments, the total bit width of the multiple memory devices **412** per rank connected to the circuit **416** equals the bit width

of the circuit **416** (e.g., 4 bits, 8 bits, or 16 bits). The data transmission circuit **416** of FIG. 4B has a total bit width of 8 bits, and receives data bits **0-7** from the system memory controller **420** and selectively transmits data bits **0-3** to a first memory device **412**A₁, **412**B₁, **412**C₁, **412**D₁ and data bits **4-7** to a second memory device **412**A₂, **412**B₂, **412**C₂, **412**D₂ in response to the module control signals from the control circuit **430**. Similarly, data transmission circuits **416'** of certain embodiments can function with different bit widths than those of the associated memory devices **412'**A₁, **412'**A₂, **412'**B₁, **412'**B₂, **412'**C₁, **412'**C₂, **412'**D₁, **412'**D₂ to which the data transmission circuits **416'** are operatively coupled in response to the module control signals from the control circuit **430'**.

In certain embodiments, by having the data transmission circuit **416** comprise or serve as a "byte-wise" buffer (e.g., as shown in the examples of FIGS. 4A and 4B), the data signals are synchronous with the synch clock. In addition, for certain such embodiments in which the memory module **400** experiences variations in one or more characteristics (e.g., temperature, voltage, manufacturing parameters), the memory module **400** can be designed to optimize the circuits of a smaller number of components as compared to other configurations which do not utilize byte-wide buffering (e.g., having four ranks of 8-bit memory devices and having two 4-bit buffers). In certain embodiments, the data transmission circuits **416** are used for bit slicing in which the data are defined in sections. For example, rather than defining data to be 64-bit-wide (e.g., [63:0]), the data can be defined or sliced in 16-bit-wide sections (e.g., [15:0], [31:16], [47:32], [63:48]). In certain such embodiments, not all the bits are grouped together and not all the bits produce the same behavior (e.g., logic- and/or time-wise).

One or more of the data transmission circuits **416**, in accordance with an embodiment of this disclosure, is operatively coupled to a corresponding one or more of the data lines **452** connected to one or more memory devices **412** in each of the ranks A, B, C, D. For example, in certain embodiments, each data transmission circuit **416** is connected to one or more data lines **452** connected to one corresponding memory device in each of the ranks (e.g., memory devices **204**A, **204**B, **204**C, and **204**D, as shown in FIG. 3A). Each data line **450, 452** thus carries data from the system memory controller **420**, through the data transmission circuits **416**, to the memory devices **204**A, **204**B, **204**C, **204**D connected to the data transmission circuits **416**. The data transmission circuits **416** of certain embodiments may be used to drive each data bit to and from the memory controller **420** and the memory devices **412**, instead of the memory controller **420** and the memory devices **412** directly driving each data bit to and from the memory controller **420** and the memory devices **412**. Specifically, as described in more detail below, one side of each data transmission circuit **416** of certain embodiments is operatively coupled to a memory device **412** in each rank (e.g., via data lines **452**), while the other side of the data transmission circuit **416** is operatively coupled to the corresponding data line **450** of the memory controller **420**.

To reduce the memory device loads seen by the system memory controller **420** (e.g., during a write operation), the data transmission circuit **416** of certain embodiments is advantageously configured to be recognized by the system memory controller **420** as a single memory load. This advantageous result is desirably achieved in certain embodiments by using the data transmission circuits **416** to electrically couple only the enabled memory devices **412** to the memory controller **420** (e.g., the one, two, or more memory

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 29

US 10,949,339 B2

15

devices **412** to which data is to be written) and to electrically isolate the other memory devices **412** from the memory controller **420** (e.g., the one, two, or more memory devices **412** to which data is not to be written). Therefore, during a write operation in which data is to be written to a single memory device **412** in a rank of the memory module **400**, each data bit from the system memory controller **420** sees a single load from the memory module **400**, presented by one of the data transmission circuits **416**, instead of concurrently seeing the loads of all of the four memory devices **412**A, **412**B, **412**C, **412**D to which the data transmission circuit **416** is operatively coupled. In the example of FIG. **3**A, during a write operation in which data is to be written to two memory device **412** in two ranks (e.g., memory devices **412**A and **412**C or memory devices **412**B and **412**D), each data bit from the system memory controller **420** sees a single load from the memory module **402**, which is presented by one of the data transmission circuits **416**, instead of concurrently seeing the loads of all of the four memory devices **412**A, **412**B, **412**C, **412**D to which the data transmission circuits **416** is operatively coupled. In comparison to the standard JEDEC four-rank DEVINI configuration (see FIG. **2**A and FIG. **2**B), the memory system **402** of certain embodiments may reduce the load on the system memory controller **420** by a factor of four.

FIG. **5** schematically illustrates an example data transmission circuit **416** compatible with certain embodiments described herein. In one embodiment, the data transmission circuits **416** includes control logic circuitry **502** used to control the various components of the data transmission circuit **416**, which may include one or more buffers, one or more switches, and one or more multiplexers among other components. The illustrated embodiment of FIG. **5** is 1-bit wide and switches a single data line **518** between the memory controller **420** and the memory devices **412**. In other embodiments, the data transmission circuit **416** may be multiple bits wide, for example, 8 bits, and switch a corresponding number of data lines **518**. In a multiple bit wide embodiment, the control logic circuitry **502** may be shared over the multiple bits.

As a part of isolating the memory devices **412** from the system memory controller **420**, in one embodiment, the data transmission circuits **416** allow for "driving" write data and "merging" read data. In the operational embodiment shown in FIG. **5**, in a write operation, data entering a data transmission circuit **416** via a data line **518** is driven onto two data paths, labeled path A and path B, preferably after passing through a write buffer **503**. The ranks of memory devices **412** are likewise divided into two groups with one group associated with path A and one group associated with path B. As shown in FIG. **3**A, rank A and rank C are in the first group, and rank B and rank D are in the second group. Accordingly, the memory devices **412**A, **412**C of rank A and rank C are connected to the data transmission circuits **416** by a first one of the two data paths, and the memory devices **412**B, **412**D of rank B and rank D are connected to the data transmission circuits **416** by a second one of the two data paths. In other embodiments, the driving of write data and merging of read data may be performed over more than two data paths.

As is known, Column Address Strobe (CAS) latency is a delay time which elapses between the moment the memory controller **420** informs the memory modules **402** to access a particular column in a selected rank or row and the moment the data for or from the particular column is on the output pins of the selected rank or row. The latency may be used by the memory module to control operation of the data trans-

16

mission circuits **416**. During the latency, address and control signals pass from the memory controller **420** to the control circuit **430** which produces controls sent to the control logic circuitry **502** (e.g., via lines **432**) which then controls operation of the components of the data transmission circuits **416**.

For a write operation, during the CAS latency, the control circuit **430**, in one embodiment, provides enable control signals to the control logic circuitry **502** of each data transmission circuit **416**, whereby the control logic circuitry **502** selects either path A or path B to direct the data. Accordingly, when the control logic circuitry **502** receives, for example, an "enable A" signal, a first tristate buffer **504** in path A is enabled and actively drives the data value on its output, while a second tristate buffer **506** in path B is disabled with its output in a high impedance condition. In this state, the data transmission circuit **416** allows the data to be directed along path A to a first terminal Y1, which is connected to and communicates only with the first group of the memory devices **412**, e.g., those in ranks A and C. Similarly, if an "enable B" signal is received, the first tristate **504** opens path A and the second tristate **506** closes path B, thus directing the data to a second terminal Y2, which is connected to and communicates only with the second group of the memory devices **412**, e.g., those in ranks B and D.

For a read operation, the data transmission circuit **416** operates as a multiplexing circuit. In the illustrated embodiment of FIG. **5**, for example, data signals read from the memory devices **412** of a rank are received at the first or second terminals Y1, Y2 of the data transmission circuit **416**. The data signals are fed to a multiplexer **508**, which selects one to route to its output. The control logic circuitry **502** generates a select signal to select the appropriate data signal, and the selected data signal is transmitted to the system memory controller **420** along a single data line **518**, preferably after passing through a read buffer **509**. The read buffer **509** may be a tristate buffer that is enabled by the control logic circuitry **502** during read operations. In another embodiment, the multiplexer **508** and the read buffer **509** may be combined in one component. In yet another embodiment, the multiplexer **508** and the read buffer **509** operations may be split over two tristate buffers, one to enable the value from Y1 to the data line **518** and another to enable the value from Y2 to the data line **518**.

The data transmission circuits **416** present a load on the data lines **518** from the write buffer **503** and the read buffer **509**. The write buffer **503** is comparable to an input buffer on one of the memory devices **412**, and the read buffer **509** is comparable to an output buffer on one of the memory devices **412**. Therefore, the data transmission circuits **416** present a load to the memory controller **420** that is substantially the same as the load that one of the memory devices **412** would present. Similarly, the data transmission circuits **416** present a load on the first and second terminals Y1, Y2 from the multiplexer **508** and the first tristate buffer **504** (on the first terminal Y1) and the second tristate buffer **506** (on the second terminal Y2). The multiplexer **508** is comparable in loading to an input buffer on the memory controller **420**, and the first and second tristate buffers **504**, **506** are each comparable to an output buffer on the memory controller **420**. Therefore, the data transmission circuits **416** present a load to the memory devices **412** that is substantially the same as the load that the memory controller **420** would present.

Additionally, the data transmission circuits **416** operate to ameliorate quality of the data signals passing between the memory controller **420** and the memory devices **412**. With-

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 30

US 10,949,339 B2

17 18

out the data transmission circuits **416**, waveforms of data signals may be substantially degraded or distorted from a desired shape between source and sink. For example, signal quality may be degraded by lossy transmission line characteristics, mismatch between characteristics of transmission line segments, signal crosstalk, or electrical noise. However, in the read direction, the read buffer **509** regenerates the signals from the memory devices **412** thereby restoring the desired signal waveform shapes. Similarly, in the write direction, the first tristate buffer **504** and the second tristate buffer **506** regenerate the signals from the memory controller **420** thereby restoring the desired signal waveform shapes.

Referring again to FIG. **3**A, when the memory controller **420** executes read or write operations, each specific operation is targeted to a specific one of the ranks A, B, C, and D of a specific memory module **402**. The data transmission circuit **416** on the specifically targeted one of the memory modules **402** functions as a bidirectional repeater/multiplexor, such that it drives the data signal when connecting from the system memory controller **420** to the memory devices **412**. The other data transmission circuits **416** on the remaining memory modules **402** are disabled for the specific operation. For example, the data signal entering on data line **518** entering into data transmission circuit **416** is driven to memory devices **412**A and **412**C or **412**B and **412**C depending on which memory devices are active and enabled. The data transmission circuit **416** then multiplexes the signal from the memory devices **412**A, **412**B, **412**C, **412**D to the system memory controller **420**. The data transmission circuits **416** may each control, for example, a nibble-wide data path or a bytewide-data path. As discussed above, the data transmission circuits **416** associated with each module **402** are operable to merge data read signals and to drive data write signals, enabling the proper data paths between the system memory controller **420** and the targeted or selected memory devices **412**. Thus, the memory controller **420**, when there are four four-rank memory modules, sees four load-reducing switching circuit loads, instead of sixteen memory device loads. The reduced load on the memory controller **420** enhances the performance and reduces the power requirements of the memory system, as compared with, for example, the conventional systems described above with reference to FIGS. **1**A, **1**B and **2**A-**2**D.

Operation of a memory module using the data transmission circuit **416** may be further understood with reference to FIG. **6**, an illustrative timing diagram of signals of the memory module **402**. The timing diagram includes first through eighth time periods **601-608**. When the memory devices **404** are synchronous memories, each of the time periods **601-608** may correspond to one clock cycle of the memory devices **404**.

The first, second, and third time periods **601-603** illustrate write operations with data passing from the memory controller **401** to the memory module **402**. The fourth time period **604** is a transition between the write operations and subsequent read operations. The timing diagram shows a write operation to the first group of memory devices **412**A, **412**C connected to the first terminals Y**1** of the data transmission circuits **416** and a write operation to the second group of memory devices **412**B, **412**D connected to the second terminals Y**2** of the data transmission circuits **416**. Recalling the CAS latency described above, each write operation extends over two time periods in a pipelined manner.

The write to the first group of memory devices **412**A, **412**C appears in the first time period **601** when system address and control signals **440** pass from the memory controller **420** to the module controller **430**. The control circuit **430** evaluates the address and control signals **440** to determine that data is to be written to memory devices **412**A, **412**C in the first group. During the second time period **602**, the control circuit **430** supplies control signals to the control logic circuitry **502** to enable the first tristate buffer **504** and to disable the second tristate buffer **506** and the read buffer **509**. Thus, during the second time period **602**, data bits pass from the data lines **518** to the first terminal Y**1** and on to the memory devices **412**A, **412**C.

Similarly, the write to the second group of memory devices **412**A, **412**C appears in the second time period **602** when system address and control signals **440** pass from the memory controller **420** to the control circuit **430**. The control circuit **430** evaluates the address and control signals **440** to determine that data is to be written to memory devices **412**B, **412**D in the second group. During the third time period **603**, the control circuit **430** supplies control signals to the control logic circuitry **502** to enable the second tristate buffer **506** and to disable the first tristate buffer **504** and the read buffer **509**. Thus, during the third time period **603**, data bits pass from the data lines **518** to the second terminal Y**2** and on to the memory devices **412**B, **412**D.

The fifth, sixth, seventh, and eighth time periods **605-608** illustrate read operations with data passing to the memory controller **420** from the memory module **402**. The timing diagram shows a read operation from the first group of memory devices **412**A, **412**C connected to the first terminals Y**1** of the data transmission circuits **416** and a read operation from the second group of memory devices **412**B, **412**D connected to the second terminals Y**2** of the data transmission circuits **416**. Recalling the CAS latency described above, each read operation extends over two time periods in a pipelined manner.

The read from the first group of memory devices **412**A, **412**C appears in the fifth time period **605** when system address and control signals **440** pass from the memory controller **420** to the control circuit **430**. The control circuit **430** evaluates the address and control signals **440** to determine that data is to be read from memory devices **412**A, **412**C in the first group. During the sixth time period **606**, the control circuit **430** supplies control signals to the control logic circuitry **502** to cause the multiplexer **58** to select data from the first terminal Y**1**, to enable the read buffer **509**, and to disable the first tristate buffer **504** and the second tristate buffer **506**. Thus, during the sixth time period **606**, data bits pass from the memory devices **412**A, **412**C via the first terminal Y**1** to data lines **518** and on to the memory controller **420**.

The read from the second group of memory devices **412**B, **412**D appears in the seventh time period **607** when system address and control signals **440** pass from the memory controller **420** to the control circuit **430**. The control circuit **430** evaluates the address and control signals **440** to determine that data is to be read from memory devices **412**B, **412**D in the second group. During the eighth time period **608**, the control circuit **430** supplies control signals to the control logic circuitry **502** to cause the multiplexer **508** to select data from the second terminal Y**2**, to enable the read buffer **509**, and to disable the first tristate buffer **504** and the second tristate buffer **506**. Thus, during the eighth time period **606**, data bits pass from the memory devices **412**B, **412**D via the second terminal Y**2** to data lines **518** and on to the memory controller **420**.

Various embodiments have been described above. Although this invention has been described with reference to

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 31

US 10,949,339 B2

19 20

these specific embodiments, the descriptions are intended to be illustrative of the invention and not intended to be limiting. Various modifications and applications may occur to those skilled in the art without departing from the true spirit and scope of the invention as defined in the appended claims.

We claim:

**1.** A N-bit-wide memory module mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, each set of data signal lines is a byte wide, the memory module comprising:

a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and configured to be releasably coupled to corresponding contacts of the memory socket;

double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks;

a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, wherein the module controller is configurable to receive from the memory controller via the address and control signal lines input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank of the multiple N-bit-wide ranks, and to output registered address and control signals in response to receiving the input address and control signals, wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation by receiving the N-bit-wide write data, wherein the module controller is further configurable to output module control signals in response to at least some of the input address and control signals; and

a plurality of byte-wise buffers coupled to the PCB and configured to receive the module control signals, wherein each respective byte-wise buffer of the plurality of byte-wise buffers has a first side configured to be operatively coupled to a respective set of data signal lines, a second side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and a byte-wise data path between the first side and the second side, wherein the each respective byte-wise buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines;

wherein the each respective byte-wise buffer further includes logic configurable to control the byte-wise data path in response to the module control signals, wherein the byte-wise data path is enabled for a first time period in accordance with a latency parameter to actively drive a respective byte-wise section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period; and

wherein the byte-wise data path includes first tristate buffers, and the logic in response to the module control signals is configured to enable the first tristate buffers to drive the respective byte-wise section of the N-bit wide write data to the respective module data lines during the first time period.

**2.** The memory module of claim **1**, wherein the DDR DRAM devices each has a bit width of 4 bits, wherein the at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks includes a respective pair of DDR DRAM devices, and wherein a first subset of the first tristate buffers is enabled for the first time period to drive a first nibble of the respective byte-wise section of the N-bit wide write data to a first subset of the respective module data lines coupled to a first one of the respective pair of DDR DRAM devices in each of at least some of the multiple N-bit-wide ranks, while a second subset of the first tristate buffers is enabled for the first time period to drive a second nibble of the respective byte-wise section of the N-bit wide write data to a second subset of the respective module data lines coupled to a second one of the respective pair of DDR DRAM devices in each of at least some of the multiple N-bit-wide ranks.

**3.** The memory module of claim **2**, wherein the byte-wise data path further includes a set of write buffers configurable to receive the respective byte-wise section of the N-bit wide write data from the respective set of data signal lines before the first tristate buffers regenerate and drive the respective byte-wise section of the N-bit wide data to the second side of the each respective byte-wise buffer.

**4.** The memory module of claim **3**, wherein each of the write buffers is comparable to an input buffer on one of the DDR DRAM devices such that the each respective byte-wise buffer presents to the memory controller one DDR DRAM device load during the memory operation.

**5.** The memory module of claim **1**, wherein the DDR DRAM devices each has a bit width of 8 bits, and wherein the at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks includes a single DDR DRAM device.

**6.** The memory module of claim **1**, wherein the logic is configurable to enable the first tristate buffers at a beginning of the first time period and to disable the first tristate buffers at an end of first time period.

**7.** The memory module of claim **1**, wherein the module controller is configured to use the module control signals to control timing of the first time period in accordance with the latency parameter.

**8.** The memory module of claim **1**, wherein the registered address and control signals include rank select signals, the rank select signals including one rank select signal for each of the multiple N-bit-wide ranks, and wherein the rank select signal received by the first N-bit-wide rank is different from the rank select signal received by any other N-bit-wide rank of the multiple N-bit-wide ranks.

**9.** The memory module of claim **8**, wherein each of the respective module data lines is configured to carry data from the memory controller to a corresponding memory device in each of the multiple N-bit-wide ranks during the memory write operation.

**10.** The memory module of claim **1**, wherein:

the module controller is further configurable to receive from the memory controller via the address and control signal lines additional input address and control signals for a memory read operation to read N-bit-wide read data from the memory controller from a second N-bit-wide rank of the multiple N-bit-wide ranks, and to output additional registered address and control signals in response to the additional input address and control signals;

the second N bit-wide rank is configurable to output the N bit-wide read data associated with the memory read

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 32

US 10,949,339 B2

operation in response to at least some of the additional registered address and control signals;

the module controller is further configurable to output additional module control signals in response to the additional input address and control signals;

the logic in the each respective byte-wise buffer is further configurable to control the byte-wise data path in response to the additional module control signals, wherein the byte-wise data path is enabled for a second time period to actively drive a respective byte-wise section of the N bit wide read data associated with the memory read operation from the second side to the first side during the second time period in response to the additional module control signals;

the byte-wise data path further includes second tristate buffers configurable to be enabled by the logic to drive the respective byte-wise section of the N-bit wide read data to the respective set of data signal lines during the second time period; and

the second tristate buffers are disabled during the first time period and the first tristate buffers are disabled during the second time period.

**11.** A N-bit-wide memory module mountable in a memory socket of a computer system and configured to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, the memory module comprising:

a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and are configured to be releasably coupled to corresponding contacts of the memory socket;

double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks, each N-bit-wide rank includes n DDR DRAM devices;

n/2 data transmission circuits mounted on the PCB, wherein each of the n/2 data transmission circuits is disposed on the PCB at respective positions corresponding to a respective set of data signal lines among the plurality of sets of data signal lines, and wherein the each of the n/2 data transmission circuits has a first side configured to be operatively coupled to the respective set of data signal lines, a second side that is operatively coupled to a respective pair of DDR DRAM devices in each of the multiple ranks via respective module data lines, and data paths between the first side and the second side;

a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, the module controller being configurable to receive from the memory controller via the address and control signal lines input address and control signals for a memory write operation to write N-bit-wide write data from the memory controller into a first N-bit-wide rank among the multiple N-bit-wide ranks, and to output registered address and control signals in response to the input address and control signal, wherein the registered address and control signals cause the first N-bit-wide rank to perform the memory write operation by receiving the N-bit-wide write data, wherein the module controller is further configurable to transmit module control signals to the n/2 data transmission circuits in response to the input address and control signals; and

wherein, in response to the module control signals, each respective data transmission circuit is configurable to

enable the data paths for a first time period in accordance with a latency parameter to actively drive a respective section of the N-bit wide write data associated with the memory operation from the first side to the second side during the first time period, wherein a first subsection of the respective section of the N-bit wide write data output from the second side of the each respective data transmission circuit is written into a first one of the respective pair of DDR DRAM devices in the first N-bit wide rank, while a second subsection of the respective section of the N-bit wide write data output from the second side of the each respective data transmission circuit is written into a second one of the respective pair of DDR DRAM devices in the first N-bit wide rank; and

wherein the data paths includes first tristate buffers, and the respective data transmission circuit in response to the module control signals is configured to enable a first subset of the first tristate buffers to drive the first subsection of the respective section of the N-bit wide write data to a first subset of the respective module data lines coupled to a first one of the respective pair of DDR DRAM devices in each of at least some of the multiple N-bit-wide ranks, and to enable a second subset of the first tristate buffers to drive a second subsection of the respective section of the N-bit wide write data to a second subset of the respective module data lines coupled to a second one of the respective pair of DDR DRAM devices in each of at least some of the multiple N-bit-wide ranks.

**12.** The memory module of claim **11**, wherein the registered address and control signals include a rank select signal for each of the multiple N-bit wide ranks, the rank select signal for the first N-bit wide rank is different from the rank select signal for any other N-bit wide rank of the multiple N-bit wide ranks.

**13.** The memory module of claim **12**, wherein each of the respective module data lines is configured to carry data from the memory controller to a corresponding memory device in each of the multiple N-bit-wide ranks during the memory operation.

**14.** The memory module of claim **13**, wherein the data paths further include a set of write buffers configurable to receive the respective section of the N-bit wide data from the respective set of data signal lines before the respective section of the N-bit wide write data is regenerated and driven by—the first tristate buffers to the respective module data lines.

**15.** The memory module of claim **14**, wherein each of the set of write buffers is comparable in loading to an input buffer on one of the DDR DRAM devices such that the each respective data transmission circuit presents to the memory controller one DDR DRAM device load during the memory write operation.

**16.** The memory module of claim **11**, wherein the module controller is configurable to use the module control signals to control timing of the first time period in accordance with the latency parameter.

**17.** The memory module of claim **11**, wherein the each respective data transmission circuit is configured to present to the memory controller one DDR DRAM device load on each of the respective set of data lines during the memory write operation.

**18.** The memory module of claim **11**, wherein:

the module controller is further configurable to receive from the memory controller via the address and control signal lines additional input address and control signals

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 33

US 10,949,339 B2

23                                                          24

for a subsequent memory read operation to read N bit-wick: read data from a second N-bit-wide rank of the multiple N-bit-wide ranks, and to output additional registered address and control signals in response to the additional input address and control signals;

the second N-bit-wide rank of the multiple N-bit-wide ranks is configurable to output the N-bit-wide read data associated with the memory read operation in response to at least some of the additional registered address and control signals;

the module controller is further configurable to output additional module control signals in response to the additional input address and control signals; and

the each respective data transmission circuit is further configurable to enable the data paths for a second time period to actively drive a respective section of the N-bit wide read data associated with the memory read operation from the second side to the first side during the second time period in response to the additional module control signals;

the data paths further includes second tristate buffers configurable to be enabled during the second time period to drive the respective section of the N-bit wide read data to the respective set of data signal lines; and

the each respective data transmission circuit is further configurable to keep the second tristate buffers disabled during the first time period and to keep the first tristate buffers disabled during the second time period.

**19**. A N-bit-wide memory module mountable in a memory socket of a computer system and configured to communicate with a memory controller of the computer system via address and control signal lines and N-bit wide data signal lines, the N-bit wide data signal lines including a plurality of sets of data signal lines, the memory module comprising:

a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and are configured to be releasably coupled to corresponding contacts of the memory socket;

double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and arranged in multiple N-bit-wide ranks;

a module controller coupled to the PCB and operatively coupled to the DDR DRAM devices, the module controller being configurable to receive from the memory controller via the address and control signal lines first address and control signals for a first memory operation to read first N-bit-wide data from a first N-bit-wide rank among the multiple ranks and to subsequently receive second address and control signals for a second memory operation to read second N-bit-wide data from a second N-bit-wide rank among the multiple ranks, the module controller being further configurable to output first registered address and control signals for the first memory operation in response to receiving the first address and control signals and to output second registered address and control signals for the second memory operation in response to receiving the second address and control signals, wherein the first registered address and control signals cause the first N-bit-wide rank to output the first N-bit-wide data associated with the first memory operation, and the second registered address and control signals cause the second N-bit-wide rank to output the second N-bit-wide data associated with the second memory operation, wherein the module controller is further configurable to output first module control signals for the first memory operation

in response to receiving the first address and control signals and to output second module control signals for the second memory operation in response to receiving the second address and control signals; and

a plurality of buffers coupled to the PCB and configured to receive the first module control signals and to receive the second module control signals, wherein each respective buffer of the plurality of buffers has a first side that is operatively coupled to a respective set of data signal lines, a second side that is operatively coupled to at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks via respective module data lines, and data paths between the first side and the second-side, wherein the each respective buffer is disposed on the PCB at a respective position corresponding to the respective set of the plurality of sets of data signal lines;

wherein the each respective buffer further includes logic configurable to enable the data paths for a first time period to actively drive a respective section of the first N-bit wide data associated with the first memory operation from the second side to the first side during the first time period, and to enable the data paths for a second time period subsequent to the first time period to actively drive a respective section of the second N-bit wide data associated with the second memory operation from the second side to the first side during the second time period, wherein the data paths are disabled after the first time period and before the second time period.

**20**. The memory module of claim **19**, wherein the DDR DRAM devices each has a bit width of 4 bits, wherein the at least one respective DDR DRAM device in each of the multiple N-bit-wide ranks includes a respective pair of DDR DRAM devices, and wherein a first nibble of the respective section of the first N bit wide data is output by a first one of the respective pair of DDR DRAM devices in the first N-bit wide rank, while a second nibble of the respective section of the first N bit wide data is output by a second one of the respective pair of DDR DRAM devices in the first N-bit wide rank.

**21**. The memory module of claim **19**, wherein the module controller is configured to use the first module control signals to control timing of the first time period in accordance with a latency parameter and to use the second module control signals to control timing of the second time period in accordance with the latency parameter.

**22**. The memory module of claim **19**, wherein the each respective buffer is configured to present to the at least one respective DDR DRAM device a load that is similar to that of the memory controller during the first or the second memory operation.

**23**. The memory module of claim **19**, wherein the first registered address and control signals include a first set of rank select signals corresponding to respective ones of the multiple N-bit wide ranks, the first set of rank select signals including a first rank select signal received by the first N-bit wide rank that is different from each of the other rank select signals in the first set of rank select signals, and wherein the second registered address and control signals include a second set of rank select signals corresponding to respective ones of the multiple N-bit wide ranks, the second set of rank select signals including a second rank select signal received by the second N-bit wide rank that is different from each of the other rank select signals in the second set of rank select signals.

**24**. The memory module of claim **23**, wherein each of the respective module data lines is configured to carry data from

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 34

US 10,949,339 B2

25

the memory controller to a corresponding memory device in each of the multiple N-bit-wide ranks.

25. The memory module of claim 19, wherein the data path includes at least a first input buffer and a second buffer for each bit of the respective section of the first or second N-bit wide data, wherein the first buffer is configured to receive the each bit from the second side of the each respective buffer, and the second buffer is configured to regenerate and drive the each bit to the first side of the each respective buffer, wherein at least the second buffer is a tristate buffer configurable to be enabled by the logic in response to the first or second module control signals, and wherein the first buffer is comparable to an output buffer on one of the DDR DRAM devices.

26. The memory module of claim 19, wherein the data paths include a set of input buffers configurable to receive the respective section of the first or second N-bit wide data from the respective set of module data lines and a set of output buffers configurable to regenerate and drive the respective section of the first or second N-bit wide data to the first side, wherein at least the set of output buffers are tristate buffers configurable to be enabled by the logic during the first time period in response to the first module control signals and during the second time period in response to the second module control signals, and wherein at least the set of output buffers are disabled by the logic after the first time period and before the second time period.

27. A memory module mountable in a memory socket of a computer system and configurable to communicate with a memory controller of the computer system via address and control signal lines and data signal lines, the data signal lines including a plurality of sets of data signal lines, each set of data signal lines is n bit wide, the memory module comprising:

a printed circuit board (PCB) having an edge connector comprising a plurality of electrical contacts which are positioned on an edge of the PCB and are configured to be releasably coupled to corresponding contacts of the memory socket;

a module controller coupled to the PCB and configurable to receive from the memory controller via the address and control signal lines first address and control signals for a memory write operation and to subsequently receive second address and control signals for a memory read operation, the module controller being further configurable to output first registered address and control signals and first module control signals for the memory write operation in response to the first address and control signals, and to output second registered address and control signals and second module control signals for the memory read operation in response to the second address and control signals; and

double data rate dynamic random access memory (DDR DRAM) devices coupled to the PCB and configurable to perform the memory write operation by receiving write data in response to the first registered address and control signals, and to perform the memory read operation by outputting read data in response to the second registered address and control signals; and

a plurality of n-bit-wide data buffers coupled to the PCB and configured to receive the first module control signals and subsequently the second module control signals, wherein each respective n-bit-wide data buffer of the plurality of n-bit-wide data buffers has a first side that is operatively coupled to a respective set of data signal lines, and a second side that is operatively

26

coupled to a respective n-bit-wide section of the DDR DRAM devices via respective module data lines, wherein:

the each respective n-bit-wide data buffer includes a first set of input buffers configurable to receive a respective n-bit section of the write data from the respective set of data signal lines, a first set of tristate buffers configurable to drive the respective n-bit section of the write data to the respective module data lines, a second set of input buffers configurable to receive a respective n-bit section of the read data from the respective module data lines, a second set of tristate buffers configurable to drive the respective n-bit section of the read data to the respective set of data signal lines, and logic configurable to control at least the first set of tristate buffers and the second set of tristate buffers;

the logic in response to the first module control signals is configured to enable the first set of tristate buffers for a first time period corresponding to the memory write operation to drive the respective n-bit section of the write data;

the logic in response to the second module control signals is configured to enable the second set of tristate buffers for a second time period corresponding to the memory read operation to drive the respective n-bit section of the read data;

the first set of tristate buffers are disabled during the second time period; and

the second set of tristate buffers are disabled during the first time period.

28. The memory module of claim 27, wherein the logic is configurable to keep the first set of tristate buffers and the second set of tristate buffers disabled when the memory module is not targeted by the memory controller for any memory operations.

29. The memory module of claim 27, wherein:

the DDR DRAM devices include a plurality of ranks of DDR DRAM devices;

the each respective n-bit-wide buffer is coupled to at least one respective DDR DRAM device in each of the plurality of ranks via the respective module data lines;

the first registered address and control signals cause one rank of DDR DRAM devices to perform the memory write operation by receiving the write data; and

the second registered address and control signals cause one rank of DDR DRAM devices to perform the memory read operation by outputting the read data.

30. The memory module of claim 29, wherein:

the at least one respective DDR DRAM device in each of the plurality of ranks includes a respective pair of DDR DRAM devices;

a first n/2-bit section of the respective n-bit section of the write_data is driven by a first subset of the first set of tristate buffers to a first one of the respective pair of DDR DRAM devices in the one rank of DDR DRAM devices performing the memory write operation;

a second n/2-bit section of the respective n-bit section of the write_data is driven by a second subset of the first set of tristate buffers to a second one of the respective pair of DDR DRAM devices in the one rank of DDR DRAM devices performing the memory write operation;

a first n/2-bit section of the respective n-bit section of the read_data is received by a first subset of the second set of input buffers from a first one of the respective pair

US 10,949,339 B2

27

28

of DDR DRAM devices in the one rank of DDR DRAM devices performing the memory read operation; and

a second n/2-bit section of the respective n-bit section of the read_data is received by a second subset of the second set of input buffers from the second one of the respective pair of DDR DRAM devices in the one rank of DDR DRAM devices performing the memory read operation.

**31**. The memory module of claim **29**, wherein:

the at least one respective DDR DRAM device in each of the plurality of ranks includes one respective DDR DRAM;

the respective n-bit section of the write_data is driven by the first set of tristate buffers to the respective DDR DRAM device in the one rank of DDR DRAM devices performing the memory write operation; and

the respective n-bit section of the read_data is received by the second set of input buffers from the respective DDR DRAM device in the one rank of DDR DRAM devices performing the memory read operation.

**32**. The memory module of claim **29**, wherein each of the respective module data lines is configured to carry data from the memory controller to a corresponding memory device in each of the plurality of ranks.

**33**. The memory module of claim **29**, wherein:

the module controller is further configurable to receive from the memory controller via the address and control signal lines third address and control signals for a

subsequent memory read operation, and to output third registered address and control signals and third module control signals for the subsequent memory read operation in response to receiving the third address and control signals;

the DDR DRAM devices are configurable to perform the subsequent memory read operation by outputting additional read data in response to the third registered address and control signals;

the subsequent memory read operation is performed by another rank of DDR DRAM devices that is different from the one rank of DDR DRAM devices performing the memory read operation;

the logic in response to the third module control signals enables the second set of tristate buffers for a third time period corresponding to the subsequent memory read operation to drive a respective n-bit section of the additional read data; and

the logic is further configurable to disable the second set of tristate buffers after the second time period and before the third time period.

**34**. The memory module of claim **27**, wherein the first set of tristate buffers are enabled for the first time period in accordance with a latency parameter.

**35**. The memory module of claim **27**, wherein the second set of tristate buffers are enabled for the second time period in accordance with a latency parameter.

* * * * *

Samsung Electronics Co., Ltd.
Exhibit 1001, p. 36

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2024-1707

**Short Case Caption:**  Netlist, Inc. v. Samsung Electronics Co., Ltd.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes  13,972  words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date:  10/15/2024

Signature:  /s/ Jeffrey A. Lamken

Name:  Jeffrey A. Lamken